UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NADA WOLFF CULVER, et al.,<br><br>Defendants. | Case No. 21-cv-07171-SI<br><br>**QUESTIONS FOR OCTOBER 12, 2023 HEARING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

The parties' cross-motions for summary judgment are scheduled for a hearing on October 12, 2023 at 1:00 p.m. by zoom. The Court directs the parties to be prepared to address the following questions:

1. Appendices D and G to the FEIS describe the process by which the BLM designated OHV routes on remand. Appendix G states,

    The BLM developed potential network-wide minimization and mitigation measures which varied based on alternative-specific objectives. The network-wide measures addressed area and route specific impacts, and were the first response to the 43 C.F.R. § 8342.1 criteria to minimize impacts in the designation of routes, whether or not additional route-specific measures would be applied. AR 101488.

    Appendix D states,

    The above criteria [43 C.F.R. § 8342.1] served as the basis for identifying resources to be considered and establishing thresholds to trigger measures to minimize impacts for each linear feature identified in the current inventory under each alternative. These thresholds are referred to throughout this Draft SEIS as "minimization triggers." AR 183581.

    Questions:

    a. How did the minimization and mitigation measures vary based on alternative-specific objectives? How could these measures vary depending on alternatives if the

    BLM has the obligation to apply the regulatory minimization criteria in designating routes?
  b. What does "the network-wide measures addressed area and route specific impacts and were the first response to the 43 C.F.R. § 8342.1 criteria" mean?
  c. What is a "minimization trigger" and how were the triggers applied? Are the "measures to minimize impacts" optional mitigation measures that may occur sometime in the future after the OHV routes have been designated and the route network has already been implemented, or were these mitigation measures imposed during the designation process?

2. What are the BLM's resources for enforcement and mitigation? One document from 2013 states that BLM has 7 rangers to patrol the approximately 3.2 million acres in the WEMO area. AR 14401.

3. The FWS's Biological Opinion states that between 2004 and 2014, there was an estimated loss of 66,668 desert tortoises (over half of the population) in the Western Mojave Recovery Unit, the area for the 2019 Route Network. FWS AR 5369. In reaching its "no jeopardy" conclusion, FWS stated that the proposed action would not result in the creation of new routes, and also cited the following measures: (1) Permitting stopping, parking, and camping only in disturbed areas would ensure that use of the route network does not lead to additional habitat loss; (2) The designation of transportation linear disturbances and their rehabilitation would decrease effects of a route network, such as the spread of non-native plants; and (3) the adaptive management program for implementing the route network would enable the Bureau to adapt its methods for remediating issues as they arise. FWS AR 5407. Questions:
  a. In light of the estimated loss of desert tortoises from 2004-2014, how should the Court view the fact that while the 2019 Route Network does not add new routes, that route network contains one of the largest route networks that the BLM considered and increases the mileage of routes in "areas of critical environmental concern" from 1,534.5 miles to 2,055.7 miles? FWS AR 5397.

      b. Have the limitations on stopping, parking and camping been implemented?

      c. What is a "transportation linear disturbance" and how does it differ from a "closed route"? What is the consequence of labeling something a a "transportation linear disturbance" versus a "closed route"? Has rehabilitation of TLDs begun?

      d. What is the "adaptive management program"?

4. Plaintiffs argue that the 2019 Route Network does not comply with the regulatory minimization criteria and that it also violates FLPMA's "unnecessary and undue" degradation standard. Assuming the "unnecessary and undue" degradation standard applies (which the parties dispute), how is the analysis different? If the Court found that BLM complied with the minimization criteria, would that also mean that there was no violation of the unnecessary and undue degradation standard?

5. Plan Amendment 1 ("PA-1") amends the CDCA Plan to replace language that capped OHV routes to their 1980 levels with language specifying that use will be "restricted to designated routes of travel." When the FWS evaluated the impact of PA-1, the FWS focused on the 3.1 million acres of the WEMO planning area, and not the entire CDCA. Plaintiffs contend that because PA-1 is a plan-level amendment, FWS was required to evaluate the impact of that amendment on the entire CDCA and defendants argue that it was appropriate to limit the review to the WEMO planning area because that is where the 2019 Route Network is. Does the plain language of PA-1 apply to the CDCA areas outside of the WEMO Planning Area? If so, when would the FWS evaluate the impact of lifting the 1980 route cap on the remainder of the CDCA?

Dated: October 6, 2023

                                                SUSAN ILLSTON
                                                United States District Judge