1
2
3
4                           UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    CENTER FOR BIOLOGICAL            Case No. 21-cv-07171-SI
     DIVERSITY, *et al*.,
8
                  Plaintiffs,         **ORDER RE: CROSS-MOTIONS FOR**
9                                     **SUMMARY JUDGMENT AND**
           v.                         **SETTING CASE MANAGEMENT**
10                                    **CONFERENCE FOR NOVEMBER 22,**
                                      **2024 AT 3:00 P.M.**
11   NADA WOLFF CULVER, *et al*.,
                                      Re: Dkt. Nos. 38, 39
     Defendants.
12
13
14        Now before the Court are the parties' cross-motions for summary judgment. After
15   consideration of the parties' briefing, oral argument and the administrative record in this case, the
16   Court GRANTS summary judgment in favor of plaintiffs on some claims and GRANTS summary
17   judgment in favor of defendants on other claims.   The Court schedules a case management
18   conference for November 22, 2024 at 3:00 p.m. to discuss further proceedings regarding the remedy.
19
20                                   **INTRODUCTION**
21        Plaintiffs are six environmental organizations who have sued the Bureau of Land
22   Management ("BLM"), the U.S. Fish and Wildlife Service ("FWS"), the Department of the Interior,
23   and several federal officials.   This lawsuit is the latest challenge to the BLM's approval of land
24   management plans that designate route networks for off-highway vehicles ("OHVs") in the Western
25   Mojave ("WEMO") Desert, northeast of the Los Angeles metropolitan area.   The WEMO is home
26   to a number of protected species and their habitat, including the threatened Mojave desert tortoise
27   and an endangered plant, the Lane Mountain milk-vetch.   The BLM manages the public lands in the
28   WEMO, and the FWS consults with the BLM and is required to evaluate BLM actions that affect

the desert tortoise and the Lane Mountain milk-vetch, as well as other sensitive species.

In 2006, plaintiffs filed suit in this Court, claiming that the BLM's approval of a 2006 OHV route network for the WEMO violated various environmental laws. This Court sustained some of the plaintiffs' challenges and found that the BLM's process for designating the 2006 OHV route network did not comply with federal regulations mandating that the agency consider and apply criteria to "minimize" impacts to wildlife and other environmental resources ("the minimization criteria"). *See generally Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.* ("*WEMO I*"), 746 F. Supp. 2d 1055 (N.D. Cal. 2009). On remand from this Court, the BLM designated a new OHV route network through the 2019 Western Mojave Route Network Project ("WMRNP" or "2019 Route Project"), and prepared a supplemental environmental impact statement regarding the project. In 2021, plaintiffs filed this lawsuit challenging the 2019 Route Project as unlawful under the Federal Land Policy and Management Act, the National Environmental Policy Act, and the Endangered Species Act. Plaintiffs assert numerous claims under these statutes, including that the 2019 Route Project does not comply with the regulatory minimization criteria.

The Court acknowledges the complexity of the issues in this case, as well as its long and complicated procedural history. The administrative record is voluminous, and the Court has no doubt that the agencies expended considerable effort on remand in an effort to comply with the Court's prior orders. The Court is also mindful that its standard of review is deferential, and that the Court will reverse an agency action as arbitrary and capricious only if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).

After careful consideration of the parties' arguments on cross-motions for summary judgment and the administrative record in this case, the Court concludes that plaintiffs are entitled to summary judgment on some of their claims under each of the three environmental statutes. As set forth in this order, the Court concludes that the BLM's 2019 OHV route network does not comply

United States District Court
Northern District of California

the minimization criteria because the record does not affirmatively demonstrate how the BLM designated OHV routes with the objective of minimizing impacts on the desert tortoise, the Lane Mountain milk-vetch, and other resources, and because the BLM improperly relied on optional, post-designation "mitigation" measures to satisfy its obligation to designate OHV routes that complied with the regulatory criteria. The Court also concludes that the FWS violated the Endangered Species Act in several respects, including by relying on the BLM's optional mitigation measures to avoid "jeopardy" to the desert tortoise and ignoring the best available science when reaching its "no jeopardy" findings. However, the Court also concludes that defendants are entitled to summary judgment on a number of claims, including most of plaintiffs' challenges under NEPA, as well as some of plaintiffs' claims under FLPMA and the ESA. In general, the Court finds that the BLM's supplemental environmental impact statement adequately discussed the environmental impacts of the 2019 Route Project, and that the agency explored a reasonable range of alternatives before adopting the 2019 Route Project.

## BACKGROUND

### I.  Statutory and Regulatory Framework

#### A.  Federal Land Policy and Management Act ("FLPMA")

"Congress enacted the FLPMA in 1976, thereby giving authority and direction to the BLM (through the Secretary of the Interior) concerning the use and management of certain federal lands." *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011). The FLPMA requires the BLM to "develop, maintain, and, when appropriate, revise land use plans," 43 U.S.C. § 1712(a), including developing "regulations and plans for the protection of public land areas of critical environmental concern." *Id*. § 1701(a)(11). The FLPMA "also requires the BLM to manage public lands in accordance with 'principles of multiple use and sustained yield,' 43 U.S.C. § 1732(a), while contemporaneously enforcing relevant environmental laws governing the use of public lands." *Gardner*, 638 F.3d at 1220. "Multiple use management entails balancing competing uses of land, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Theodore Roosevelt Conservation*

3

*P'ship v. Salazar*, 661 F.3d 66, 69 (D.C. Cir. 2011) (quoting 43 U.S.C. § 1702(c)).

Of particular relevance to this case are regulations addressing OHV use on public lands.  In 1979, the BLM promulgated 43 C.F.R. § 8342.1, which governs the designation of OHV routes within public lands under the agency's control.  *See* Off-Road Vehicles, Use of Public Lands, 44 Fed. Reg. 34,834 (June 15, 1979) (to be codified at 43 C.F.R. pt. 8340).  43 C.F.R. § 8342.1, titled "Designation Criteria," provides:

> The authorized officer shall designate all public lands as either open, limited, or closed to off-road vehicles.  All designations shall be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria:
>
> (a)  Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.
>
> (b) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.  Special attention will be given to protect endangered or threatened species and their habitats.
>
> (c) Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.
>
> (d) Areas and trails shall not be located in officially designated wilderness areas or primitive areas.  Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

These route designation criteria are referred to as the "minimization criteria."

## B.      The National Environmental Policy Act ("NEPA")

In the National Environmental Policy Act ("NEPA"), "Congress recognized the 'profound impact' of human activities, including 'resource exploitation,' on the environment and declared a national policy 'to create and maintain conditions under which man and nature can exist in productive harmony.'"  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting 42 U.S.C. § 4331(a)).  To further this policy, NEPA "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences."

*Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).

Under NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ"), federal agencies must prepare and circulate to the public a comprehensive environmental impact statement ("EIS") so that the environmental impacts can be considered and disclosed to the public during the decision-making process. In the EIS, the agency must identify direct, indirect, and cumulative impacts of the proposed action, consider alternative actions (including the alternative of taking no action) and their impacts, and identify all irreversible and irretrievable commitments of resources associated with the action. *See* 42 U.S.C. § 4332(2). An EIS serves two purposes:

> First, [i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (internal quotation marks and citations omitted).

### C.    The Endangered Species Act ("ESA")

"The Endangered Species Act ('ESA'), 16 U.S.C. §§ 1531–1544, evidences a congressional intent to afford endangered species the highest of priorities." *Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1033 (9th Cir. 2007). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id*. at 185.

> To accomplish this ambitious goal, the ESA sets forth a comprehensive program to limit harm to endangered species in the United States. Section 9 of the ESA establishes a blanket prohibition on the taking of any member of a listed endangered species. 16 U.S.C. § 1538(a)(1)(B). Section 7 affirmatively commands each federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). However, § 7 carves out limited exceptions for federal agencies and certain statutorily-defined "applicants," allowing those contemplating action that

may harm endangered species to obtain a limited exemption from penalties under certain circumstances.  16 U.S.C. § 1536(a)–(c), (o ); 50 C.F.R. § 402.02.

Under § 7, if any listed (or proposed listed) species may be present in the area of the proposed action, the federal agency (the "action agency") must conduct a biological assessment in order to determine the likely effect of its proposed action on the species. 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. § 402.02.  If the action agency concludes that its proposed action may affect listed species or critical habitat, it must initiate consultation with the FWS or the National Marine Fisheries Service.  *See* 50 C.F.R. § 402.14.

*Allen*, 476 F.3d at 1033.

After the agencies engage in the Section 7 consultation process, the consulting agency issues a biological opinion ("BiOp"), which includes a "detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(1)(iii).  The BiOp assesses the likelihood of the proposed action resulting in jeopardy to a listed species or destruction or adverse modification to designated critical habitat.  *See* 50 C.F.R. § 402.14(g)(4).  If an action is not likely to result in jeopardy, but is reasonably likely to result in "take"[1] incidental to the proposed action, then the consulting agency attaches an Incidental Take Statement ("ITS") to the BiOp.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i-v).  If the agency implements the project as proposed and complies with the terms and conditions ("T&Cs") of the ITS, ESA § 7(o)(2) exempts the specified level of take from the ESA § 9 take prohibition. 16 U.S.C. § 1536(o)(2).

## II.     Factual background

### A.     California Desert Conservation Area and the Western Mojave ("WEMO") Planning Area

As part of the FLPMA, Congress designated 25 million acres of southern California as the California Desert Conservation Area ("CDCA").  43 U.S.C. § 1781.  Congress declared,

(1) the California desert contains historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources that are uniquely located adjacent to an area of large population;

(2) the California desert environment is a total ecosystem that is extremely fragile, easily scarred, and slowly healed;

---

[1] "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. at § 1532(19).

(3) the California desert environment and its resources, including certain rare and endangered species of wildlife, plants, and fishes, and numerous archeological and historic sites, are seriously threatened by air pollution, inadequate Federal management authority, and pressures of increased use, particularly recreational use, which are certain to intensify because of the rapidly growing population of southern California;

(4) the use of all California desert resources can and should be provided for in a multiple use and sustained yield management plan[2] to conserve these resources for future generations, and to provide present and future use and enjoyment, particularly outdoor recreation uses, including the use, where appropriate, of off-road recreational vehicles;

(5) the Secretary has initiated a comprehensive planning process and established an interim management program for the public lands in the California desert; and

(6) to insure further study of the relationship of man and the California desert environment, preserve the unique and irreplaceable resources, including archeological values, and conserve the use of the economic resources of the California desert, the public must be provided more opportunity to participate in such planning and management, and additional management authority must be provided to the Secretary to facilitate effective implementation of such planning and management.

*Id.* § 1781(a)(1)-(6).  Congress directed the Secretary of the Interior to prepare and implement "a comprehensive, long-range plan for the management, use, development, and protection of the public lands within the California Desert Conservation Area," and that "[s]uch plan shall take into account the principles of multiple use and sustained yield in providing for resource use and development, including, but not limited to, maintenance of environmental quality, rights-of-way, and mineral development."  *Id.* § 1781(d).

In 1980, the Secretary of the Interior finalized the land management plan for the CDCA.  AR 18-201 (1980 CDCA Plan).  The Plan provides general, regional guidance for management of the CDCA "over at least a 20-year time period," AR 215 (1980 CDCA Plan, as amended), and it has been amended numerous times over the years.  The Plan contains twelve "plan elements" which provide "more specific application of the multiple-use class guidelines for a specific resource or activity about which the public has expressed significant concern."  *Id.* at AR 225.  The twelve plan elements are:  (1) Cultural Resources, (2) Native American Values, (3) Wildlife, (4) Vegetation, (5) Wilderness, (6) Wild Horses and Burros, (7) Livestock Grazing, (8) Recreation, (9) Motorized-Vehicle Access, (10) Geology-Energy Minerals, (11) Energy Production and Utility Corridors, and

---

[2] The original statute used the word "plant" but that was likely a typographical error.

1  (12) Land Tenure Adjustment.  *Id.*  For each element, the plan sets forth goals, actions (such as

2  management tools), and information about implementation.

3        The WEMO (also referred to as the "WEMO Planning Area") is located within the CDCA,

4  and covers 9.4 million acres in the western portion of the Mojave Desert in Southern California,

5  including parts of San Bernadino, Los Angeles, Riverside, Kern and Inyo counties.  AR 183522

6  (2019 ROD for West Mojave Road Network Project "WMRNP").  Approximately 3.1 million acres

7  within the WEMO Planning Area are public lands managed by the BLM.  *Id.*  In this case, the BLM

8  manages the WEMO Planning Area in accordance with the 2006 WEMO Plan, a resource

9  management plan, as amended by the 2019 WEMO Land Use Plan Amendment, which is the focus

10  of the current lawsuit.  The WEMO is home to diverse ecosystems and habitats and hundreds of

11  special status plants and animals, including the Mojave desert tortoise and the Lane Mountain milk-

12  vetch.

13

14      **B.**      **The Mojave Desert Tortoise and the Lane Mountain milk-vetch**

15        The desert tortoise (*Gopherus agassizii*) is a large, herbivorous reptile found in portions of

16  the western United States and Mexico.  Throughout most of the Mojave Desert, tortoises occur most

17  commonly on gently sloping terrain with sandy-gravel soils and low-growing shrubs.   AR 9892

18  (FWS, 2011 Revised Recovery Plan for the Mojave Population of the Desert Tortoise).  The desert

19  tortoise requires 13 to 20 years to reach sexual maturity, has low reproductive rates during a long

20  period of reproductive potential, and individual tortoises experience relatively high mortality early

21  in life.  *Id.* at AR 9893.

22        The FWS listed the Mojave population of the desert tortoise (all desert tortoises north and

23  west of the Colorado River in Arizona, Utah, Nevada, and California) as a threatened species in

24  1990.  *See* Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for

25  the Mojave Population of the Desert Tortoise, 55 Fed. Reg. 12,178 (Apr. 2, 1990) (to be codified at

26  50 C.F.R. pt. 17).  On February 8, 1994, FWS published a final designation of critical habitat for

27  the Mojave population of the desert tortoise.  Endangered and Threatened Wildlife and Plants;

28  Determination of Critical Habitat for the Mojave Population of the Desert Tortoise, 59 Fed. Reg.

5820 (Feb. 8, 1994) (to be codified at 50 C.F.R. pt. 17). In June 1994, FWS finalized the Recovery Plan for the Mojave population of the desert tortoise, which describes a strategy for recovering and delisting the desert tortoise. The 1994 Recovery Plan divided the range of the Mojave population of the desert tortoise into recovery units and recommended that land management agencies establish Desert Wildlife Management Areas ("DWMAs") throughout the recovery units, with at least one DWMA in each recovery unit. One of the recovery units is the West Mojave Recovery Unit, within the WEMO.[3] FWS issued a Revised Recovery Plan in 2011. AR 9884-10129. The 2011 Revised Recovery Plan identified the need for "conservation areas" to protect existing desert tortoise populations and habitat, including designated critical habitat and areas of critical environmental concern ("ACECs"). *Id.*; FWS 5359 (2019 BiOp).

Surveys have documented desert tortoise population declines in the WEMO Planning Area averaging 7.1 percent per year since 2004, *Id.* at FWS 5521. The FWS's 2019 BiOp states that between 2014 and 2024, the FWS estimated a loss of approximately 50% of the adult desert tortoises in the Western Mojave Recovery Unit, the area for the 2019 Route Network. *Id.* at FWS 5405-5406 (stating extrapolated numbers of adult desert tortoises in conservation areas, and showing decline from 17,645 tortoises in 2014 to 8,702 tortoises in 2024).

The Lane Mountain milk-vetch (*Astragalus jaegerianus*) ("LMMV") is a slender light grey or greenish perennial plant species in the pea family that is found only in the WEMO. *Id.* at FWS 5423-5425. The FWS listed the LMMV as endangered in 1998. 63 Fed. Reg. 53596. In 2011, the FWS designated critical habitat for the LMMV. 76 Fed. Reg. 29108.

## C.    WEMO and Prior Litigation

In 2006, plaintiffs filed suit in this Court against the BLM and FWS challenging a 2006 OHV route network that was designed through a "decision tree."[4]   In an order filed in 2009, the

---

[3] Originally six recovery units were established, but that was later reduced to five. AR 9893. The other four recovery units are Colorado Desert, Northeastern Mojave, Eastern Mojave, and Upper Virgin River. FWS 5373.

[4] The 2006 litigation was related, in part, to earlier litigation involving the desert tortoise and OHV use in the WEMO and other areas of the CDCA, including the Imperial Sand Dunes

9

Court granted summary judgment in favor of plaintiffs on their claims under FLPMA and NEPA, and granted summary judgment in favor of defendants on plaintiffs' ESA claims. *See WEMO I*, 746 F. Supp. 2d 1055 (N.D. Cal. 2009). As relevant here, the Court determined that:

(1)  The "decision tree" that the BLM used to designate OHV routes was flawed because it did not comply with the FLPMA minimization regulation at 43 C.F.R. § 8342.1;

(2)  Because the 2006 OHV route network authorized numerous OHV routes that were not in existence in 1980, the 2006 network was inconsistent with the CDCA Plan language that limited OHV routes to those existing in 1980;

(3)  The EIS was flawed because it did not contain a reasonable range of alternatives to the proposed action because all alternatives considered the same 5,098 mile OHV network, and because its discussion of the "no action" alternative was incomplete and internally inconsistent; and

(4)  The EIS contained an incomplete analysis of impacts on cultural resources, certain biological resources, and air quality.

The Court held further proceedings regarding the appropriate remedy, and in 2011 issued an order regarding the scope of the remand and injunctive relief. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. C 06-4884 SI, 2011 WL 337364 (N.D. Cal. Jan. 29, 2011) (hereafter referred to as the "Remedy Order").  The Court ordered a partial vacatur of the 2006 WEMO ROD, finding that certain protective measures in the ROD and the 2006 WEMO Plan should be retained (such as measures adopting new ACECs, the closure of certain OHV routes, etc.), but that the portions of the ROD adopting the 2006 OHV route network should be vacated.  The Court directed the BLM to (1) prepare a revised OHV route network that complied with the FLPMA minimization regulation, (2) conduct a supplemental NEPA analysis, and (3) address the CDCA Plan's restriction on post-1980 routes in a manner consistent with that Plan and applicable law. *Id.*

---

Recreation Area ("ISDRA").  *See e.g.*, *Am. Motorcycle Ass'n  Dist. 37 v. Norton.*, No. 03-2509 SI, No. 03-3807 SI, 2004 WL 1753366 (N.D. Cal. Aug. 3, 2004); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115 (N.D. Cal. 2006) ("*ISDRA I*"); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 35 F. Supp. 3d 1137 (N.D. Cal. 2014) ("*ISDRA II*"), *aff'd*, *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136 (9th Cir. 2016).

**D.     2019 West Mojave ("WEMO") Route Network Project**

The background leading up to the 2019 Route Network Project and 2019 ROD is complicated.  The BLM began its work on remand in September 2011, AR 195464-19566 (2011 Federal Register Notice of Intent), and published a Draft Supplemental Environmental Impact Statement ("DSEIS") in March 2015.  *See* AR 183522 (2019 ROD describing background of the 2019 Route Network Project).  However, the planning process was postponed due to the DRECP LUPA project.[5]  *Id.*

After the  process resumed, the BLM published a revised DSEIS in March 2018.  *Id.*  The BLM received "more than 9,000 comments of which more than 7,900 were route specific comments."  AR 183525.  The BLM also received 29 protest letters.  *Id.*  The BLM issued the Final Supplemental Environmental Impact Statement ("FSEIS") in April 2019.  AR 103320-103910 (FSEIS, not including Appendices).  While the BLM was resolving protests, Congress passed the John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act") in March 2019, which resulted in the creation of certain new land use designations and modifications to others.  AR 183523.  The BLM published an Errata to the FSEIS in August 2019, *see* AR 204951, explaining the changes to the FSEIS that resulted from the Dingell Act.  The BLM issued its ROD approving the FSEIS in October 2019.  AR 183521.

Most of plaintiffs' current claims relate to 2019 Route Network Project and the process that

---

[5] The CDCA Plan was amended in 2016 through the Desert Renewable Energy Conservation Plan Land Use Plan Amendment ("DRECP LUPA")  AR 103348 (2019 FSEIS, discussing DRECP LUPA).  The purpose of the DRECP LUPA was to amend the CDCA Plan and the Bakersfield and Bishop Resource Management Plans to provide a streamlined process for the development of renewable energy.  AR 19127-26688 (FEIS for DRECP LUPA); AR 34904-35013 (2016 DRECP LUPA ROD).  The DRECP LUPA addressed a larger land area than the WEMO Planning Area, but the WEMO Planning Area is entirely encompassed within the DRECP area.  AR 103348 (2019 FSEIS).  "To the extent specific land use decisions actually apply to resources and uses within the WEMO Planning Area, the land use planning decisions made in the DRECP apply to the entire WEMO Planning Area."  *Id.*

As relevant to the 2019 OHV route network, the DRECP LUPA modified boundaries of OHV Open Areas, changed land use designations by adding new areas of critical environmental concern ("ACECs"), modified existing conservation area boundaries, and updated and consolidated conservation decisions made in the 1980 CDCA Plan and subsequent amendments.  *Id.*; AR 34928 (2016 DRECP ROD).  The BLM used the DRECP LUPA process to formally identify lands within the CDCA to manage for conservation purposes, and those lands are identified as California Desert National Conservation Lands ("CDNCLs").  *Id.*  The BLM also created Conservation and Management Actions ("CMAs") to set goals and objectives for resource development, use, and conservation within designated areas.  AR 34914, 34929, 103348.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the BLM used to inventory the route network.  Because an understanding of this process is necessary to evaluate plaintiffs' claims, the Court describes this process in detail, drawing from the FSEIS and its appendices.

The FSEIS describes the inventory process as follows:

> As discussed in Section 1.1.3, the court requested that BLM clarify the source of the baseline route network used for identifying and evaluating the impacts of the Proposed Action, No Action Alternative, and other action alternatives.  The court agreed that the baseline should reflect the status quo, which is the actual route inventory existing on the ground.  The court directed that the discussion of the baseline should describe how it came to be different from the 1980 route network, but that it need not be defined as the 1980 network.

> To define the baseline, the BLM began two efforts in 2012 that would provide a comprehensive baseline of routes for the West Mojave Planning Area.  BLM updated the inventory of linear features[6] by tracing features from United States Department of Agriculture's (USDA) one meter-resolution National Agriculture Imagery Program (NAIP) aerial photography into the Ground Transportation Linear Features (GTLF) geospatial database.  The inventory consisted of the WEMO Plan network (as corrected), and other linear features that currently exist on the ground, to ensure that all existing features were included in the analysis.  Note that this inventory reflects the on-the-ground features existing as of 2013, and thus includes features that existed in 1980 or were developed after 1980 through BLM authorization.  In addition, the inventory includes features which resulted from unauthorized routes.  It also reflects substantial improvement in technical accuracy, as most of the "new" features are simply the result of better photography since 1980 and were not detected at that time.  The total mileage and acreage associated with the inventoried routes is presented in Table 2.1-2.

**Table 2.1-2. Baseline -Inventoried Linear Disturbance**

| Use Description | Mileage/Acreage |
|---|---|
| **Total Mileage** | 15,235 |
| **Direct Acreage**<br>**(based on 12 foot width of routes)** | 21,870.9 |

---

[6] A "linear feature" or "transportation linear feature" is a physical disturbance, planned and unplanned, on BLM-managed lands.  AR 183545.  "Transportation-related linear features include engineered roads and trails, as well as user-defined, non-engineered roads and trails, created as a result of the public use of the BLM-managed lands" and "[m]ay include roads and trails identified for closure or removal as well as those that make up the BLM's defined transportation system." *Id.*; *see also* AR 103368 (stating that the 2012-2013 route inventory identified approximately 15,000 miles of linear features and that "[t]hese linear features either are currently being used as OHV or primitive routes, or historically have been used for these purposes and still show some evidence of that use.").  A "transportation linear disturbance" or "TLD" is a closed route that is not part of the travel network.  AR 183580; AR 183538-183539 (glossary stating that the term "closed route" "is being supplanted by 'Translinear Disturbance'").

United States District Court
Northern District of California

Despite the language in the 1980 CDCA Plan that motorized vehicle use would be restricted to existing routes of travel, the resulting baseline includes many routes that were not part of the 1980 route network. The inventory is also larger than previous inventories associated with the 1985-1987/ACEC network, the 2001-2002 inventory, and the 2006 WEMO Plan. The inventory is approximately 7,235 miles more than the inventory for the 2006 WEMO Plan indicated, as identified in the 2006 WEMO Plan and discussed further in Chapter 3. As discussed in Section 1.1.4, the increase in the inventory over previous inventories is due to several factors, including public land acquisitions, improved aerial photography technology, improved electronic data storage, and correction of previous mapping errors based on magnetic alignment. BLM's sample review of the recent and earlier route inventories indicates that these routes have been in existence for some time.

The previously undocumented routes that were found in the linear disturbance inventory, but were not identified in any previous inventory were considered transportation linear disturbances in the No Action Alternative regardless of when those routes may have been physically created, unless they have been determined to be limited to authorized users, under current permit or other authorizing instrument. This is consistent with the requirement in the 2003 Decision Record for the Western Mojave Off Road Vehicle Designation Project that routes are considered transportation linear disturbances unless they are signed as "open". Based on these assumptions the miles of actual classification as transportation linear disturbances as a result of the 2006 WEMO Plan is substantially higher than the number that was actually reported in the 2006 WEMO Plan.

AR 103393-103394; *see also* AR 183579-183580 (Appendix D to DSEIS, providing more detailed description of inventory process).

After the BLM prepared the route inventory, the agency developed the alternative OHV route networks. Alternative 1 is the "no action" alternative, which the BLM stated was "the travel management and grazing strategy in effect." AR 103406. Table 2.2-2 in the FSEIS sets forth the goals and objectives for each action alternative for different issues such as "OHV Use," "Desert Resources," "Wildlife Conservation," "Range of Recreation opportunities," and so forth. AR 103401-103403. The FSEIS explains,

[T]o develop Alternatives 2, 3, 4, and 5, each linear feature in the inventory was considered within the context of the objectives of that alternative. Based on a review of the objectives and the coincidence of the route with potentially impacted resources, the route was either included in the designated travel network, or was considered to be a transportation linear disturbance. Sub-designations were also made, including identification of the route as "motorized" (OHV Open use or OHV Limited), "non-motorized", or "non-mechanized"; identification of specific modes of travel; and identification of minimizations including authorization/permit, administrative, or seasonal restrictions.

13

AR 103441.[7]  The alternatives considered ranged from an OHV route network of 4,912 miles of motorized OHV routes (Alternative 2) to 10,280 miles of motorized OHV routes (Alternative 3). AR 103440.  The BLM ultimately adopted Alternative 5, which originally consisted of 6,247 miles of motorized OHV routes, and as ultimately adopted consisted of 5,997 miles because the passage of the Dingell Act modified boundaries of Alternative 5.  AR 204966-204968.

Appendix D to the DSEIS explains the process for development of the route network alternatives. [8]   Section D.4 quotes the 43 C.F.R. § 8342.1 minimization criteria and states that "[t]he above criteria served as the basis for identifying resources to be considered and establishing thresholds to trigger measures to minimize impacts for each linear feature identified in the current inventory under each alternative."  AR 183581. These thresholds are referred to as "minimization triggers."  *Id.*  The FSEIS states,

> The minimization triggers used to initially identify the GIS[9] version of route designations involved the use of a series of resource-based criteria to determine potential need for minimization measures, and which would be most appropriate to accomplish the objectives of each alternative.

AR 103397.

The BLM developed an "Access database" that "was used to document the potential route

---

[7] Alternative 2's stated goal and objective with regard to "OHV Use," was to "provide for constrained OHV use in a manner that recognizes the overall sensitivity of the WEMO Planning Area, while addressing the needs of all desert users, private landowners, and public agencies," while Alternative 3's stated goal and objective for OHV use was to "provide for a wide range of dispersed motor-vehicle access opportunities . . . ."  AR 103401.  Regarding OHV use, alternatives 4 and 5 have the stated goal and objective of "provide for a wide range of dispersed recreation opportunities and diverse experiences in the WEMO Planning Area outside of designated OHV Open Areas . . . ."  *Id.*; *see also* AR 103437 ("The transportation network under Alternatives 4 and 5 focuses on maintaining access to serve existing transportation needs, provide additional recreational opportunities consistent with network and designated area goals, limit access in sensitive areas to minimize habitat, wildlife, cultural, and other resource impacts, address adopted disturbance caps, and minimize conflicts between users, consistent with regulatory criteria and policies for natural and cultural resource and multi-species conservation.").

[8] Section D.4 of Appendix D, titled "Process for Development of Route Network Alternatives," contains a detailed description of the overall process that BLM used to designate the route networks under the action alternatives.  AR 183580-183597.

[9] "GIS" stands for Geographical Information System, which is "a computer system that analyzes and displays geographically referenced information."  *See* https://www.usgs.gov/faqs/what-geographic-information-system-gis#:~:text=A%20Geographic%20Information%20System%20(GIS)%20is%20a%20computer%20system%20that,and%20displays%20geographically%20referenced%20information.

United States District Court
Northern District of California

segment baseline, the resources associated with each route segment," and "preliminary route network recommendations resulting from application of the minimization trigger analysis . . . for each preliminary alternative" and to "generate an analysis of impacts from the route network under each alternative to 43 C.F.R. 8342.1 criteria." AR 183587. BLM identified "specific resource values (e.g. riparian areas) that could adequately identify potential resource impacts based on the 43 C.F.R. 8342.1 minimization criteria associated with the network and with individual routes and linear features." *Id*.

BLM formulated "[m]inimization and mitigation measures fall[ing] into three categories: (1) network-wide; (2) site- or use-specific; and (3) designation changes to a route segment or entire route." AR 183588. The network-wide minimization measures consist of "minimization of T&E [threatened and endangered] impacts," "minimization of sensitive species impacts," "minimization of air quality impacts," "minimization of cultural impacts," "designation of newly developed routes (allowable ground disturbance limitations)," "designation of previously closed routes," "designation of newly identified routes," "stopping and parking minimization measures," "camping/second vehicle staging minimization measures," "designation of long-distance competitive race course corridors and 'C' routes," "designation parameters on OHV use of washes," and "OHV use of lakebeds (those specifically designated in CDCA Plan." AR 103397-103400. At the hearing on the parties' cross-motions, defense referred to the network-wide minimization measures as the broad "initial filter" to develop alternatives to minimize impacts, and he stated that these network-wide measures, on their own, would not satisfy the 43 C.F.R. § 8342.1 minimization criteria.

BLM staff also "identified resource minimization triggers that would identify the potential need for minimization and mitigation of resource impacts on the network and on each specific route segment (referred to herein as minimization measures), for criteria in 43 CFR 8342.1." AR 183588. These "resource minimization triggers" are found in Table 2.2-4 at AR 103404-103405, and that table includes the minimization criteria implicated, the resource (such as "desert washes" or "tortoise habitat"), and the "resource trigger for considering further mitigation or minimization" (such as "route parallel to and predominantly in a wash" for desert washes and "route within a DT ACEC or high density modelled habitat" for tortoise habitat). *Id.*; *see also* AR 101488-101495

(Appendix G, Table G-2 "Potential Resource-Specific Minimization and Mitigation Action(s) listing "Possible Minimization and Mitigation Action(s)" including items such as "construct wildlife bypass," "install fencing," "install access type restrictor," "install barriers," and "construct or install educational information such as signs."); AR 103700-103701 (listing "resource-specific minimization and mitigation measures" that "may be implemented"); AR 103725-103726 (similar list).  The "Potential Resource-Specific Minimization and Mitigation Actions" are discussed in greater detail *infra* in the analysis of plaintiffs' FLPMA claims.

For each of the nine travel management areas ("TMAs"), the Errata at Appendix G presents a "route table" identifying and describing each inventoried linear feature, its proposed designation, the applicable regulatory criteria, and a summary of the impact minimization strategy and supporting rationale.  AR 205084-214746.  The route tables for all nine TMAs total 9,663 pages.  In addition, BLM also produced "route reports" in excel format containing more specific information for each identified route or route segment, totaling 51,752 items.[10]

## LEGAL STANDARD

Claims under FLPMA, NEPA and the ESA are reviewed under the standards of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.  See Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).  "Because this is a record review case, we may direct that summary judgment be granted to either party based upon our de novo review of the administrative record."  *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006); *Riddell v. Unum Life Ins. Co. of Am.*, 457 F.3d 861, 864 (8th Cir. 2006) (explaining that judgment on the administrative record is "a form of summary judgment").  Under the APA, the court "shall" set aside any agency decision that the Court finds is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

"The arbitrary or capricious standard is a deferential standard of review under which the

---

[10] The route reports are found at row 2175 of the index to the September 28, 2022 Administrative Record Supplement at Dkt. No. 30.  The reports are not individually Bates stamped, but consist of individual excel files.

agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). "The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam). "The court's responsibility is narrower: to determine whether the [agency's plan] complied with the requirements of the APA." *Id.* The Court must determine whether the agency decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99 (1977). The Supreme Court has explained that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

## DISCUSSION

### I.  FLPMA

Plaintiffs challenge the 2019 Route Network Project on five interrelated grounds. First, plaintiffs contend that the BLM failed to designate OHV routes that comply with the minimization criteria contained in 43 C.F.R. § 8342.1. Second, plaintiffs argue that the 2019 Route Network violates FLPMA's unnecessary or undue degradation standard. Third, plaintiffs argue that the Plan Amendments adopted as part of the 2019 Route Network are inconsistent with FLPMA and the CDCA Plan. Fourth, plaintiffs claim that the BLM violated FLPMA's route inventory and data collection requirements. Fifth, plaintiffs contend that the BLM's air quality impacts analysis failed to demonstrate compliance with applicable State Implementation Plans, as required by FLPMA.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### A.      Minimization Criteria

#### 1.      Plaintiffs' Contentions

Plaintiffs argue that when the BLM designated the 2019 OHV route network, the BLM only "considered" FLPMA's minimization criteria but did not actually apply that criteria, and they argue that nowhere in the FSEIS, ROD, or Errata does BLM show how it designated routes to minimize impacts to wildlife, vegetation, and the other minimization criteria.  Plaintiffs argue that the BLM's failure to adequately apply the minimization criteria is demonstrated by the fact that the adopted alternative, Alternative 5 (as amended by the Errata), is one of the largest route networks BLM considered in the 2019 FSEIS and because its harmful impacts to desert resources outpace those of the other alternatives.  For example, plaintiffs note that Alternative 5 designated the greatest amount of OHV Open and Limited routes in critical habitat for the LMMV.  Plaintiffs also note that Alternative 5 designated more OHV route mileage impacting wildlife corridors than the three other action alternatives, and it "has a greater impact to wildlife corridors as compared to the No-Action Alternative, with 224 more miles" of routes.  AR 103723.[11]  Plaintiffs emphasize that Alternative 5 designated OHV routes in protected habitat for special status wildlife species such as Bendire's thrasher (a special-status bird), and the imperiled Mohave ground squirrel, and in designated critical habitat for the desert tortoise, *see* AR 103720-103724 (stating, *inter alia*, that Alternative 5 contains 2,218.8 miles of OHV Open and Limited routes and 26,860.8 acres of stopping/parking/camping in desert tortoise critical habitat), and they argue that there is no demonstration or explanation of how these OHV route designations comply with the regulatory criteria.  Plaintiffs also argue that the BLM improperly considered the minimization criteria within the context of BLM's stated objective for Alternative 5 of "maintaining access to serve existing transportation needs," AR 103437, and that in doing so, BLM "put a thumb on the scale" in favor of OHV use.

Plaintiffs contend that nowhere in the FSEIS, ROD, or Errata does BLM adequately describe

---

[11]  The FSEIS states that while Alternative 5 designates more OHV route mileage than the other alternatives, including the No-Action Alternative, Alternative 5 has "a reduced impact from stopping/parking/camping with 28,656.7 fewer acres than the No Action Alternative."  *Id*.

how it designated routes "specifically to minimize impacts."  Plaintiffs argue that the BLM's voluminous "route tables" in the spreadsheets only show that the BLM compared the locations of potentially affected resources to specific route locations, but that it is impossible to discern why decisions were made to allow OHV access on routes, or how those decisions comply with the minimization criteria.  Plaintiffs also argue that compliance with FLPMA's minimization criteria cannot be achieved by proposing optional "potential" unenforceable mitigation measures to address impacts.  *See* AR 101515 ("[r]esource-specific measures that may be applied"); AR 101488 (listing "potential" network-wide mitigation measures that "may be implemented on a case-by-case basis as determined appropriate"); AR 103633 (same); AR 103654 (same).  Plaintiffs also argue that given BLM's limited resources and documented ongoing enforcement difficulties across WEMO lands, an approach requiring significant and ongoing adaptive mitigations leaves any resulting impact reduction in doubt.[12]

## 2.    The BLM's Response

The BLM contends that the administrative record demonstrates that it properly applied the minimization criteria.  The BLM asserts that the 2019 Route Network Project "details tens of thousands of particularized decisions to close routes, limit types or locations of use, or implement control measures, all tied to the regulatory minimization criteria," and asserts that BLM has "shown its work in excruciating detail" in the 9,663 pages of route tables.  Defs' Mtn. at 11 (Dkt. No. 39).  The BLM largely did not respond to plaintiffs' specific criticisms of Alternative 5's environmental impacts, except to assert that plaintiffs simply disagree with BLM's individual route designations.

---

[12] For example, plaintiffs note the during the process of preparing the 2014 12-month finding on whether to downlist the endangered Lane Mountain milk vetch, FWS staff interviewed BLM staff about BLM's management activities as they related to that plant and its habitat.  AR 14395-14401 (notes from Mar. 6, 2013 meeting between BLM and FWS regarding the Lane Mountain milk vetch).  According to those notes, in 2005 BLM designated two conservation areas or ACECs for the plant, the Coolgardie Mesa Conservation Area and the West Paradise Conservation Area.  *Id.* In response to questions about BLM's monitoring of those areas, BLM stated that it "does not routinely monitor OHV use" and had "recently proposed to visit non-open routes every 4 years" and that at the time, "BLM ha[d] seven rangers that patrol 3.2 million acres."  AR 14400-14401.

The record does not contain information on how many BLM employees are currently working in the WEMO area.  At the October 2023 hearing on this matter, defense counsel stated that 18 positions had been authorized, and that 16 or 17 employees were employed at the time.

1    The BLM did respond to one of the three specific routes that plaintiffs cited as an example, WEMO

2    ID 104952, stating:

3        For example, AR 208409 (Route Table TMA 4) describes WEMO ID 104952, a
         roughly 1.48-mile primitive road that has been designated for motorized use through
4        application of the minimization criteria.  Route report 104952 identifies the specific
         attributes of WEMO ID 104952 for each of the triggers, indicating that this route is
5        within special-status plant species habitat, passes within 100 feet of cultural
         resources, passes through an identified wildlife corridor, and ends at private property.
6        These documents demonstrate how BLM applied the minimization criteria to every
         route, even undesignated routes, within the Project area.
7
     *Id*.  At the hearing on this matter, counsel for the BLM stated that the route tables and reports

8    provide an "insight" into the process that BLM used and that the Court can look at these materials

9    and "infer" why BLM closed certain routes and designated others as open to motorized use.

10       The BLM did not address plaintiffs' arguments about BLM's reliance on optional, post-

11   designation mitigation measures, nor did the BLM dispute that those measures are in fact optional,

12   except to state that designating a route as a "transportation linear disturbance" is not an

13   unenforceable and voluntary mitigation strategy, but rather is a concrete, definitive step to avoid

14   further impacts.  In sum, BLM emphasizes (1) the fact that the 2019 Project designated thousands

15   of routes as "translinear disturbances," thus closing those routes and removing them from the travel

16   network, and (2) the massive amount of work that BLM conducted on remand in inventorying the

17   route network and creating the route reports and route tables, which BLM contends demonstrates

18   that it both considered and applied the minimization criteria.

19

20       **3.     Analysis**

21       The Ninth Circuit has instructed that in order to comply with the minimization criteria, an

22   agency cannot merely "consider" that criteria when designating OHV routes, but is under an

23   "affirmative obligation" to "apply the data it has compiled to show how it designed the areas [open

24   to OHV use]" with the objective of minimizing damage to resources, wildlife, and conflicts with

25   other users.  *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015).

26   In *WildEarth Guardians*, the Ninth Circuit evaluated a challenge to the Forest Service's decision to

27   designate over two million acres of public land in the Beaverhead-Deerlodge National Forest in

28

United States District Court
Northern District of California

Montana for use by winter motorized vehicles. *Id.* at 922. As compared to prior forest plans, the Revised Forest Plan at issue decreased the area open to snowmobiles, but the court noted that this did not necessarily result in a reduction of impacts because snowmobile use had increased sharply since the 1980s and advances in technology allowed snowmobiles to reach previously inaccessible areas. *Id.* at 923. The court held that the Forest Service failed to comply with the minimization requirements contained in a Travel Management Rule[13] because the record showed that the agency did not consider or document application of minimization criteria.

Specifically, the Ninth Circuit rejected the Forest Service's reliance on "generalized statements in the EIS that it designed snowmobile allocations to 'protect low elevation winter range for deer, elk, and moose; . . . [to] protect [ ] high elevation secure habitat for mountain goat and wolverine; [ ] and to provide quiet winter recreation opportunities in locations people can drive to' as evidence that it considered the minimization criteria." *Id.* at 930. The court held that "reference to plan-wide data and general decision-making principles is inadequate under the TMR" and that "the Forest Service must provide a more granular minimization analysis" and "document how it evaluated and applied the data on an area-by-area basis with the objective of minimizing impacts." *Id.* at 930-31.

In so holding, the Ninth Circuit explicitly "agree[d] with the approach" of four district courts, including this Court's 2009 summary judgment opinion. *Id.* at 932. The Ninth Circuit stated,

> Moreover, as various district courts have held, mere consideration of the TMR's
> minimization criteria is not sufficient to comply with the regulation. In *Idaho*
> *Conservation League v. Guzman*, for example, the district court determined that,

---

[13] The Travel Management Rule ("TMR") requires that,

> [I]n designating National Forest System trails and areas on National Forest System
> lands, the responsible official shall consider effects on the following, with the
> objective of minimizing: (1) Damage to soil, watershed, vegetation, and other forest
> resources; (2) Harassment of wildlife and significant disruption of wildlife habitats;
> (3) Conflicts between motor vehicle use and existing or proposed recreational uses
> of National Forest System lands or neighboring Federal lands.

*Id.* at 929-30 (quoting TMR). The Ninth Circuit noted that "[a]lthough there are some small distinctions between the Bureau of Land Management's and the Forest Service's minimization criteria, they are largely analogous. *Compare* 36 C.F.R. § 212.55(b) with 43 C.F.R. § 8342.1." *Id.* at 932 n.12.

United States District Court
Northern District of California

United States District Court
Northern District of California

although matrices included in an EIS showed that the Forest Service "met its duty to consider the minimization criteria," 766 F.Supp.2d 1056, 1071 (D. Idaho 2011), the Forest Service nonetheless failed to comply with the TMR because it did not include a "description of how the selected routes were designed 'with the objective of minimizing' impacts," id. at 1073 (quoting 36 C.F.R. § 212.55(b)). As a result, there was "no way to know how or if the Forest Service used [the information in the matrices] to select routes with the objective of minimizing impacts." *Id*. at 1072. As another district court explained, the Forest Service is under an "affirmative obligation . . . to actually show that it aimed to minimize environmental damage when designating trails and areas." *Cent. Sierra Envtl. Res. Ctr. v. U.S. Forest Serv*., 916 F.Supp.2d 1078, 1096 (E.D. Cal.2 013); *see also Defenders of Wildlife v. Salazar*, 877 F.Supp.2d 1271, 1304 (M.D. Fla. 2012).

*Center for Biological Diversity v. United States Bureau of Land Management*, 746 F. Supp. 2d 1055, 1079–81 (N.D. Cal. 2009) similarly noted that, "'[m]inimize'... does not refer to the number of routes, nor their overall mileage ... [but] to the effects of route designations, i.e. the [Bureau of Land Management] is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses." *Id*. (quoting 43 C.F.R. § 8342.1(a)-(c)).

*Id.*

Because the Ninth Circuit explicitly "agree[d] with the approach" of the district courts and quoted those opinions, the Court examines those cases for guidance regarding what an agency must do in order to demonstrate compliance with the minimization criteria. In *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056 (D. Idaho 2011), the court held that the Forest Service "considered" the minimization criteria because the administrative record showed that the Forest Service had "gathered information consistent with the minimization criteria," – 28 "Matrix Criteria" – that did not mirror the minimization criteria but were substantially equivalent. *Id*. at 1071-72. However, the court held that the "missing piece" was "some demonstration that the minimization criteria were then implemented into the decision process consistent with the objective of minimizing their impacts." *Id*. at 1072.

The Route Designation Matrices are not evidence of the implementation of such criteria. (AR 020313–020452). Instead, they contain a large number of subject boxes with a variety of different checkmarks and other notations recorded. There is no way to know how or if the Forest Service used this information to select routes with the objective of minimizing impacts. Without some explanation for how this information was implemented, the Forest Service has failed to meet the regulatory requirements contained in the 2005 Travel Management Rule.

In an attempt to connect the dots, the Forest Service points to certain conclusory statements in the record. For example, the Forest Service explained that "[i]ndicators were chosen so that the Deciding Official could evaluate the differences between alternatives and determine which alternatives have the least potential impact to forest resources." (AR 046727). In addition, the ROD states that the Deciding Official was

"fully satisfied that all practicable means to avoid or minimize environmental harm from the Selected Alternative have been adopted through the implementation of route designation criteria and project design features." (AR 047080).

Still, there is nothing in the record identifying how this happened and on what basis the conclusions were reached. Without some description of how the selected routes were designed "with the objective of minimizing" impacts, the Court cannot assess whether there is a "rational connection between the facts found and the decision made." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv*., 378 F.3d at 1065.

*Id*. at 1072-73. The *Guzman* court found that "[s]imply listing the criteria and noting that they were considered is not sufficient to meet this standard. Instead, the Forest Service must *explain* how the minimization criteria were applied in the route designation decisions." *Id*. at 1074 (emphasis added).

Similarly, in *Central Sierra Environmental Resource Center v. U.S. Forest Service*, 916 F. Supp. 2d 1078 (E.D. Cal. 2013), the court found that although the Forest Service gathered data relevant to the minimization criteria, identified "mitigations/requirements" that would be needed for each route, and the Record of Decision stated that the agency had applied the minimization criteria, the court concluded that the agency "ha[d] not demonstrated the link between the Forest Service's assessments of the mitigation required for each trail considered for the SMTMD and any analysis showing the Forest Service actually used this data to minimize environmental impacts." *Id*. at 1096-98. The court reached that conclusion based in part on the plaintiffs' showing that the Forest Service designated OHV routes that were, in fact, causing environmental harm. *Id*. at 1097. In the fourth district court case cited by the Ninth Circuit, *Defenders of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1286-90, 1304 (M.D. Fla. 2012), the court held that the National Park Service "failed to cite to substantive evidence in the record which demonstrates that the decision to reopen trails was made with the objective of minimizing impacts," and the record showed *inter alia* that the agency gathered information about resources, including endangered and threatened species, but did not perform promised environmental assessments.

Since the Ninth Circuit's decision in *WildEarth Guardians*, several district courts have analyzed whether the Forest Service complied with the minimization criteria when designating OHV routes. *See Friends of the Clearwater v. Probert*, Case No. 3:21-cv-00056-BLW, 2022 WL 768836, at *9-11 (D. Idaho Mar. 12, 2022) (holding Forest Service had satisfied the minimization criteria with regard to OHV route designation as it related to elk and its habitat where agency's Record of

Decision discussed how the OHV designation would affect the elk's habitat and explained why, in light of closures of other areas to OHVs, the OHV designation would not impair the effectiveness of the elk habitat, but that ROD did not demonstrate compliance with minimization criteria as to other wildlife, soil, watershed, vegetation, or other forest resources where ROD stated criteria was considered but there was no demonstration as to how data was evaluated and applied with objective of minimizing impacts); *see also WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1249-50 (D. Or. 2019) (holding Forest Service failed to comply with TMR minimization criteria because "[h]ow the routes comply with the minimization criteria, specifically as to how they are located and designated to minimize these effects, is not explained"; "The Forest Service did not properly analyze how trail designation would minimize impacts to special landscapes, such as scablands and old growth management areas, and to wildlife and wildlife habitats, particularly with regard to elk calving sites and wallows; and "general statements about attempts to comply with the minimization criteria . . . fail to demonstrate, at the 'granular' area-and-trail level, how routes were designated or located, how the minimization criteria were evaluated and implemented, how data was applied, or how impacts were minimized.").

Applying the *WildEarth Guardians* standard, the Court concludes that while the administrative record shows that BLM gathered data relevant to the minimization criteria and considered that criteria in its route designation process, BLM has not affirmatively documented or explained *how* the agency used that data to designate OHV routes with the objective of minimizing impacts on wildlife and other resources. The Court does not reach this conclusion lightly, mindful of the significant amount of work that the BLM undertook on remand, as well as the deferential standard review under the APA. The Court has carefully examined the voluminous administrative record to determine whether the BLM's description of the OHV route designation process in conjunction with the route tables and route reports show how it applied the minimization criteria when designating the route network with the objective of minimizing the impacts listed in 43 C.F.R. § 8342.1. Although the FSEIS and Appendices D and G contain detailed descriptions of the route designation process and the information gathered, there is no documentation or explanation anywhere of how the ultimate OHV route designations comply with the minimization criteria. The

1   record shows that the BLM gathered information relevant to the minimization criteria, used

2   "network-wide minimization measures" or "triggers" to create the alternatives, and then conducted

3   a further review "to identify the potential need for minimization and mitigation of resource impacts."

4   At the hearing in response to questioning from the Court, defense counsel stated that the "network-

5   wide minimization measures" did not, on their own, demonstrate compliance with 43 C.F.R.

6   § 8342.1.  Thus, if the agency complied with the minimization criteria, it was at the next stage of

7   the route designation process.  However, there is no discussion of how the agency actually went

8   about that review and determined that the OHV routes that it designated minimized impacts to

9   wildlife and other resources.

10      Defendants contend that that the voluminous route tables and route reports demonstrate that

11   the BLM properly applied the minimization criteria on a route by route basis.  The Court has

12   examined the route tables and corresponding route reports at great length, and it is true that by

13   reviewing that material, one can more or less "infer backwards" to determine why a route was

14   designated as a translinear disturbance (closed).  *See, e.g.*, WEMO ID 874 (designated as TLD; route

15   is "within a DT ACEC or high density modelled habitat," passes through an identified wildlife

16   corridor, and is within special-status plant species habitat); AR 209301 & Corresponding Route

17   Report.  And the route reports do reflect that thousands of miles of routes were designated as TLDs

18   and therefore closed to motorized access.

19      However, as in *Guzman* and *Central Sierra Environmental Resource Center*, while the route

20   reports (and the FSEIS) "list[] the criteria and not[e] that they were considered," there is no

21   explanation of "how the minimization criteria were applied in the route designation decisions" or

22   "analysis showing the [BLM] actually used this data to minimize environmental impacts."

23   *Guzman*, 766 F. Supp. 2d at 1074; *Cent. Sierra Env't. Res. Ctr.*, 916 F. Supp. 2d at 1096-98.

24   Although the route reports are voluminous and document the minimization criteria implicated by

25   each route, the record does not contain any analysis – either on a route by route basis, or at a higher

26   level – showing how the route designations for OHV motorized use are consistent with the objective

27   of minimizing impacts to the various resources listed in the minimization criteria.

28      For example, while the FSEIS states that "Alternative 5 has the greatest amount of OHV

25

Open and OHV Limited routes at 25.2 miles in Lane Mountain milk vetch designated Critical Habitat as compared to the other alternatives," AR 103699, there is no corresponding statement or explanation of how the designation of these OHV routes in LMMV critical habitat is consistent with the objective of minimizing impacts to that endangered plant.  This is concerning in light of the FWS's 2014 decision not to downlist the plant from endangered to threatened, in which the FWS stated,

> OHV activity is present throughout the range of Lane Mountain milk-vetch outside the National Training Center at Fort Irwin (see Service 2014, Off-highway Vehicle (OHV) Activities).  This includes all of the Coolgardie Mesa population and the portion of the Paradise Valley population that occurs on BLM lands, including those areas within the ACECs. OHV activity and roads cause habitat loss, fragmentation, and degradation.  In the West Mojave Plan, the BLM identified minimizing vehicle routes of travel, fencing, education, and enforcement as conservation measures to help the Lane Mountain milk-vetch and its habitat.  However, activities such as fencing, signing, and closing areas have had limited success in managing access or controlling new unauthorized routes.  In addition, BLM is also obligated to provide access to mining claims and mines (BLM could revisit route designations if withdrawal of lands within the ACECs from mineral entry is completed).  Our review of BLM data identified an increase in OHV routes in the Coolgardie Mesa area from over 67 miles (mi) (108 kilometers (km)) in 2005 to 134 mi (216 km) in 2012.  OHV activities include not only development of roads but also establishment of camping and staging areas in previously undisturbed areas.  OHV use in undisturbed areas not only destroys Lane Mountain milk-vetch plants or their nurse shrubs directly, it also disturbs the soil surface leading to reduced moisture-holding capabilities and provides a means for nonnative invasive plant species, such as annual grasses (e.g. Bromus sp.), Marrubium vulgare (horehound), and Brassica sp. (mustard) to invade otherwise remote, intact habitats.  These impacts contribute to changes in vegetation type; increases in fire frequency, size, and intensity; fragmentation and reduction/loss of connectivity; reduced gene exchange; and reduced population persistence.  With ongoing reports of increases in OHV activity and creation of new roads, this increased use would continue to expand the area of impact to Lane Mountain milk-vetch plants and habitat in the Coolgardie Mesa and West Paradise Conservation Areas.
>
> Based on the best available information, including the discussion contained in the Species Report, we conclude that OHV use is ongoing and has increased from past levels.  The impacts of OHV use currently threaten the destruction, modification, or curtailment of the habitat or range of Lane Mountain milk-vetch.

Endangered and Threatened Wildlife and Plants; 12-Month Finding on a Petition To Reclassify Astragalus Jaegerianus as a Threatened Species, 79 Fed. Reg. 25,084 at 25,087-25,088 (May 2, 2014) (to be codified at 50 C.F.R. Part 17).[14]  Although the administrative record contains the FWS's

---

[14] The 2014 status review was based up a 132 page species report by FWS in March 2014, U.S. Fish & Wildlife Serv., Special Report for Lane Mountain Milk-vetch (Astragalus jaegerianus) (Mar. 2014), found at http://www.regulations.gov at Docket No. FWS-R8-ES-2014-0011.

United States District Court
Northern District of California

press release announcing the 2014 decision not to downlist the Lane Mountain milk vetch, AR 15955-15956, nowhere in the DSEIS or FSEIS does the BLM address these findings or explain how Alternative 5's designation of OHV routes in Lane Mountain milk vetch critical habitat is consistent with minimizing impacts to that species.[15]  To the contrary, the FSEIS acknowledges that "the Lane Mountain milkvetch ACEC in Coolgardie Mesa and West Paradise, similarly contain resources that are highly sensitive to vehicle damage" and "[t]he listed plants . . . could be subject to direct impacts by crushing from use of the camping, parking, and stopping areas."  AR FSEIS 103705.

With regard to this particular example, defendants respond by noting that Alternative 5 only designated slightly more OHV routes in Lane Mountain milk vetch critical habitat than the other alternatives.  Defs' Mtn. at 17-18.  While this may be true, that does not mean that the designation of 25.2 miles of OHV routes in the plant's designated critical habitat is consistent with the regulatory requirement to designate OHV routes with the objective of "minimiz[ing] damage to . . . vegetation."  43 C.F.R. § 8342.1(a).  The Court cannot conclude that the OHV route designations in LMMV critical habitat comply with the minimization criteria without some affirmative explanation as to how the minimization criteria were applied with regard to the LMMV.  *Cf. Friends of the Clearwater*, 2022 WL 786836, at *10 (holding that the Forest Service had satisfied minimization criteria with regard to elk and its habitat where agency's ROD discussed how the OHV designation would affect the elk's habitat and explaining why, in light of closures of other areas to OHVs, the OHV designation would not impair the effectiveness of the elk habitat).

The same is true for other types of impacts on the environment and wildlife.  As another example, Alternative 5 designates 2,218.8 miles of OHV Open and Limited routes in desert tortoise critical habitat,[16] with 26,860.8 acres for stopping/parking/camping, and over 2,000 miles of OHV Open and Limited routes in four desert tortoise ACECs.  AR 103721 (Table 4.4-30 "Alternative 5

---

[15]  The record reflects that when BLM staff were alerted to the 2014 findings, BLM stated that "[t]his needs to go to the contractor for incorporation into the LMMV discussions for WEMO," AR 15955, but there is no explicit recognition or discussion of these findings in the FSEIS.

[16]  The FSEIS states that there are approximately 979,153 acres of designated desert tortoise critical habitat within the planning area.  AR 103505.

1    – Acreage and Mileage of Routes Within Range or Other Protected Habitat for Special Status

2    Wildlife Species").  There is no discussion in the FSEIS about how designating thousands of miles

3    of OHV Open and Limited routes in desert tortoise critical habitat and ACECs aligns with the

4    objective of minimizing impacts to this threatened species.   Chapter 4 of the FSEIS discusses

5    Environmental Consequences and contains a section on the desert tortoise, but that section does not

6    explain how the minimization criteria were applied with respect to the desert tortoise, and instead

7    that section generally summarizes the negative direct and indirect impacts of OHVs on desert

8    tortoises.  That section states:

9    *Desert Tortoise*

10   Designating and implementing an OHV Open and OHV Limited network in DT
     ACECs that is supported by land use laws and compatible with tortoise recovery is
11   an important management action that could be implemented to minimize human
     impacts to desert tortoise.  The goal is to designate and implement a route network
12   throughout DT ACECs that would provide for public access, authorized uses, and
     the following desired results:
13
14           • Fewer losses of tortoises to crushing, poaching, pet collection, intentional
     vandalism, and similar activities requiring vehicle access;
15
             • Less degradation and loss of occupied designated critical habitat (first
16   priority), unoccupied suitable habitat (second priority), and future climate refugia
     (third priority);
17
             • Maintaining large blocks of unfragmented habitat; and
18
             • Prevent use of transportation linear disturbances which will allow for
19   natural and assisted habitat restoration.

20   OHV use can have both direct and indirect effects on desert tortoises and their
     habitat.  The primary direct effect is vehicles striking desert tortoises while driving
21   on routes of travel.  As is usually the case, hatchling desert tortoises are the most
     difficult individuals to detect and may be inadvertently struck by vehicles.  However,
22   they may be at somewhat less risk than sub-adult and adult desert tortoises because
     their territories are presumably smaller and they may move around less and therefore
23   are less likely to encounter a road.  Their propensity to be more active during cooler
     times of the year may extend the periods during which they are at risk from vehicle
24   strikes.

25   Although larger individuals can be seen on roads more readily than the younger,
     smaller ones, vehicles can travel at speeds that reduce the ability of drivers to detect
26   and avoid desert tortoises.  Rises and turns in roads also decrease the ability of drivers
     to detect desert tortoises.  The actual level of mortality that would occur along a
27   specific road would be influenced by many variables and is difficult to predict; the
     level and type of use of the road by vehicles and the number of desert tortoises
28   present during periods of heavy use are primary factors that are difficult to predict.
     Mortality associated with vehicle strikes would be greatest in the spring and fall, in

United States District Court
Northern District of California

28

areas where desert tortoises are most common.  Along heavily used roads, the number of desert tortoises is depressed for some distance from the edge of the road; along lightly used roads, no significant difference exists in the distribution of desert tortoises (Von Seckenforff, Hoff and Marlow 2002).

Based on a review of the literature, the USGS (Ouren et al. 2007) concludes that an "important concern" regarding OHV effects on desert tortoise is the susceptibility of this species to mortality on all types of roads.  According to the Recovery Plan (USFWS 2011), effects to desert tortoise habitat from roads, routes, trails, and railroads occur during initial stages or off-highway vehicle route/trail establishment when vegetation and soils are lost or severely degraded.  Hoff and Marlow (2002), as cited in the Recovery Plan (USFWS 2011), demonstrated that there is a detectible impact on the abundance of desert tortoise sign adjacent to roads and highways with traffic levels from 220 to over 5,000 vehicles per day and the extent of the detectable impacts was positively correlated with the measured traffic level; the higher the traffic counts, the greater the distance from the road reduced tortoise sign was observed.  The Recovery Plan also states that Hoff and Marlow (2002) concluded that unpaved access roads with lower traffic levels may have significant effects on tortoises.  As cited in the Recovery Plan, Boarman (2002) concludes that off-highway vehicle activities remain an important source of habitat degradation and could result in reductions in desert tortoise densities (Boarman 2002).  Therefore, the extent of mortality of desert tortoises is anticipated to increase as the density of roads and the number of animals increase.  At some point, vehicle use on roads (and other activities that accompany vehicle use) would likely reduce the number of desert tortoises to a point where the level of mortality also decreases, simply because fewer desert tortoises live in the region.

Some routes of travel are located in washes.  Washes can provide important resources to desert tortoises because they often support forage plants at times when upland areas do not; desert tortoises also frequently use the banks of washes to construct their burrows.  At times, desert tortoises may use washes to move through their territories; they may travel along washes more frequently in extremely rugged terrain.  Consequently, vehicle use in washes has the potential to have a relatively greater degree of impact on desert tortoises than the use of roads.  Adverse effects would be greatest in more narrow, vegetated washes where vehicles do not have room to maneuver around shrubs or avoid riding partially up banks; the ability of drivers to see desert tortoises in these washes is also diminished.  In wide washes, where flooding causes relatively frequent disturbance and few shrubs are present, the quality of desert tortoise habitat is already reduced; therefore, OHV use will likely have less of an effect on desert tortoises or their habitat in these areas

The human activities that routes of travel accommodate may pose a greater threat to desert tortoises than being struck by a moving vehicle because of the variety of indirect effects that can result.  Routes of travel through the desert increase the frequency at which people can interact with desert tortoises.  These interactions can lead to uninformed or malicious interactions that result in injury, mortality, or collection of desert tortoises.  Unauthorized handling or restraint of a desert tortoise could induce physiological stress that reduces the animal's ability to withstand high temperatures.  Additionally, desert tortoises may seek shelter in the shade of vehicles parked along a route of travel and be crushed when those vehicles are subsequently moved.  Improper disposal of food wastes and trash left by users of routes of travel can attract predators of the desert tortoise, especially common ravens.  Pet dogs brought onto public lands by people using routes of travel could disturb, injure, or kill desert tortoises.

Within the DT ACECs, the stopping, parking, and camping zones are assumed to be occupied desert tortoise habitat, with burrows, food plants, shelter and drinking depressions. Rocky mountainous areas and playas within a DT ACEC are exceptions. Other ACEC, CDNCL, and national areas protecting threatened and endangered plants, such as the Carbonate Endemic Plants Research Natural Area ACEC near Lucerne Valley, or the Lane Mountain milkvetch ACEC in Coolgardie Mesa and West Paradise, similarly contain resources that are highly sensitive to vehicle damage. The listed plants as well as desert tortoises could be subject to direct impacts by crushing from use of the camping, parking, and stopping areas.

The CDCA Plan currently allows cars and trucks to drive and park up to 300 feet from a route of travel. This authorized off-road use can crush desert tortoises, which would be more difficult to see away from roads, destroy their burrows, crush shrubs that they use for cover, and disturb soils and allow invasion by non-native plant species. In some areas, recreation users prefer specific sites where they can congregate, which degrades habitat to the point that desert tortoises would be unlikely to forage or burrow in these areas.

An increase in non-native plants can increase the spreading of fire across the desert landscape (Lovich and Bainbridge 1999, Brooks and Esque 2002). Neither desert tortoises nor the plant species upon which they depend are adapted to fire; consequently, fires could result in a substantial loss of desert tortoises and severely alter the plant community structure within their habitat (Brooks and Esque 2002). Also, non-native plants tend to provide less nutrition value than do native species.

Most routes of travel are not used on such a frequent basis that they would inhibit movement or be likely to result in traffic-induced mortality of the desert tortoise. Most use of routes of travel involves recreational activities, which generally occur at higher levels on weekends and holidays.

However, some routes of travel are maintained such that the bed of the road is lowered and side berms raised so much, that if desert tortoises enter that roadway, they cannot exit. These animals are subsequently threatened with predation, exposure to extreme temperatures, collection, and collision with vehicles.

The USFWS notes that neither the BLM or the USFWS has definitive information on how differing route networks affect the desert tortoise (USFWS 2002a); obviously roadless areas would have the least adverse effect on desert tortoises and their habitat; it follows that with increasing amounts of open routes within the planning area, the greater the impact to the desert tortoise and its habitat. However, the use patterns on the open route network may be as important, particularly in areas where tortoises are more likely to be found.

[final paragraph discussing livestock grazing]

AR 103703-103706. Elsewhere in the FSEIS (Chapter 3, Affected Environment), the BLM discusses FWS studies from 2008 and 2014 which suggest "appreciable" and "broadly distributed" declines in desert tortoise populations in the WEMO, and the FSEIS states that "specific management actions over a 23-year monitoring program have not demonstrated a substantial positive effect on populations." and "[t]he population of desert tortoise in the West Mojave

1      Recovery Unit, which encompasses the WEMO Planning Area, shows a downward trend

2      (population estimate of 35,777 individuals in 2004 to 17,644 individuals in 2014)."  AR 103505.

3      The Errata at Appendix B added the following text to this discussion:

> Population declines were noted in all three Tortoise Conservation Areas
> (Fremont/Cramer, Ord Mountains, and Superior/Cronese) within the West Mojave
> Recovery Unit between 2004 and 2014 as reported by Allison and McLuckie (2018).
> Adult tortoise densities in the Western Mojave Recovery Unit have shown an annual
> decrease of 7.1% per year (Allison and McLuckie 2018) over this period. The
> proportion of juveniles between 2004 and 2014 has declined 91%. Allison and
> McLuckie (2018) attribute these declines to droughts and increased predation risk
> with an increasing abundance of Common Ravens.

AR 204954.

The closest that the FSEIS and the route tables come to demonstrating that routes were

designated with the objective of minimizing impacts are the references in the FSEIS to "resource-

specific minimization and mitigation measures."  *See* AR 103700-103701; AR 103725-103726; AR

101488-101495 (Appendix G, Table G-2 "Potential Resource-Specific Minimization and Mitigation

Actions" listing "Possible Minimization and Mitigation Action(s)").  These measures include, *inter*

*alia*, "restrict stopping/parking/camping," "install fencing," "re-align route to avoid

environmentally sensitive area," and so forth.   *Id*.; *see also* AR 103406 (Table 2.2-5

"Implementation Strategies for All Action Alternatives," listing travel management activities and

corresponding timing, such as "Identify and place fencing in areas of concern" for "Year 2").   The

FSEIS also states that "additional measures were developed specifically for special-status species,

desert tortoise habitat in DT ACECs, near active golden eagle nests, and in the Mohave Ground

Squirrel Core Area," and the FSEIS lists those measures.  AR 103725-103726 (stating, *inter alia*,

"[f]or tortoise habitat in DT ACECs, additional potential minimization and mitigation measures

include: Install Wildlife Safety Zone signs; Re-align route to avoid designated area; Install fencing;

and Maintain berms so that they do not adversely impact the movement of desert tortoise).[17]

However, the problem with that approach is that all of the listed minimization and mitigation

---

[17]   Although the FSEIS states that additional measures were developed for "special-status species," there are no additional measures listed for "special-status species" aside from those listed for desert tortoise habitat in DT ACECs, near active golden eagle nests, and in the Mohave Ground Squirrel Core Areas.  *Id*.

United States District Court
Northern District of California

measures, whether the general ones or the additional ones for particular species, are "potential" measures that "may" occur. Thus, as to the "potential minimization" measures, the Court has no way of determining whether, in fact, any of those minimization measures were applied, or if they were applied consistent with the regulatory minimization criteria. As to the "potential mitigation measures," those occur *after* the route is designated. In the briefing, defendants agree that the mitigation measures occur after the route designation process, and that the mitigation measures should not be considered when evaluating the route *designation* process:

> Plaintiffs emphasize BLM's statement that route closure "may not result in recovery in the short-term, unless active rehabilitation efforts are taken." Id. (quoting AR 103701). But this conflates application of the minimization criteria in making route designations with rehabilitation of impacts from past use, and is beyond the scope of the Complaint. For example, displacement of soil or vegetation from a route (or area) receiving historical vehicle travel might not be rehabilitated merely by closing the route (or area) to further vehicle use, but could require active recontouring or reseeding should BLM seek to restore pre-displacement conditions. The minimization criteria do not address site rehabilitation, but reflect the application of criteria in making designations of areas and trails for off-road vehicle use. 43 C.F.R. § 8342.1.

Defs' Reply at 5 (Dkt. No. 41).

As other courts have held, "[e]ducation, enforcement, increased compliance, maintenance, and monitoring may all serve to reduce impacts, but this does not meet the TMR's requirement to show application of the criteria to minimize impacts when locating routes." *Jeffries*, 370 F. Supp. 3d at 1250; *cf. Pryors Coalition v. Weldon*, 551 Fed. App'x 426, 430 (9th Cir. Jan. 7, 2014) (holding record showed Forest Service applied TMR minimization criteria where, *inter alia*, "[i]t made a number of its route designations *contingent on first* reducing negative impacts to soil, fisheries, and water quality") (emphasis added); *cf. also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 71, 77-78 (D.C. Cir. 2011) (holding BLM did not violate FLPMA's "undue or unnecessary degradation" standard where ROD contained numerous specific, definite mitigation measures to minimize and offset environmental impact of development, BLM ensured "funding for and oversight of monitoring and mitigation," and ROD contained specific, additional measures "if further declines in wildlife populations" were observed).[18] Here, there is nothing in either the route

---

[18] In connection with the parties' FLPMA arguments about undue or unnecessary degradation, defendants assert that this Court previously found that the BLM's approach to

reports or the FSEIS showing that route designations were made contingent on first reducing negative impacts or that any particular minimization or mitigation measures were in fact implemented.    To the contrary, it is clear that the FSEIS contemplates that the BLM will "potentially" engage in post-designation mitigation measures.

The BLM emphasizes the fact that the agency designated over 10,000 miles of TLDs, and argues that these closures demonstrate compliance with the minimization criteria.    This Court rejected that same argument during the earlier proceedings involving the Decision Tree:

> Nor does the fact that the BLM closed almost two-thirds of the evaluated routes constitute evidence that the BLM complied with 43 C.F.R. § 8342.1. 'Minimize' as used in the regulation does not refer to the number of routes, nor their overall mileage.  It refers to the *effects* of route designations, i.e., the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts' of uses.  43 C.F.R. § 8342.1(a)-(c).    Thus, simply because the BLM closed two-thirds of the routes evaluated does not, on its own, compel the conclusion that the minimization criteria were applied.

*WEMO I*, 746 F. Supp. 2d at 1080-81; *see also WildEarth Guardians*, 790 F.3d at 932 (quoting this language from *WEMO I*).  For the same reasons as stated in 2009, the Court cannot conclude that the BLM has complied with the minimization criteria simply because the BLM closed a number of routes to OHV use.

The BLM notes that the cases involving the Forest Service's application of the TMR involved smaller geographic areas, sometimes significantly so.  *See, e.g.*, *Guzman*, 766 F. Supp. 2d at 1069 (preferred action alternative designated 3,534 miles of OHV routes).  Thus, the BLM argues, not without force, that those cases are not directly analogous to the BLM's management of the WEMO Planning Area of 3.1 million acres, and the BLM states that it "does not concede that a route-by-route analysis is required in every instance."  Defs' Mtn. at 9 n.6.  However, the BLM

---

mitigation was sufficient in the 2006 project, citing *WEMO I*, 746 F. Supp. 2d at 1092-93.  *See* Defs' Reply at 7.  However, the cited portion of *WEMO I* addressed the BLM's obligations under NEPA, not FLPMA or the FLPMA minimization criteria.  *See id.* (because the BLM's obligation under NEPA is procedural, not substantive, "there is no requirement that BLM 'prove' in an EIS that its mitigation measures will work, and that 'NEPA requires only that an EIS contain 'a reasonably complete discussion of possible mitigation measures.'") (internal quotations omitted).    Unlike NEPA, the FLPMA minimization criteria do impose a substantive obligation on the BLM to designate OHV routes with the objective of minimizing impacts to wildlife and other environmental resources, as well as conflicts with other uses.  *See WildEarth Guardians*, 790 F.3d at 932.

United States District Court
Northern District of California

asserts that "the Court need not reach this issue because the thousands of pages in the record here demonstrate BLM's route-by-route application of the minimization criteria in the 2019 Project." *Id*. The Court recognizes the differences in geographic scope between this case and the cases involving the Forest Service and its application of the TMR.  And the Court does not hold that a route-by-route discussion is necessarily required in this context.[19]   However, what the regulations and *WildEarth Guardians* require is an affirmative demonstration that the BLM applied the minimization criteria with the objective of minimizing impacts to the various criteria listed in the regulation.  That could be satisfied with a discussion or explanation of how route designations minimized those impacts, such as an explanation of how "areas and trails shall be located to minimize damage to soil, watershed, vegetation, [and] air" and how "areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats."  43 C.F.R. § 8342.1(a)-(b).  On this record, the Court cannot conclude that the BLM has "affirmatively" shown that it applied the minimization criteria when it designated the 2019 Route Network.

### B.    Unnecessary or Undue Degradation

#### 1.    Standard

The FLPMA provides that the BLM, in managing the public lands, "take any action necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).  Plaintiffs contend that the 2019 Route Network violates FLPMA's unnecessary or undue degradation ("UUD") standard because evidence shows that OHV use has degraded the public lands within the WEMO Planning area.  Plaintiffs also argue that Plan Amendments I, III, IV and V violate the UUD standard because they lift restrictions on OHV use in various ways and thus will lead to further degradation of the environment.  Plaintiffs contend that the FLPMA's UUD standard is enforceable independent of the BLM's obligation to comply with the regulatory minimization criteria, and they argue that the BLM has the burden of demonstrating that the 2019 Route Network

---

[19]    However, the Court is not persuaded that doing so would prove burdensome or unworkable, as the agency is required to designate routes that comply with the minimization criteria in the first instance, and thus all that is required is some explanation of how the designated route complies with the criteria.

United States District Court
Northern District of California

and Plan Amendments do not violate the UUD standard.

Defendants respond that the UUD standard is a "broad mandate affording BLM broad discretion," and they suggest that this standard does not apply to land use planning. Defs' Mtn.at 12, Defs' Reply Brief at 5. Defendants also argue that even if the UUD standard does apply to land management plans and amendments thereto, the proper inquiry "is whether BLM has reasonably determined that appropriate measures have been instituted, such as mitigation, that will prevent degradation unnecessary, or undue in proportion to, the use, occupancy, and development of public lands the 2019 ROD allows." Defs' Mtn. at 12-13. Thus, the parties disagree on what the UUD standard is and how it should be applied, and they both contend that *Gardner v. U.S. Bureau of Land Management*, 638 F.3d 1217 (9th Cir. 2011), supports their interpretation.

In *Gardner*, the Ninth Circuit addressed the "undue or unnecessary degradation" standard in a case brought by a resident and an advocacy organization who sought to compel the BLM to prohibit OHV use in Oregon's Little Mountain Canyon. The Ninth Circuit first analyzed the plaintiffs' claim that the BLM was required to close the area under § 1732(b) of FLPMA and 43 C.F.R. § 8341.2(a)[20] because of the significant negative effects generated by OHV use. *Id.* at 1222. The court stated that because a reviewing court can compel an agency to act "'only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required* to take,'" "unless the BLM is required to take certain actions with respect to off-road vehicle use in Little Canyon Mountain, we cannot compel the BLM to act." *Id.* at 1221-22 (quoting *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004) (emphasis in original)). The Ninth Circuit held that while "§ 1732(b) directs the BLM to achieve the broad objectives of preventing unnecessary or undue degradation of public lands," the statute "'leaves [the] BLM a great deal of discretion in deciding how to achieve' these objectives because it does not specify precisely how the BLM is to

---

[20] "43 C.F.R. § 8341.2(a) requires the immediate closure of areas used by off-road vehicles when an 'authorized officer determines that off-road vehicles are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources.'" *Gardner*, 638 F.3d at 1221 (quoting regulation). The *Gardner* plaintiffs did not contend, as plaintiffs do here, that the BLM had failed to comply with the minimization criteria in 43 C.F.R. § 8342.1.

United States District Court
Northern District of California

meet them, other than by permitting the BLM to manage public lands by regulation or otherwise." *Id.* at 1222 (quoting *SUWA*, 542 U.S. at 66).  The court held that "the broad wording of § 1732(b) does not mandate that the BLM adopt restrictions that would result in completely excluding off-road vehicle use in Little Canyon Mountain."  *Id.*  The court also noted that there was no evidence that Little Canyon Mountain had suffered "unnecessary or undue degradation," and that "[m]oreover, even if off-road vehicles were causing 'unnecessary or undue degradation,' it is within the BLM's discretion to decide how to remedy such harm and manage the lands in accordance with the multiple-use directive set forth in the FLPMA."  *Id.*  (citing 43 U.S.C. § 1732(a)).  The Ninth Circuit found that "unless the BLM is required to take certain actions with respect to off-road vehicle use in Little Canyon Mountain, we cannot compel the BLM to act."  *Id.*  The Ninth Circuit also evaluated the plaintiffs' contention that the BLM's decision not to close Little Canyon Mountain was arbitrary and capricious under 5 U.S.C. § 706(2).  The court reviewed the record and found that the BLM articulated a rational reason for denying the plaintiffs' petition seeking closure, stating "[t]he BLM's response clearly indicated that, based on the evidence before it, the specific resources listed in the regulation were not affected to the level required by 43 C.F.R. § 8341.2(a)" and that "Gardner does not point to any other evidence in the record where the specific resources listed above are being adversely affected."  *Id.* at 1225.

Plaintiffs assert that under *Gardner*, if there is evidence of unnecessary or undue degradation, the BLM is required to take action to address that degradation, and that if the BLM fails to take such action – or takes action that causes unnecessary or undue degradation – the Court can issue an appropriate remedy.  The practical implication of plaintiffs' position relates to the burden of proof and standard of review, because if plaintiffs are correct, once plaintiffs have demonstrated "unnecessary or undue degradation" – whatever that means in a particular context – the BLM must rebut that showing by demonstrating that the degradation is not, in fact, "unnecessary or undue," or that the BLM had taken action that adequately addressed the degradation.

The Court finds that plaintiffs' interpretation of *Gardner* is not persuasive and is at odds with the standard of review required by the APA.  The Court interprets *Gardner* as holding that the "broad wording" of § 1732(b) provides the BLM with discretion on how to achieve the objective of

36

preventing unnecessary or undue degradation of the public lands, and that a plaintiff alleging that the BLM has failed to meet that duty can (1) seek relief under 5 U.S.C. § 706(1) compelling the BLM to act if the agency has violated a statute or regulation that requires it to take a discrete action or (2) seek to set aside a final agency action as arbitrary and capricious or otherwise unlawful pursuant to 5 U.S.C. § 706(2).  Thus, while the FLPMA imposes on the BLM the obligation to "take any action necessary to prevent unnecessary or undue degradation of the lands," 43 U.S.C. § 1732(b), under *Gardner* a plaintiff cannot pursue a claim that the BLM has violated that broad mandate without also showing that the BLM has failed to perform a mandatory duty or that the BLM's actions are arbitrary and capricious or otherwise not in accordance with the law (such as 43 C.F.R. § 8342.1).

  *Gardner* is in accord with another case relied on by both plaintiffs and defendants, *Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66 (D.C. Cir. 2011), in which the D.C. Circuit reviewed the plaintiff's FLPMA claim under an arbitrary and capricious standard.  *Id.* at 76-77.  The D.C. Circuit held that the BLM did not act arbitrarily or capriciously when it determined that a plan approving an expansion of natural gas development in Wyoming would prevent undue or unnecessary degradation of the project area because the ROD contained numerous specific, definite mitigation measures to minimize and offset environmental impact of development, the BLM ensured "funding for and oversight of monitoring and mitigation," and the ROD contained specific, additional measures "if further declines in wildlife populations" were observed.  *Id.* at 78; *see also Western Watersheds Project v. McCullough*, No. 23-15259, No. 23-15261, No. 23-15262, 2023 WL 4557742, at *1 (9th Cir. July 17, 2023) (holding "the BLM was not arbitrary, capricious, or otherwise not in accordance with law in complying with FLPMA's mandate 'to prevent unnecessary or undue degradation of the lands'" where the BLM conditioned its approval on a corporation's compliance with environmental standards and where the ROD did not impermissibly harm greater sage-grouse population, which was neither endangered nor threatened).  Under this framework, the Court has already concluded that the 2019 Route Network did not comply with 43 C.F.R. § 8342.1, and therefore that the BLM's adoption of it was otherwise unlawful under 5 U.S.C. § 706(2); in the Court's view, there is no separate analysis required under *Gardner* and the UUD standard.

However, while the Court agrees with defendants that no court has applied the UUD standard in the manner that plaintiffs advocate, to the extent defendants suggest that the UUD standard does not apply to land use planning or plan amendments, the Court disagrees, and the Court notes that defendants have not cited any authority so holding. The Court will evaluate whether BLM's approval of those amendments to the CDCA Plan was arbitrary and capricious or otherwise contrary to law.

## 2.     Plan Amendment I

Plan Amendment I amends the CDCA Plan by replacing the language that restricted the OHV route network to the 1980 "existing routes of travel" with language that provides that OHV use will be "restricted to designated routes of travel."  AR 103389-103390; AR 183523.  Plaintiffs argue that (1) the new language does not provide any meaningful limit on OHV route proliferation, thus failing the CDCA Plan's goal of enhancing and not diminishing the values of the West Mojave Desert, and (2) the absence of a cognizable route limit contradicts the Motor Vehicle Access Element of the CDCA Plan, which requires that motorized vehicle use be "constrained" and that "when designating or amending areas or routes for motorized vehicle access, [the BLM must] to the degree possible, avoid adverse impacts to desert resources."  AR 279.[21]  Plaintiffs contend that if the BLM wanted to remove the 1980 route cap, it should have proposed alternative language that would meaningfully limit the overall size and impact of motorized routes and the route network on the Desert now and in the future, such as a route-density cap.

---

[21] The CDCA plan, as amended in March 1999, provides that the "specific objectives" for the Motor Vehicle Element are:

> 1. Provide for constrained motorized vehicle access in a manner that balances the needs of all desert users, private landowners and other public agencies.
>
> 2. When designating or amending areas or routes for motorized vehicle access, to the degree possible, avoid adverse impacts to desert resources.
>
> 3. Use maps, signs and published information to communicate the motorized vehicle access situation to desert users. Be sure all information materials are understandable and easy to follow.

*Id.*

With regard to PA-1, the FSEIS states,

***PA-1: Limiting Route Network to 1980 Baseline***

The current language in the CDCA Plan within "Limited" areas provides a 1980 inventory that is interpreted to be the universe of routes from which "approved routes" can be identified. The CDCA Plan's MVA Element discussion of allowable vehicle use in OHV "Limited" areas reads as follows:

"At the minimum, use will be restricted to existing routes of travel. An existing route of travel is a route established before approval of the Desert Plan in 1980, with a minimum width of two feet, showing significant surface evidence of prior vehicle use or, for washes, history of prior use."

The language creates an unmanageable situation 35 years after the approval of the CDCA Plan. For one thing, the 1980 route network continues to be in dispute due to the limitations of the source data. Also, there is much confusion over the interpretation of the sentence "At the minimum, use will be restricted to existing routes of travel." Also, the 1980 network has undergone substantial changes, both planned and unplanned, and applied to a public land base that is significantly different than it was in 1980 as a result of major acquisitions, donations, and exchanges.

Ultimately, the language in the CDCA Plan no longer serves current transportation and travel management needs, and there is no assurance it responds appropriately to sensitive issues. The existing routes language as it is currently interpreted is also in conflict with how route designation was conducted in the 2006 WEMO Plan, in various ACEC Plans, and in approving rights-of-way and other permits since the approval of the 1980 CDCA Plan. In response, BLM proposes to revise the CDCA Plan to be consistent with current regulatory and management policy regarding designation of routes for motorized vehicle access (OHV Open and OHV Limited use), and to provide a mechanism for designating, limiting, or classifying transportation linear disturbances as new issues arise, on-the-ground information or needs change, and new public lands are acquired.

Based on a review of the Court's Summary Judgment order, BLM has determined that the language in the 1980 CDCA Plan restricting travel to existing routes does not conform to the procedures required in BLM's TTM Handbook. The TTM Handbook establishes procedures for making route designations, including establishing new routes, and makes no reference to restricting BLM from establishing new routes. Also, BLM's other management responsibilities under FLPMA, including providing access for minerals exploration and issuing rights-of-way, leases, and other grants for new and existing facilities, demands consideration of new routes to provide access to those activities and facilities. The CDCA Plan recognized FLPMA access needs and made a distinction between public access and authorized access. The TTM Handbook recognizes the interconnected nature of transportation and travel, whether for public access or access for specified users, uses, or to access non-public lands. Now, in compliance with the requirements of the Court, the current planning action considers modifying the CDCA Plan language that appears not to be in conformance with the current TTM guidance and which appears inconsistent with BLM's other management responsibilities under FLPMA.

As a result, the BLM proposes to modify the MVA Element and to eliminate the current "Limited to existing routes" language and replace it with language to reflect that use will be "restricted to designated routes of travel". The specific routes, as

well as additional mechanisms and thresholds for their modification, would be identified and updated in travel management plans and through other mechanisms to keep the plans current. Broader network thresholds may be established at the LUP level for the entire network, and at the LUP or Activity Plan level for particular TMAs, or other appropriate polygons.

AR 103389-103390.

The Court concludes that the BLM's adoption of PA-I was not arbitrary, capricious or contrary to law. The FLPMA regulations state that once a land use plan is developed, "[a]ll future resource management authorizations and actions . . . shall conform to the approved plan." 43 C.F.R. § 1610.5-3(a). That regulation further provides that "[i]f a proposed action is not in conformance, and warrants further consideration before a plan revision is scheduled, such consideration shall be through a plan amendment in accordance with the provisions of § 1610.5-5 of this title." 43 C.F.R. § 1610.5-3(c). Section 1610.5-5, in turn, states that "[a] resource management plan may be changed through amendment. An amendment shall be initiated by the need to consider monitoring and evaluation findings, new data, new or revised policy, a change in circumstances or a proposed action that may result in a change in the scope of resource uses or a change in the terms, conditions and decisions of the approved plan. . . ." 43 C.F.R. § 1610.5-5.

The stated goal of the CDCA Plan is "to provide for the use of the public lands, and resources of the California Desert Conservation Area, including economic, educational, scientific, and recreational uses, in a manner which enhances wherever possible—and which does not diminish, on balance—the environmental, cultural, and aesthetic values of the Desert and its productivity." AR 211-212. The FSEIS explained the reasons for the amendment, including *inter alia* the practical reality that it was impossible to identify the 1980 route network and that the prior language was not consistent with current regulatory and management policy. Although plaintiffs argue that the new language places no constraints on the proliferation of OHV routes and is therefore inconsistent with the stated goals of the CDCA Plan and the Motor Vehicle Element, the BLM must comply with 43 C.F.R. § 8342.1 when designating OHV routes, as the agency recognized in the FSEIS. AR 103621 (addressing PA-I and stating that for any new route, "[a]s part of that evaluation, BLM would consider the potential impacts of the new route as required by 43 C.F.R. 8342.1 . . . ."). As discussed at length *supra*, that regulation requires the BLM to designate OHV routes with the objective of

"minimizing" impacts to wildlife and other environmental resources, which is consistent with the CDCA Plan's stated goal. Further, compliance with the minimization criteria imposes an inherent "constraint" on motorized vehicle access because the designation of OHV routes must adhere to that regulation. Finally, while plaintiffs prefer different language that would have imposed additional limitations, such as a route density cap, the Court finds that it was not arbitrary or capricious for the BLM to adopt the language that it chose, particularly since the BLM must comply with 43 C.F.R. § 8342.1 when making route designations. Thus, the BLM "articulated a rational connection between the facts found and the choice made." *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001) (as amended) (internal quotation marks omitted).[22]

### 3.    Plan Amendments III, IV and V

Amendment-III expanded routes designated for competitive ("C") events, with Alternative 5 designating 105.4 miles of "C" routes, more than any other alternative. AR 103432, 103437, 103440 (FSEIS); AR 183523 (ROD).

Plan Amendment IV designates Cuddleback and Coyote dry lakebeds as OHV Open Areas "subject to specific minimization measures"; Koehn dry lakebed as OHV Limited to designated routes or as authorized by permit; and Chisholm Trail dry lakebed as Closed. AR 103391 (FSEIS), AR 183523 (ROD).

Plan Amendment V eliminates the permit requirement for OHV use in the Rand Mountains-Fremont Valley Management Area and replaces that system "with an intensively managed route network with an OHV Limited use designation." AR 103391-103392 (FSEIS); AR 183523. The Rand Mountains-Fremont Valley area overlaps with desert tortoise critical habitat. AR 12807 (Berry et al., <u>A Comparison of Desert Tortoise Populations and Habitat on Three Types of Managed Lands in the Western Mojave Desert in Spring 2011:  the Rand Mountains, Fremont Valley, and</u>

---

[22] As discussed *infra*, plaintiffs raise an additional challenge to PA-I in the context of plaintiffs' claims under the ESA.

Desert Tortoise Research Natural Area (2012)).

Thus, Plan Amendments III, IV and V all impact OHV use and alter the OHV route network in some way.  Because the Court has concluded that the BLM's 2019 OHV route designation process did not comply with the minimization criteria, the Court concludes that these three plan amendments are also contrary to law for the same reasons.

### C.     Data Collection and Route Inventory

#### 1.     Lane Mountain Milk Vetch

Plaintiffs contend that the BLM violated a FLPMA regulation, titled "Inventory data and information collection," because the FSEIS fails to discuss or consider the FWS's 2014 findings regarding the Lane Mountain milk vetch.  That regulation provides,

> The Field Manager, in collaboration with any cooperating agencies, will arrange for resource, environmental, social, economic and institutional data and information to be collected, or assembled if already available.  New information and inventory data collection will emphasize significant issues and decisions with the greatest potential impact.  Inventory data and information shall be collected in a manner that aids application in the planning process, including subsequent monitoring requirements.

43 C.F.R. § 1610.4-3; *see Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1097 (9th Cir. 2010) ("The BLM, in other words, is obligated to 'arrange for resource, environmental, social, economic and institutional data and information to be collected, or assembled if already available.' 43 C.F.R. § 1610.4–3.").

Plaintiffs emphasize that the FSEIS does not discuss the FWS's 2014 findings in connection with its decision not to downlist the plant, but plaintiffs do not explain how this omission violates this specific regulation.  It is not obvious that the failure to mention the 2014 information is a violation of the requirement to collect information "in a manner that aids application in the planning process," and plaintiffs do not cite any cases applying this regulation in the fashion they assert (nor has the Court located any such authority).  In any event, the Court has already found that the record does not demonstrate that BLM properly applied the FLPMA minimization criteria with respect to the LMMV.

### 2. Mojave Fringe-Toed Lizard

In *WEMO I*, the Court held that BLM had violated NEPA with regard to its assessment of the Mojave fringe-toed lizard ("MFTL"). The Court noted although the "Species Account" for the MFTL stated that there was no recent data on population status and relative density, the 2006 FEIS nevertheless found that "light" OHV travel in an area that comprised one-quarter of MFTL habitat "does not appear to be impacting this species." *WEMO I*, 746 F. Supp. 2d at 1097. The Court held that the BLM's conclusion of no-impact "is unsupported by any factual basis," *id.*, and the Remedy Order directed BLM to "carry out additional information gathering and monitoring regarding . . . [the] status of [MFTL] and its habitat." *WEMO II*, 2011 WL 337364, at *9.

The FSEIS states that on remand,

> Spring field surveys were conducted in 2012 and 2013 on eight parcels within the Mojave fringe-toed lizard Area of Critical Environmental Concern (ACEC) within the WEMO Planning Area. The latest of these surveys was conducted between May 8 and May 31, 2013. The eight parcels are located in five geographic areas (Yermo-3 parcels, Manix-3 parcels, Rasor, and Twentynine Palms).

AR 103508. The sites surveyed included those identified as potential habitat locations by the FWS as part of FWS's 2012 ESA listing decision for the MFTL. AR 103509. Surveyors found a total of 16 MFTL on the sites between the two survey periods. *Id.*; *see generally* AR 103508-103511 (describing survey effort).

Plaintiffs contend that the BLM's efforts on remand violated the inventory regulation by gathering inadequate information about the MFTL, which they contend the BLM acknowledged in staff emails at AR 16255. Plaintiffs complain that the BLM's surveys were "scattershot," and that the BLM should have conducted more monitoring. Plaintiffs assert that the monitoring was inadequate because the survey size was too small "given that the WEMO contains approximately 45,000 acres of MFTL habitat" and that the surveys were not properly timed because they were done "in the spring" while the evidence shows that the lizard "'is at risk from any route within its sand habitat between April 1 and September 30.'" Pls' Reply at 14 (Dkt. No. 40, quoting AR 103721). Plaintiffs contend that the BLM has "ignored" critical data needs and therefore acted in an arbitrary and capricious manner.

The Court concludes that plaintiffs have not shown that the BLM has violated the inventory

regulation.  As a factual matter, the FSEIS states that the 2013 surveys occurred in May, and thus were within the "at risk" time frame.  AR 103509.[23]  In addition, the BLM staff emails at AR 16255 do not support plaintiffs' broad assertion that BLM staff "warned that analyzing impacts would be 'hard' because the agency did not 'have OHV use data.'"  Pls' Mtn. at 23 (Dkt. No. 38, citing AR 16255).  In the cited emails among BLM staff (from 2014), employees discuss how to quantify impacts to MFTL where OHV routes pass through MFTL habitat.  AR 16255-16258.  In the portion cited by plaintiffs, a BLM staff member states that "I agree generally that the effects of OHVs on MFTL in the Mojave River channel are likely very little" but that it was "much harder to properly characterize this" because "[w]e don't have OHV use data."  AR 16255.  The staff member continued, "My observations are that there isn't a lot of OHV opportunity to drive off route in the channel. It is too treacherous. . . ."  Id.  Thus, AR 16255 does not stand for the broad proposition that BLM staff "warned" that its MFTL data was inadequate to assess impacts.

More importantly, although plaintiffs assert that the BLM should have surveyed a larger area and over a longer period of time, that does not mean that the BLM's efforts are legally insufficient. The FLPMA regulation directs that "[i]nventory data and information shall be collected in a manner that aids application in the planning process," and plaintiffs have not demonstrated how BLM's efforts violated this regulation. Absent such authority, the Court cannot conclude that the BLM's efforts violated FLPMA.  See Ctr. for Biological Diversity v. Bureau of Land Mgmt., 833 F.3d 1136, 1148 (9th Cir. 2016) ("We are confident that the Center could demonstrate persuasively numerous ways in which BLM's emissions analysis could be improved.  Mere differences in opinion, however, are not sufficient grounds for rejecting the analysis of agency experts.").

### 3.    Route Inventory

The FLPMA requires that BLM "shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values."  43 U.S.C. 1711(a); see also 43 U.S.C. § 1712(c)(4) ("In the development and revision of land use plans, the Secretary shall—. . .

---

[23] It is not clear when the "spring" of 2012 surveys were conducted.

1    (4) rely, to the extent it is available, on the inventory of the public lands, their resources, and other

2    values.").

3         Plaintiffs contend that the BLM's route inventory violates these statutes because "ground-

4    truthing" by members of the public showed purported inaccuracies in the inventory.[24]  *See e.g.*, AR

5    33059 (stating that "Fieldwork in the Newberry and Rodman Mountains documented numerous

6    proposed routes that do not exist on the ground and are in fact naturally occurring washes" and

7    listing 8 WEMO IDs); AR 29107 (photograph with caption stating "There is no road here, the

8    proposed route runs through desert washes and vegetation.").  Plaintiffs assert that the BLM did not

9    perform its own comprehensive ground-truthing, "leaving in question" the accuracy of the route

10   inventory.

11        Defendants respond by directing the Court to the FSEIS' description of the route inventory

12   process at AR 103368-103369, which states *inter alia*  that the BLM used "GPS handheld equipment

13   that could directionally track routes as they were being driven and would help to assure map

14   accuracy.  At the same time, high quality aerial photography from 2009 was being reviewed by GIS

15   personnel at 1:2000 resolution and was used to provide a digital record (completed in 2013) of all

16   the OHV Open and Limited routes and any unauthorized routes."  AR 103368.  Thus, defendants

17   emphasize that the route inventory process did not just consist of relying on aerial photography, but

18   also used other methods.  With regard to plaintiffs' assertions that the BLM incorrectly identified

19   numerous washes as routes, defendants state that BLM's inventory started with identifying features

20   on the ground, and that BLM used additional methods to eliminate many washes (and other non-

21   route features) from the OHV route network.  Defs' Reply at 16.

22        The Court concludes that the record shows that the BLM conducted a reasoned and

23   substantial effort to update the route inventory, and that plaintiffs' complaints about inaccuracies do

24   not meet their burden to show that the BLM acted in an arbitrary or capricious manner.  The FSEIS

25   details at length the steps that BLM took to update the route inventory and to correct errors in the

26

27        [24]  Plaintiffs' motion also challenged the route inventory as inaccurate based on the fact that
     "TLD mileage varies wildly" between the alternatives.  Pls' Mtn. at 24.  However, after the BLM
28   explained in its response that a TLD is a closed route, plaintiffs appear to have abandoned that
     argument.

prior inventory.  As an initial matter, the Court notes that the FSEIS states that some OHV routes are in fact in washes.  *See* AR 103704 ("Some routes of travel are located in washes.").  While that fact may be problematic with regard to whether those OHV routes comply with the minimization criteria, it also demonstrates that the BLM intentionally designated some OHV routes in washes, and thus the fact that "ground-truthing" by members of the public identified OHV routes that were washes does not necessarily indicate a route inventory "error."  In addition, based upon defendants' explanation that the inventory of transportation linear features included some washes that were ultimately removed from the OHV route network, the Court cannot conclude that the route inventory was deficient in the ways that plaintiffs assert.  Further, even assuming plaintiffs are correct and that the few ground-truthing examples do in fact demonstrate some errors in the route inventory, plaintiffs have not shown that those errors were of such a magnitude as to render the BLM's actions arbitrary or capricious.  *See Swomley v. Schroyer*, 484 F. Supp. 3d 970, 978-79 (D. Colo. 2020) (stating that not "every erroneous statement in an agency's analysis rises to the level of arbitrary and capricious conduct" and that Forest Service's erroneous statement in analysis was "only a 'flyspeck'" and not a substantial error warranting remand); *cf. also Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 538 (8th Cir. 2003) (holding under NEPA that agency's use of aerial photographs to identify noise-sensitive receptors was reasonable because "[i]n a project of this size, the agency is not required to maximize precision at all costs" and agency "explained that any discrepancy between its calculations and the actual number of affected receptors can be corrected by the Board during its oversight period").

###    D.    Air Quality Impacts

Plaintiffs contend that the BLM violated FLPMA and the Clean Air Act because the BLM's air quality impacts analysis failed to demonstrate compliance with applicable state implementation plans.  "FLPMA requires the Secretary of the Interior, in developing and revising land use plans, to 'provide for compliance with applicable pollution control laws, including State and Federal air, water, noise, or other pollution standards or implementation plans.'"  *Ctr. for Biological Diversity*, 833 F.3d at 1146 (quoting 43 U.S.C. § 1712(c)(8)).  The federal Clean Air Act establishes a

comprehensive program for controlling and improving the nation's air quality through shared federal and state responsibility.  The Clean Air Act authorizes the Environmental Protection Agency ("EPA") to establish national ambient air quality standards ("NAAQSs") for pollutants deemed by EPA to be "criteria" pollutants, including particulate matter with a diameter greater than 10 microns ("$PM_{10}$").  42 U.S.C. §§ 7407–7410. EPA designates areas which fail to attain an NAAQS standard as "nonattainment areas." *Id.* §§ 7407(d)(1).    There are five air quality districts that overlap the WEMO and at least some portion of each district is designated as "nonattainment."  AR 103451-103452.

Section 110(a) of the Clean Air Act, 42 U.S.C. § 7410(a), sets forth the process by which the states may develop their own regulatory programs, called "State Implementation Plans" ("SIPs"), that satisfy the minimum requirements of the federal law.  *See generally* 42 U.S.C. § 7410(a).  A SIP must specify emission limitations and other measures necessary to maintain the NAAQS for each pollutant. 42 U.S.C. § 7410(a)(2)(A)–(M).  Section 176(c)(1) of the Clean Air Act provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a SIP]." 42 U.S.C. § 7506(c)(1).   The agency must undertake a full "conformity determination . . . for each criteria pollutant or precursor where the total of direct and indirect emissions of the criteria pollutant or precursor in a nonattainment or maintenance area caused by a Federal action would equal or exceed" listed *de minimis* quantities.  40 C.F.R. § 93.153(b).

The BLM determined that the 2019 Route Network's $PM_{10}$ emissions would exceed *de minimis* thresholds in the San Bernardino area of the Mojave Desert Air Quality Management District.  AR 204956-204957.  The BLM listed  six "reasonably available control measures" to "address the WMRNP's PM-10 exceedance:"

> • Use BLM-standard road design and drainage specifications when maintaining existing roads;
>
> • Provide wind and water erosion controls sufficient to minimize deposition of silt on paved roads;
>
> • Provide for paving or other stabilization of major ingress/egress routes to unpaved/paved road access points;

• Provide for paving or other stabilization of major vehicle staging and parking areas;

• Provide for restoration of transportation linear disturbances; and

• Provide public educational materials (e.g., brochures, kiosks, signs) concerning PM10 emissions, including reducing vehicular speeds.

AR 144216 (Aug. 2019 ROD Appendix B, Errata); AR 204957 (Oct. 2019 ROD Appendix B, Errata).

Plaintiffs argue that the BLM's statement about "reasonably available control measures" does not comply with 40 C.F.R. § 93.160(a) because it lacks information about specific measures that will be taken or timelines for implementation. That regulation provides "Any measures that are intended to mitigate air quality impacts must be identified and the process for implementation and enforcement of such measures must be described, including an implementation schedule containing explicit timelines for implementation." 40 C.F.R. § 93.160(a).

The BLM argues that it disclosed and considered detailed analyses of air quality impacts, noting the BLM's assessments of ozone, $PM_{2.5}$, and $PM_{10}$. The BLM also asserts that its approach is similar to its approach in managing OHV access to the ISDRA, which was approved by this Court and affirmed by the Ninth Circuit. *See ISDRA II*, 35 F. Supp. 3d at 1160-62, *aff'd*, 883 F.2d at 1147-48. However, in that case the BLM concluded that emissions would not exceed *de minimis* quantities – and thus no conformity determination was required – and the question presented was whether the assumptions underlying that conclusion were arbitrary and capricious. *See ISDRA II*, 35 F. Supp. 3d at 1059-60 ("BLM determined that adopting the preferred alternative would not result in a greater than *de minimis* increase in emissions of $PM_{10}$ and ozone . . . As a result, the BLM was not required to make a 'conformity determination' under the CAA in order to adopt the 2013 RAMP."). Here, in contrast, the BLM concluded that $PM_{10}$ emissions *would* exceed *de minimis* levels, and the question is whether the BLM's conformity determination complies with the law.

The Court agrees with plaintiffs that the BLM did not comply with the portion of the regulation that requires the agency to identify "the process for implementation and enforcement" including "an implementation schedule containing explicit timelines for implementation." The FSEIS Appendix B does not discuss a process for implementation or enforcement nor does it contain a timetable for implementation (and the BLM did not respond to this issue in its papers). *See Stand*

1    *Up for California! v. U.S. Dep't of Interior*, 204 F. Supp. 3d 212, 322-23 (D.D.C. 2016) (finding

2    tribe complied with 40 C.F.R. § 93.160(a) where tribe's resolution stated mitigation measures would

3    be implemented "prior to the operation of the project.").

4           However, the Court is not persuaded by plaintiffs' other FLPMA challenges to the air quality

5    impacts analysis.  Plaintiffs have not cited any authority for their contention that the BLM was

6    required to provide a more specific description of the control measures, and the Court concludes

7    that the description of control measures is sufficient.  *See Stand Up for California!*, 204 F. Supp. 3d

8    at 322-23 (rejecting the plaintiffs' argument that tribe "fail[ed] to identify precisely" what the tribe

9    would do to ensure conformity requirements were met in violation of 40 C.F.R. § 93.160(a) where

10   tribe's resolution contained mitigation measures specified in final conformity determination).

11          Citing AR 133489, plaintiffs also argue that the BLM ignores evidence in the record

12   indicating that the listed "reasonably available control measures" will not effectively mitigate $PM_{10}$

13   emissions.  That document is an email exchange between BLM staff and a local air district official

14   in which the BLM employee states that two general measures related to paving "are not [] feasible

15   reasonable available control measures for the BLM" because of the "predominantly rural setting,"

16   and the air district official responds, "I am well aware how unapplicable those [reasonable available

17   control measures] are – don't blame me.  Blame USEPA.  We are (were) stuck with them."  *Id*. AR

18   133489-133490.  The Court finds that this email exchange does not support plaintiffs' general

19   assertion that the six listed control measures would not be effective.  As an initial matter, four of the

20   listed measures do not involve paving.  AR 144216 (ROD Appendix B, Errata); AR 204957 (same).

21   The two measures that do involve paving state that BLM will install "paving or other stabilization"

22   of "major ingress/egress routes to unpaved/paved road access points" and of "major vehicle staging

23   and parking areas"; neither of these specific "paving or other stabilization" measures were explicitly

24   mentioned in the email exchange.

25

26   **II.    NEPA**

27          Plaintiffs contend that the BLM violated NEPA in four respects:  (1) the "no action"

28   alternative is inconsistent and ignores the status quo; (2) the BLM failed to consider a reasonable

range of alternatives; (3) the BLM inadequately evaluated the 2019 Route Network's impacts; and the FSEIS fails as an informational document and as a result the BLM unlawfully impaired public participation.

"In reviewing the adequacy of an EIS, we apply the 'rule of reason' standard, which requires a 'pragmatic judgment whether the EIS's form, content and preparation foster both informed-decision-making and informed public participation.'" *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2015)). The Court evaluates an EIS "simply to determine whether it 'contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' of a challenged action." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000) (quoting *Oregon Env't. Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987)). The Court "need not agree with the agency's conclusions; we must approve the EIS if we are satisfied that the EIS process fostered informed decision-making and public participation." *Id.* If the Court determines that the agency took a "hard look" at a project's environmental consequences, that is sufficient. *Id.*

### A.    No Action Alternative

Before analyzing plaintiffs' current challenge to the no action alternative, it is important to provide context. The Court's 2009 summary judgment order detailed the labyrinthine process by which the OHV route network evolved between 1980-2006 through BLM route designation efforts as well as unsanctioned user-driven proliferation of OHV routes. *See WEMO I*, 746 F. Supp. 2d at 1062-68 (discussing history). With regard to plaintiffs' prior challenge to the no action alternative, the Court held,

> Plaintiffs contend that neither the 2003 EA nor the FEIS uses a clearly defined baseline from which environmental impacts are discussed and compared. Plaintiffs contend that the correct baseline is the OHV route [network] as it existed in 1980 because that is the only OHV route [network] that is permitted by the CDCA Plan. In contrast, the BLM and the intervenors argue that the baseline in the 2003 EA and the FEIS (which are different) accurately reflect the baseline as it currently existed, and that is all that is required under the law.

The parties' arguments highlight one of the central difficulties of this case. While plaintiffs are correct that the CDCA Plan limited the OHV route network to those routes in existence in 1980, it is also true that there is no readily identifiable inventory of the OHV routes extant in 1980. It is also a fact that since 1980, the BLM has designated numerous OHV routes through the ACEC and 1985–1987 route designation processes—at least some of which did not exist in 1980—that have become part of the actual on the ground OHV route network. Further complicating matters is the fact that over the years, numerous "illegal" OHV routes that were not designated by the BLM have proliferated and also became part of the de facto OHV route network. . . . [T]he purpose of setting a baseline is because the "'no action' status quo alternative . . . is the standard by which the reader may compare the other alternatives' beneficial and adverse impacts related to the applicant doing nothing." *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1453 (9th Cir. 1984) (internal citation and quotation omitted).

To the extent that plaintiffs contend that the BLM was required to use the "1980" OHV route network as the "no action" alternative, the Court disagrees.  As a practical matter, there is no way to easily identify that network.  More importantly for NEPA purposes, the "1980 OHV network" cannot be the "no action" alternative against which the proposed action would be compared because the 1980 network has not been the status quo since 1980, decades before the proposed action. . . .

. . .

To fulfill NEPA's goal of providing the public with information to assess the impact of a proposed action, the "no action" alternative should be based on the status quo—with a full description of what the status quo is and how it was reached—and should be consistently used as the benchmark by which the various alternatives are compared.  The FEIS defined the "no action" alternative as the route network that had been adopted by the 2003 ROD (the 2003 EA routes), because that was the "status quo" at the time of the FEIS.  However, in order to present an accurate picture of that status quo "no action" alternative to the public, the FEIS should have informed the public that many of the routes included in that alternative were not part of the 1980 route network.  The FEIS also should have informed the public that the "no action" alternative consisted of a route network that was larger than both the 1980 OHV route network, as well as the 1985–1987/ACEC network, but smaller than the actual on the ground network as identified in the 2001–2002 inventory.  Only with all of this information could the public accurately assess the true nature of the status quo, as well as the proposed alternatives against which it is compared.  Of course, the development of the OHV route network from 1980 through the creation of the WEMO Plan is relevant both in the context of explaining and justifying the need to deviate from the 1980 cap (and amend the CDCA Plan language to eliminate that limitation), and in the context of the "no action" alternative.

*Id*. at 1090-91.

On remand, the BLM reformulated the no action alternative as follows:

The no action alternative is the travel management and grazing strategy in effect.  It is the strategy approved in the 2006 WEMO Plan, as modified by the US District Court (the Court) Remedy Order for specific routes, and reflecting recent changes that have resulted from legislation, or from identified valid existing rights.  It does not address policy inconsistencies identified by the Court in its Summary Judgment Order, including the limitation of the routes in the route network to existing routes as of 1980.

United States District Court
Northern District of California

1    AR 103406.  The FSEIS also described the history of the WEMO OHV route network, including

2    the various inventories and route designation efforts that had occurred both prior to the 2006 WEMO

3    Plan and upon remand.  AR 103368-103370, AR 103446-103448.

4         Plaintiffs contend that the reformulated no-action alternative is flawed because it is based on

5    the 2006 route network that the Court struck down, and they assert that the no action alternative

6    "should have reflected the route network that existed before 2006."  Pls' Mtn. at 26.[25]  At the hearing

7    on this matter, in response to questioning from the Court, plaintiffs' counsel stated that the no action

8    alternative should consist of "the pre-2006 legally established route network," which counsel stated

9    consisted of the 1980 OHV route network and OHV routes authorized in 2003.  Plaintiffs argue that

10   it is improper to base the no action alternative on any part of the 2006 route network, even those

11   parts that were allowed to go into effect through this Court's Remedy Order, and they argue that the

12   no action alternative should not include any of the "illegal" routes that proliferated between 1980

13   and 2006.

14        "A no action alternative in an EIS allows policymakers and the public to compare the

15   environmental consequences of the status quo to the consequences of the proposed action."  *Ctr. for*

16   *Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010).  The Court finds

17   that the "status quo" to be compared to the action alternatives is the OHV network that was left in

18   place after the 2011 Remedy Order because that was the actual, on the ground network that was

19   being used, and that was the network that would be changed under the action alternatives.  This

20   Court's 2011 Remedy Order vacated the portions of the 2006 WEMO Plan that formally adopted

21   new routes for OHV access – the Motorized Vehicle Access Networks in the Rand

22   Mountains/Fremont Valley and the Afton Canyon Natural Area, as well as the "connector route" in

23   the Stoddard Valley to Johnson Valley Corridor – and left in place the remainder of the existing

24   "status quo" OHV route network.  Remedy Order, 2011 WL 337364, at *3-4. Thus, the Court agrees

25

26   _____

27        [25]  Plaintiffs' motion also challenged the no-action alternative on the ground that it includes
     PA-I (removal of the 1980 route cap), and thus that it unlawfully assumed the existence of the very
     plan being proposed.  However, that is incorrect, as the FSEIS states that only the action alternatives
28   include PA-I.  AR 103401.

United States District Court
Northern District of California

1    with plaintiffs that the no action alternative cannot include elements of the 2006 OHV network that

2    the Court struck down because those routes were not supposed to be open and used during remand

3    and thus were not part of the status quo.[26]

4        However, to the extent plaintiffs contend that the no action alternative should consist of a

5    theoretical pre-2006 OHV network that did not actually reflect the status quo, the Court disagrees.

6    As a practical matter, it is impossible to reconstruct such a network for all of the reasons discussed

7    in the prior order, and the post-remand inventory efforts revealed further inaccuracies in the earlier

8    route inventories.  In addition, the purpose of the no action alternative is to provide a baseline for

9    comparison so that the agency and the public can understand the environmental impact of adopting

10   the various action alternatives, and a no action alternative that does not actually reflect the existing

11   status quo does not serve that purpose.  *See Ass'n of Public Agency Customers, Inc. v. Bonneville*

12   *Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997) (stating NEPA regulations "allow the status

13   quo to properly be the no action alternative" and that the "'no action' alternative may be thought of

14   in terms of continuing with the present course of action until that action is changed.").

15       Plaintiffs rely on *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024 (9th Cir. 2008),

16   for the proposition that agencies may not include in a no action alternative "even those elements of

17   the [plan] that [the court] did not explicitly strike down."  *Id*. at 1038.  The Court finds that this

18   statement must be interpreted within the particular facts of that case.  In *Friends of Yosemite Valley*,

19   the Ninth Circuit had twice held a land management plan (the "2000 CMP") invalid, with explicit

20   clarification in the second appeal that the "entire" 2000 CMP was "invalid."  Despite the Ninth

21   Circuit's clarification, the agency on remand prepared an EIS that assumed as its baseline "the

22   existence of the 2000 CMP, which we previously held invalid."  *Id*.  On the third appeal to the Ninth

23

24       [26] It is not clear from the parties' briefing or the record whether the no action alternative in
     fact improperly included any OHV routes that the Court vacated in the Remedy Order.  Plaintiffs

25   assert that the no action alternative improperly included OHV routes in the Western Rand Mountains
     and Afton Canyon ACECs in areas that had been closed or "mostly closed" prior to 2006 (and

26   therefore, presumably, were "new" routes in the 2006 WEMO Plan).  The BLM disagrees with
     plaintiffs' assertion that those ACECs had been closed prior to 2006.  Defs' Reply at 12-13.  The

27   BLM also argues that in any event, the OHV route mileage issue is not substantial, suggesting that
     any error is inconsequential.  The FSEIS no action alternative lists 13.1 miles of OHV routes in

28   Afton Canyon ACEC and 57.4 miles of OHV routes in Western Rand Mountains ACEC, AR
     103377, 103799.  The parties shall address this issue during the remedy proceedings.

United States District Court
Northern District of California

Circuit, the court held that the agency's no action alternative was "logically untenable" because it "assume[d] the existence of the very plan being proposed." *Id*. Here, in contrast, the Court did not strike down the entirety of the 2006 WEMO Plan, and – at least as described in FSEIS at AR 103406 – the no action alternative does not include portions of that plan that the Court vacated, and simply reflects the status quo. *See Bonneville Power Admin.*, 126 F.3d at 1188; *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Dep't of Interior*, 929 F. Supp. 2d 1039, 1051-54 (E.D. Cal. 2013) (discussing various cases "approving the use of a 'status quo' no action alternative" and cases that "confirm that it is appropriate for a no action alternative to reflect 'historic uses' of a resource").

### B.      Reasonable Range of Alternatives

In the prior summary judgment order, the Court held that the BLM failed to consider an adequate range of alternatives because all seven alternatives were based upon "the same [5,098 mile] OHV route network, with variations on the extent to which the routes would be designated 'open' versus 'limited'; no alternative proposed closing additional routes to OHV use." *WEMO I*, 746 F. Supp. 2d at 1088. On remand, the FSEIS considered five alternatives. The FSEIS states,

> The different networks were developed by choosing a set of objectives; establishing minimization triggers to indicate a potential effect with respect to the 43 CFR 8342.1 [criteria] based on proximity between route and resource or related factor for each of the 32 resources; and additional recreation and use data relevant to objectives, and then running a GIS analysis which generated the route designations for each alternative. The output was then augmented to factor in other resources not available in GIS and route knowledge, public input, and network needs.

AR 103379. The five alternatives considered in the FSEIS are:

- Alternative 1 (no action): 5,677 miles Total Motorized (OHV Open and Limited); 9,957 miles OHV closed

- Alternative 2: 4,912 miles Total Motorized; 10,322 miles OHV closed

- Alternative 3: 10,280 miles Total Motorized; 4,954 miles OHV closed

- Alternative 4: 5,955 miles Total Motorized; 9,280 miles OHV closed

- Alternative 5 (preferred): 6,247 miles Total Motorized; 8,988 miles OHV closed[27]

---

[27] The BLM's 2019 Errata modified Alternative 5, reducing OHV Open and Limited routes from 6,247 miles to 5,997 miles, in response to legislation affecting land use designations. AR

United States District Court
Northern District of California

1    AR 103440 (Table 2.3-2), AR 103349-103350 (narrative description of alternatives); AR 103386

2    (stating that Alternatives 2-4 were developed for analysis and consideration in DSEIS, and

3    Alternative 5 was developed following agency review of public comments on the 2018 DSEIS and

4    that Alternative 5 is modeled after Alternative 4).

5        The FSEIS also states that two alternatives were considered but eliminated from detailed

6    evaluation.  AR 103443.  The first is an alternative that would have imposed a density cap on routes:

> Specific route density caps (mileage and township) were considered at length in the 2006 WEMO Plan for the entire Desert Tortoise (DT) Category I and Category II habitat areas.  The alternative was dismissed due to the arbitrary nature of the density caps, which had no basis in the Desert Tortoise Recovery Plan or the scientific literature.  The alternative was dismissed from further analysis in favor of a process that considered specific issues known to be associated with desert tortoise sensitivity (2005 WEMO Plan FEIS, p. 2-26).  In addition, the area wide density would need to consider the relative importance of other criteria resource values, which are also tied to specific factors related to each resource.  Opening or classification as transportation linear disturbance of a route may result in specific impacts to criterion resources.  The process of making a route designation for features based only on the area designation precludes a feature-specific consideration of resource impacts, as required by 43 CFR 8342.1.  Therefore this approach was again dismissed from further analysis.

*Id.*  The second alternative that was eliminated from detailed evaluation was the "1985-1987 ACEC

Route Network Alternative."  The FSEIS provides this explanation for why that alternative was

eliminated:

> This alternative would keep in place the specific route designations as they existed prior to the June, 2003 adopted interim route network.  This alternative was also considered at length in the 2005 WEMO FEIS (pp. 2-228-229) and dismissed from further consideration.  The alternative was dismissed due to several reasons: These issues are still valid—the network has continuity issues and design flaws.  Inaccuracies were found in locating routes in the open route network and the network lacked connectivity, particularly at the edges with ACECs and with networks on adjacent lands.  It no longer provides a reasonable network adjacent to substantially developed areas in the southern portions of the planning area. Substantial new rights-of-way, urban development, and other commercial and access development has occurred since that time.  While the 1985-1987 network did a fair job at documentation of its rationales for many of the closures and limitations under 43 CFR 8342.1, it did not do as good a documentation job for routes that were left open.
>
> In addition, a multitude of changes in resource conditions have ensued since these designations, which are more than 20 years old.  The network was developed prior to the listing of the desert tortoise as threatened and the designation of CHUs.  This network was developed prior to the California Desert Protection Act, which

United States District Court
Northern District of California

183523-183524; AR 204951-204972.  The BLM's October 2019 ROD adopted Alternative 5 as modified by the Errata.  *Id.*

designated areas of the planning area as Wilderness, prior to an OHV area addition and boundary adjustments, prior to many ACEC designations and boundary or management plan adjustments, prior to the listing of various plants, prior to the significant growth of the Victor Valley region.  Major changes have also occurred in the grazing program and due to major fires that resulted in watershed level changes in plant cover.  For these reasons, the 1985-1987 network was not carried forward for analysis.

AR 103443-103444.

Plaintiffs argue that the range of alternatives was inadequate because all of the action alternatives applied PA-1 (removing the 1980 route cap), and none included any type of route cap or constraints on future OHV route proliferation.  Plaintiffs assert that multiple commenters proposed viable constraints on future OHV route proliferation such as density caps, route length limits, seasonal limits, the rollback of routes to sometime after 1980, and/or restrictions on route proliferation in conservation lands designated in the DRECP LUPA, citing AR 96463, AR 97042-97043 (Public Comments).  Plaintiffs argue that each of these suggestions meets the expansive purpose and needs of the project and that the BLM's justifications for rejecting them are inaccurate and that the BLM did not meaningfully consider these viable proposed alternatives.  Plaintiffs also assert that because all of the action alternatives incorporated PA-1, the alternatives "bleed into one another" and therefore deprive the public of an informed comparison.  Plaintiffs also contend that the BLM should have considered at least one alternative with substantially lower route network mileage than the no action alternative.  Plaintiffs assert that Alternative 2, presented as the "environmentally preferred alternative," "is only 3.7 percent (186) fewer miles than the unlawful 2006 Route Network . . . and 13.5 percent (765) fewer miles than the 2019 no action alternative." Pls' Mtn. at 28.

Defendants respond that the FSEIS complied with NEPA and the Court's prior summary judgment order by evaluating a reasonable range of alternatives spanning an OHV network of 4,912 motorized miles (Alternative 2) to an OHV network of 10,322 motorized miles (Alternative 3), and they assert that such a range is "typical" for a travel management project.  Defendants also assert that plaintiffs' comparison of the total mileage in Alternative 2 to the 2006 network is flawed because, as noted in the WEMO SEIS, the 2006 network was based on an incomplete inventory (33% of the 2.35 million acres planning area), while the 2019 Route Network was based on a

United States District Court
Northern District of California

complete inventory of the same area.  AR 183580.  Defendants argue that "[w]hen properly evaluated against the more accurate 2019 Project inventory depicting over 15,000 miles of routes, the Alternative 2 network of 4,912 miles of motorized routes reflects a meaningful reduction in route density when compared to the 2006 Project."  Defs' Mtn. at 24-25.  Defendants also contend that the FSEIS rationally explains that the BLM chose not to impose route density caps because the agency chose instead to tie designations to the regulatory designation criteria as applied to specific resource conditions on individualized routes rather than through caps that are "arbitrary [by] nature[.]"  AR 103443.

The NEPA regulations require that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a) (2019).[28]  "Judicial review of the range of alternatives considered by an agency is governed by a 'rule of reason' that requires an agency to set forth only those alternatives necessary to permit a 'reasoned choice.'" *Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982).  "The scope of reasonable alternatives that an agency must consider is shaped by the purpose and need statement articulated by that agency." *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1097 (9th Cir. 2006).  "The [agency] must consider all reasonable alternatives within the purpose and need it has defined." *Id*.  "Agencies do not have to consider infinite, unfeasible, or impractical alternatives, but they must consider reasonable ones." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt*., 36 F.4th 850, 877 (9th Cir. 2022).  "The existence of a 'viable but unexamined alternative' renders the environmental review conducted under NEPA inadequate." *Id*.  However, "NEPA does not require an agency to consider 'every conceivable permutation' of its proposed alternatives." *Earth Island Inst. v. United States Forest Serv*., 87 F.4th 1054, 1065 (9th Cir. 2023).  A court evaluating whether a range of alternatives is reasonable "begins by determining whether or not the Purpose and Need Statement was reasonable." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004).

---

[28]  The Council on Environmental Quality revised the regulations implementing NEPA in 2020.  These amendments occurred after BLM conducted its environmental assessment and issued its decision.  Because the previous regulations were controlling at the time BLM conducted its assessment, the Court will refer to the then-existing regulations and requirements.

1    The FSEIS states that the purpose and need for the West Mojave Route Network Project "is

2    to provide a framework for transportation management, and specific travel management

3    implementation strategies in the CDCA Plan Limited Access Areas of the West Mojave Planning

4    Area. This framework and these strategies address (1) conflicts and threats to sensitive resources,

5    (2) current and anticipated future transportation and travel needs, (3) appropriate recreational access,

6    and (4) consistency with the CDCA Plan, as amended by the 2006 WEMO Plan, and the 2016

7    DRECP LUPA." AR 103370.

8    The Court concludes that the BLM considered a reasonable range of alternatives within this

9    broad statement of purpose and need. The BLM was required to balance motorized and recreational

10   access to the WEMO with the need to minimize environmental impacts, and the agency considered

11   alternatives ranging from 4,912 miles of OHV open and limited routes to 10,279.5 miles of OHV

12   open and limited routes, over a total network of over 15,000 miles. The FSEIS states that the

13   alternatives "provide both a framework for route designation and an implementation-level

14   transportation network and strategies to manage the risks and evaluate the impacts of the

15   transportation system on resources and resource uses," and notes that Alternative 2 addressed the

16   Court's direction that at least one alternative analyze a less extensive network. AR 103386. In

17   addition, Alternative 2 evaluated the elimination of livestock grazing within desert tortoise ACECs.

18   *Id*. The Court finds that this range of alternatives permitted a reasoned choice and informed

19   decision-making. *See Guzman*, 766 F. Supp. 2d at 1069-71 (holding Forest Service considered

20   reasonable range of alternatives spanning from low of 2,905 miles of motorized routes to high of

21   5,147 miles because the range "covers a wide variety of approaches" and was reasonable given

22   purpose and need of project "'to designate a system of roads, trails, and areas open for public motor

23   vehicle use,' while balancing a host of other factors including the reduction of 'impacts to forest

24   resources'").[29]

25   As to plaintiffs' contention that BLM should have considered an alternative that placed some

---

[29] The Court recognizes, however, that in light of the Court's rulings on plaintiffs' FLPMA and ESA claims, that the agency will be required to designate a different, and potentially smaller, OHV route network.

1   type of cap on OHV routes, such as a route density cap, the BLM's explanation for why it did not

2   include such an alternative is reasonable.  The BLM explained that a route density cap was dismissed

3   in favor of a process that would allow for a more particularized analysis of specific resources as

4   well as issues known to be associated with desert tortoise sensitivity.  In addition, as discussed

5   earlier in connection with plaintiffs' FLPMA challenge to PA-1, the Court is not persuaded that PA-

6   1 (and its inclusion in all of the action alternatives) means that there is no restriction on OHV route

7   proliferation, as any OHV route designation must comply with the minimization criteria set forth in

8   43 C.F.R. § 8342.1.

9           Although plaintiffs claim that BLM should have considered a "sufficiently small route

10   network" with "substantially lower route network mileage than the no-action alternative," plaintiffs

11   do not quantify or identify that alternative in their briefs, nor do they cite the administrative record

12   to show that a such a reasonable and viable alternative was proposed and rejected by BLM.  *See* Pls'

13   Mtn. at 28-29; Pls' Reply at 20-22; *cf. Earth Island Inst.*, 87 F.4th at 1063 ("Crucially, in order to

14   object to an agency's failure to address alternatives, a party must have submitted comments

15   identifying, or otherwise urging, alternative(s) beyond those evaluated in the EA.").

16           Plaintiffs cite *California v. Block*, 690 F.2d 753 (9th Cir. 1982), for the proposition that the

17   BLM was required to consider a smaller OHV route network.  In *Block*, the Ninth Circuit considered

18   the Forest Service's range of alternatives in a project to allocate roadless national forest system land

19   among three categories:  "wilderness," "nonwilderness," and "further planning."  The court held

20   that the range of alternatives was not reasonable because no alternative designated more than 33%

21   of the land as wilderness and thus the EIS "uncritically assumes that a substantial portion of the

22   [inventoried roadless] areas should be developed and considers only those alternatives with that end

23   result." *Id*. at 767.  However, as other courts have noted, *Block* must be viewed within the factual

24   context of a "challenge to a nation-wide, programmatic EIS for designating wilderness," as opposed

25   to a challenge to a management plan for a specific area designating appropriate OHV routes.  *See*

26   *Guzman*, 766 F. Supp. 2d at 1070-71.  In addition, as the district court in *Guzman* held in rejecting

27   a NEPA challenge to the Forest Service's range of alternatives, the fact that the BLM did not

28   consider an alternative "substantially" smaller than the no-action alternative "does not *per se* render

the range of alternatives unreasonable" because "[t]he reasonableness of the alternatives is measured from many angles, and not simply from a purely quantitative measure of the percentage of acreage reserved for wilderness protection."  *Id.* at 1069-70 (holding Forest Service considered reasonable range of alternatives designating between 2,905 and 4,351 miles of OHV routes, and rejecting argument that the agency should have considered an alternative that included more than 43% closure of existing motorized routes).

### C.    Evaluation of 2019 Route Network's Impacts

#### 1.    Baseline/"Hard Look"

Plaintiffs contend that the 2019 FSEIS failed to adequately assess baseline conditions and thus that the NEPA analysis of impacts was flawed.  Specifically, plaintiffs contend that the FSEIS was deficient because it contained a flawed route inventory and baseline data was either wholly missing or incomplete as to soils, riparian vegetation along dry washes, seeps and springs, and the MFTL.

"Establishing appropriate baseline conditions is critical to any NEPA analysis" because "'[w]ithout establishing the baseline conditions which exist  . . . before [a project] begins, there is simply no way to determine what effect the [project] will have on the environment and, consequently, no way to comply with NEPA.'" *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (quoting *Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988)).  The Ninth Circuit has instructed that agencies "have a duty to assess, in some reasonable way, the actual baseline conditions" at the location for the proposed project.  *Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 569 (9th Cir. 2016) (holding BLM failed to assess baseline conditions where FEIS contained no data about sage grouse numbers at particular site where wind turbines were to be installed and instead relied on flawed extrapolation using inaccurate data about sage grouse at other locations).

##### a.    Route Inventory

Plaintiffs first argue that BLM predicated its baseline routes on largely unverified aerial

60

survey data and therefore BLM mischaracterized desert washes as routes.  For the same reasons stated earlier in connection with plaintiffs' FLPMA challenge to the route inventory, the Court finds this contention unpersuasive.

### b.      MFTL

Next, plaintiffs argue that the BLM's assessment of the MFTL was inadequate, relying on the same arguments that plaintiffs made with regard to their FLPMA inventory challenge.  For the same reasons stated earlier in connection with plaintiffs' FLPMA challenge to the MFTL surveys, the Court finds this contention unpersuasive.

### c.      Riparian Vegetation

Plaintiffs devote one line of their motion to assert that the BLM failed to consider riparian vegetation along dry washes as part of the DSEIS inventory, citing a report prepared by a hydrology consultant for CBD.  AR 26689-26727; Pls' Mtn. at 30.  The portion of the report cited by plaintiffs states that the maps included in the DSEIS "fail to include riparian vegetation locations so that these areas may be assessed" and that "[i]t is clear that BLM failed to consider the riparian vegetation along dry washes as part of the DSEIS inventory."  AR 26703.

Defendants do not specifically respond to this argument except to cite portions of the FSEIS addressing riparian resources.    Chapter 3 of the FSEIS, which discusses the "Affected Environment," mentions riparian vegetation several times, including stating that "[a] total of 436 springs are found in the planning area, as well as approximately 46,600 acres of riparian vegetation," AR 103462, and mentions riparian vegetation in connection with assessments of springs and impacts of OHVs.  *See, e.g.*, AR 103462, 103588, 103661.

The Court concludes that plaintiffs' single citation to a report evaluating the DSEIS does not demonstrate that the BLM failed to consider riparian vegetation in the environmental baseline, particularly in light of the FSEIS' statement about the amount of acreage of riparian vegetation.

61

d.      Seeps/Springs and Soils

The Court addresses plaintiffs' baseline arguments about soils and seep/springs in the next subsections discussing those resources in greater depth.

## 2.      Riparian Areas and Springs

Plaintiffs assert a number of challenges to the FSEIS' assessment of riparian areas and springs in the WEMO planning area.  The first challenge is related to the Court's prior summary judgment order and the 2011 Remedy Order.  In *WEMO I*, the Court held that the 2006 FEIS was deficient as to its treatment of riparian and water resources because "there is no discussion or analysis of the impacts flowing from the OHV route network designated by the WEMO plan" and that "while NEPA does not require a detailed discussion of how every designated route will affect every riparian resource . . . the FEIS should contain some discussion of the particular impacts flowing from the WEMO Plan."  *WEMO I*, 746 F. Supp. 2d at 1096-97.  This Court's 2011 Remedy Order directed BLM to "carry out additional information gathering and monitoring regarding . . . riparian areas . . . including new 'proper functioning condition' ('PFC') assessments[30] for all of the springs and seeps in the Western Mojave planning."[31]  Remedy Order, 2011 WL 337364, at *9.

The FSEIS explains the work the BLM conducted on remand and states in relevant part,

### *Riparian Areas and Springs*

Aquatic wetland and riparian habitat occurs within the WEMO Planning Area. The primary locations of the riparian areas are along the Mojave River; however, riparian areas occur in other dispersed locations throughout the planning area. Creeks and springs primarily occur in higher elevation mountainous areas. Most creeks and some larger springs and spring complexes in the region support an area of riparian vegetation near the water source and in a linear zone leading downstream from the water source. The extent of these areas is usually limited, as evaporation and infiltration of the water removes it from the surface.

---

[30]   PFC assessments determine, for example, whether a water body is in functioning condition or is at risk.  AR 103462, 183674-183679.

[31]   Defendants assert that the Court's use of "planning" "is not entirely clear, particularly since PFC assessments are typically conducted on a systemically derived sample of riparian features to determine functioning conditioning in the livestock grazing management context," Defs' Mtn. at 29 n.12 (citing AR 196159-196161).  The Court agrees that the word "planning" is unclear, and that this sentence should have read "planning area."

In 2015, BLM contracted with Andy Zadon & Associates to collect basic water quality components like water temperature, pH and TDS at seeps, springs wetlands and creeks in both Barstow and Ridgecrest.  In addition, the data collectors often did a PFC assessment.  The PFC assessments conducted in 2015 and 2016 were conducted at the peak of a prolonged drought cycle.  Often their findings differ from PFC assessment conducted at the same source years earlier and often rated the source from PFC to Functioning-at-Risk with the primary cause of the downgrade attributed to prolonged drought conditions.  The 2015 and 2016 PFC assessment conducted by Zadon may not reflect the "true" conditions of that source but rather the cumulative, deleterious effect on riparian vegetation's vigor and ability to reproduce because of a prolonged drought on riparian health.  These PFC assessments should not be ignored but may need to be considered skewed based primarily on a natural phenomenon, the prolonged drought conditions.  The results of these assessments are presented in Appendix E.

AR 103462.  Appendix E to the FSEIS states that "[a]s of April, 2016, BLM has completed a total of 162 PFC assessments in the planning area," and contains Table E.3-2, which "describes those seeps, springs, wetlands and creeks that have been assessed for PFC between 2011 and 2016."  AR 183674.

Plaintiffs first complain that the BLM only did PFC assessments for 162 of the 183 springs, and thus that (1) the BLM failed to present an accurate baseline assessment and (2) BLM has not complied with the Remedy Order.[32]  Although plaintiffs assert that NEPA requires the BLM to use "complete baseline data," Pls' Mtn. at 30, plaintiffs do not identify any authority for that proposition, and plaintiffs do not explain why the absence of PFC assessments for 21 of 183 springs (11.4%) means that the baseline is inadequate.  Further, while incomplete data could certainly lead to an inaccurate or flawed environmental baseline, it does not follow that the converse – that "complete" data is required in order for an accurate or adequate environmental baseline – must be true.

Plaintiffs rely on *Northern Plains Resource Council, Inc. v. Surface Transportation Board*, 668 F.3d 1067 (9th Cir. 2011), but that case does not hold that an agency must conduct a "complete" inventory in order to prepare an accurate environmental baseline.  In *Northern Plains Resource Council*, the Ninth Circuit held an EIS inadequate where it did "not provide baseline data for many of the species, and instead [the agency] plan[ned] to conduct surveys and studies as part of its post-

---

[32]  Plaintiffs also assert that the BLM "relied on two competing spring datasets," with one set identifying 436 springs within the planning area and the other identifying 183 springs, and they assert that BLM "did not explain the relationship between these datasets."  Pls' Mtn. at 31.  However, as defendants note in their opposition, the FSEIS states that there are a total of 436 springs in the planning area, of which 183 are on BLM public lands.  AR 103462.

United States District Court
Northern District of California

approval mitigation measures." *Id*. at 1083.  The Ninth Circuit rejected the agency's argument that it could rely on outdated aerial photographs and aerial surveys, both because the photographs and surveys were outdated (from 10-22 years prior to the EIS), and because the agency relied on the aerial photographs and surveys to "identify habitats and populations of fish, plants, and other wildlife" without "any explanation in the record of what reliable methodology allowed it to determine the population of fish in rivers or identify sensitive plant species from these aerial surveys." *Id.* at 1085-86.  Here, in contrast, the BLM has provided baseline data for 162 of 183 springs (as well as data about other riparian resources) based on surveys conducted within a reasonable time period of the FSEIS.  The Court concludes that BLM has assessed, "in some reasonable way," the baseline conditions of springs.  *Oregon Nat. Desert Ass'n*, 840 F.3d at 569.

To the extent plaintiffs contend that BLM has not complied with the Remedy Order, the Court finds that this issue should have been raised in the *WEMO I* action, Case No. 06-4844 SI (N.D. Cal.).  As the parties are aware, in that case defendants provided regular status reports regarding the implementation of the Remedy Order, and Magistrate Judge Vadas presided over several motions related to enforcement and implementation and also held periodic status conferences with the parties.  It is not clear to this Court whether plaintiffs ever raised an issue regarding completion of the PFC assessments in those proceedings, but in any event, that would have been the proper avenue for relief.

Plaintiffs next complain that the information contained in the FSEIS about the surveyed springs was inadequate.  Plaintiffs note that of the springs the BLM did survey, 60 were found to be impaired.  AR 183674-183679 (Table E.3.2 listing seeps and springs and PFC findings).  Plaintiffs argue that the BLM did not "explain the reasons for all of these impairments, nor did it publish the underlying data from these assessments," and they contend that these failures violate 40 C.F.R. § 1502.24 (2019) and prevent the public from engaging in informed decision making.  Plaintiffs also assert that ground-truthing by conservation group call into question the "veracity" of the PFC assessments, citing AR 95579-95992.

Table E.3-2 contains a list of the seeps and springs assessed by the BLM as well as the PFC findings, such as "proper functional condition," "non-functional," "functional at risk" and so on.

AR 183674-183679.  Some of the entries state "non-functional" or "functional-at-risk" without any additional information, while others provide some information, such as "collapsed well" or "burned in 2016," or "stop ongoing disturbance 99% of the water captured in a pipeline system and is unavailable to wildlife."  *Id.*  While plaintiffs contend that BLM should have provided more fulsome explanations and supporting data, the regulation cited by plaintiffs[33] does not impose such a requirement and plaintiffs do not otherwise demonstrate how the information provided violated NEPA.

Plaintiffs also argue that the "BLM failed to acknowledge and correctly interpret data about the impacts of OHVs on springs."  Pls' Mtn. at 31.  Plaintiffs assert that "the BLM claimed that lower spring quality was primarily caused by 'prolonged drought conditions,' AR 103462, and that '[t]he vast majority of at-risk or non-functional' results were caused by 'mining activities, private land encroachment,' or grazing, AR 103661."  Pls' Mtn. at 31.  Plaintiffs contend that these claims are unsupported and run counter to the evidence before the agency because "[d]ata in the record shows that droughts account for 22 percent of spring disruptions, and that OHVs and roads – not mining, private lands, or grazing – are the second-most common cause of spring disruption."  *Id.* (citing Table E.3-2 at AR 183674-183679 for the proposition that OHVs cause 19 percent of spring disruption and that "[n]one of BLM's data indicate that mining activities caused spring disruption").

The Court finds these challenges lack merit.  As to the FSEIS statement about drought conditions, the FSEIS stated,

> The PFC assessments conducted in 2015 and 2016 were conducted at the peak of a prolonged drought cycle.  Often their findings differ from PFC assessment conducted at the same source years earlier and often rated the source from PFC to Functioning-at-Risk with the primary cause of the downgrade attributed to prolonged drought conditions.  The 2015 and 2016 PFC assessment conducted by Zadon may not reflect the "true" conditions of that source but rather the cumulative, deleterious effect on

---

[33] The 2019 version of that regulation stated,

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements.  They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement.  An agency may place discussion of methodology in an appendix.

40 C.F.R. § 1502.24 (2019).

United States District Court
Northern District of California

> riparian vegetation's vigor and ability to reproduce because of a prolonged drought on riparian health.  These PFC assessments should not be ignored but may need to be considered skewed based primarily on a natural phenomenon, the prolonged drought conditions.

AR 103462.  Thus, it is not quite accurate to assert that the BLM "claimed" that the lower spring qualities were primarily caused by drought conditions.  Rather, the BLM provided factual context for the 2015-2016 PFC assessments, noting that they were conducted "at the peak of a prolonged drought cycle," and that those assessments "may not reflect the 'true' conditions" but rather the effects of drought and "may need to be considered skewed."  While plaintiffs may disagree with how to evaluate the information presented in Table E.3-2, the Court finds nothing misleading in the FSEIS discussion at AR 103462 or the information contained in the table.  Further, "[a] court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise."  *N. Plains Res. Council, Inc*, 668 F.3d at 1075.

Finally, plaintiffs argue that the BLM's analysis of impacts on water resources is "rife with unexplained inconsistencies and unsupported methodologies."  Plaintiffs assert that the BLM evaluated impacts to water resources from OHV stopping and parking as if each alternative allows 300 feet from a route for these activities, AR 103462, despite the fact that outside of conservation areas, parking and stopping distances vary drastically between alternatives.  The no action alternative allows parking and stopping within 300 feet, Alternatives 3,4, and 5 allow 100 feet, and Alternative 2 allows 50 feet.  AR 103399.  Plaintiffs argue that the BLM's arbitrary and unexplained use of 300 feet across the board to assess impacts obscures the harms Alternative 5 will have on water resources.  Plaintiffs also argue that the BLM operated on the unfounded assumption that all route corridors are at least 50 feet wide, using this width to compare the impacts of each alternative on riparian areas.  AR 103462.  Plaintiffs argue that elsewhere in the FSEIS, however, the BLM calculated the total acreage of routes by assuming that all routes are 12 feet wide.  AR 103394, 103612.  Plaintiffs assert that the BLM did not acknowledge or explain this discrepancy and that nowhere in the FSEIS or other planning documents does the BLM list route-by-route widths or discuss how widths differ between alternatives.  AR 103397-400.

The FSEIS states,

1
2
3
4
5
6
7

> In the impact analysis in Chapter 4, BLM evaluated the mileage of routes in close proximity to riparian areas and springs as an indicator of potential impacts from OHVs. To support the analysis, BLM developed a GIS-based inventory of springs and riparian areas throughout the planning area. A total of 436 springs are found in the planning area, as well as approximately 46,600 acres of riparian vegetation. Because 50 feet is the minimum corridor width for routes under any of the alternatives, all riparian areas within 50 feet of a route have the potential to be impacted by OHV use. Therefore, this distance was considered to be a measurement of how the designated route network might impact Proper Functioning Condition (PFC) of riparian areas throughout the planning area. The analysis also included quantification of the mileage of routes passing within 300 feet of all springs in the planning area. The 300 foot width is the current allowable stopping and parking distance outside of DT ACECs in the planning area, and therefore captures all potentially-impacted springs in the area.

8

AR 103462. The Chapter 4 Environmental Consequences analysis states, in relevant part,

9
10
11
12
13
14
15

> In that analysis, riparian resource impacts were considered as a criterion in determining which routes would remain open and which would be designated as transportation linear disturbances under the various alternatives. Riparian area impacts were considered by evaluating route locations with respect to proximity to identified riparian areas and springs, and either placing limitations or designation of routes as transportation linear disturbances that are within 50 feet of a riparian area or 300 feet of a spring. To date, PFC assessments have revealed that vehicle routes have little to no direct impacts to riparian areas with only a few exceptions, such as where they physically lead to the removal of riparian vegetation such as at stream crossings. In addition, the WMRNP alternatives include consideration of stopping and parking distances from routes in order to minimize disturbance in previously undisturbed areas, thus reducing the potential for new impacts to riparian areas.

16

AR 103661. Table 4.3-3 compares the mileage of routes in proximity to riparian areas and springs.

17

AR 103664.

18

The Court finds that the FSEIS sufficiently describes the methodologies used as well as the

19

impacts of the alternatives on riparian resources, and that plaintiffs have not shown that the BLM's

20

approach is arbitrary and capricious or contrary to law. BLM explained its process and why it chose

21

to use 50 feet and 300 feet, and BLM used data from a GIS inventory of springs and riparian area

22

to evaluate impacts. While plaintiffs quibble with BLM's choice of 50 feet versus 300 feet, or the

23

size of route used, BLM used the same methodology across the alternatives, thus allowing for a

24

comparison among alternatives. *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 735-

25

36 (9th Cir. 2020) (rejecting challenge to agency's methodology where agency used the same

26

methodology in comparing the no-action and action alternatives and "[t]he analysis is ultimately a

27

relative comparison, sufficient for making a "reasoned choice among alternatives.'").

28

### 3.     Soils

The Court's prior order found that while the 2005 FEIS contained a detailed discussion of the general impacts of OHVs on soils, "what is lacking from the FEIS is a discussion of how soils would be impacted by the proposed WEMO OHV route network."  *WEMO I*, 746 F. Supp. 2d at 1094.  The Court stated that "the BLM need not provide a detailed description on a route-by-route basis; however, the FEIS should contain some discussion of the particular impacts on soils of the proposed Plan."  *Id*.

Plaintiffs contend that the BLM's discussion of soil impacts is still deficient because the BLM focused on soil erosion and "ignored" soil compaction.  Plaintiffs argue that because it is well established that soil compaction is one of the most common and important effects of OHV use, "comparing soil compaction on a route-by-route basis and between alternatives was crucial, but not performed here."  Pls' Mtn. at 29.

Chapter 4 of the FSEIS discusses the environmental consequences of the 2019 Route Network, and contains a section on the effects on soil resources from OHV use.  AR 103643-103655.  That section includes, *inter alia*, three subsections in which soil compaction is discussed:  "Impacts Common to All Alternatives," AR 103643-103645; "Effect of Route Designation," AR 103648-103649; and "Resource-Specific Minimization and Mitigation Measures," AR 103654-103655.  Plaintiffs are correct that the subsection "Differences in Impacts Among Route Designation Alternatives" focuses on soil erosion and does not also specifically address soil compaction.  AR 103652-103654.  However, the fact that this particular subsection does not address soil compaction does not support the conclusion that the BLM "ignored" soil compaction.  *See, e.g.*, AR 103649 ("In addition, the WMRNP alternatives include consideration of stopping and parking distances from routes in order to minimize disturbance in previously undisturbed areas, thus reducing the potential for soil compaction.").  Plaintiffs do not cite any authority under NEPA for the contention that the BLM was required to evaluate the impacts to soil compaction in the level of detail that they claim, and the Court finds that the FSEIS contains a "reasonably thorough discussion" of soil compaction.  *See Nat'l Parks & Conservation Ass'n*, 222 F.3d at 680.

Plaintiffs also argue that the BLM failed to evaluate the relative impacts of the different

1  alternatives on sensitive soil resources, such as biotic soil crusts and desert pavements.  Plaintiffs

2  argue that the BLM refused to evaluate the impacts because it did not know where the resources

3  were.  AR 103457-103458 ("The distributions of sensitive soils on BLM lands in the WEMO

4  Planning Area depicted here are presently incomplete.").  Plaintiffs argue that the BLM is required

5  to "use its best efforts to find out all that it reasonably can," *Bernhardt*, 982 F.3d at 735, and that

6  the BLM ignored extensive soil mapping data already in the record, citing AR 26179-26182, 26706.

7        The BLM responds that there is no legal requirement that it conduct mapping of sensitive

8  soil resources such as biotic crusts, and it argues that it sufficiently discussed the impact of the 2019

9  OHV Network on sensitive soils, citing the FSEIS's discussion of biotic crusts and sensitive soils

10  at AR 103457-103458 and the discussion of impacts to soils on all alternatives, including mitigation

11  measures, at AR 103643-103655.  The BLM argues that these sections show that the BLM analyzed

12  impacts to sensitive soils such as biotic soil crusts by noting that OHV-related soil impacts can

13  include "removal of vegetation or [biotic soil crusts] that stabilize surface soils," AR 103643, and

14  that designation of routes as TLDs can facilitate reestablishment of BSCs.  AR 103617.

15        The Court notes that while the FSEIS states that the mapping of biotic soil crusts and

16  sensitive soils is incomplete, the FSEIS also states that "[a]s the BLM continues to collaborate with

17  the USDA Natural Resource Conservation Service on surveying and mapping West Mojave Desert

18  soils, missing data will become available."  AR 103457-103458.  While plaintiffs are unhappy with

19  the fact that all of the mapping had not been completed by the time of the FSEIS, the Court cannot

20  conclude that the BLM's discussion is inadequate under NEPA.  As whole, the Court finds that the

21  FSEIS's discussion of impacts to soils is "reasonably thorough."

22

23              **4.    Air Quality**

24                  a.    OHV Open Areas

25        Plaintiffs contend that BLM failed to analyze air quality impacts in two ways.  First,

26  plaintiffs contend that despite this Court's previous holding that the 2006 EIS' "discussion of

27  impacts on air quality [was] incomplete without consideration of emissions in open areas," *WEMO*

28  *I*, 746 F. Supp. 2d at 1098, BLM did not do a complete analysis of emissions in open areas.  Plaintiffs

cite the FSEIS at AR 103450, which states that "[f]ugitive windblown dust was not estimated for BLM WEMO Open OHV Riding Areas."  AR 103450.  Plaintiffs assert that because fugitive dust is the most significant direct air quality impact from OHVs, the BLM understated the air quality impacts of the 2019 Route Network by ignoring fugitive dust impacts in OHV open areas.

Defendants respond by first citing the BLM's description in the FSEIS of how the agency responded to the Court's order on remand:

> BLM coordinated with the California Desert Air Working Group (CDAWG), which included the five air districts within the WEMO Planning Area, to supplement its air quality analysis and develop a strategy to comply with the Remedy Order.  To demonstrate compliance with the Remedy Order, BLM contracted with the MDAQMD to compile the results from the 46 ambient air monitoring stations in a report to BLM (included in Appendix E).  The report concluded that OHV Open Areas are not a significant contributor to either total unpaved road dust or fugitive windblown dust subcategories, and are thus not a significant contributor to regional PM10 emissions. A detailed evaluation of the MDAQMD report is presented in Section 3.2 of this EIS. The WEMO Plan Conformity Analysis was re-visited for this FSEIS, based on the additional information provided in the Air Quality Analysis report, and the results are presented in Section 4.2 of this FSEIS.

AR 103384.  The MDAQMD report, contained in Appendix E states,

> OHV Open Area Contribution
>
> OHV Open Areas are indirectly inventoried as area sources, as an element of the unpaved road dust and the fugitive windblown dust subcategories.  OHV Open Areas are not significant contributors to either subcategory due to scale – the WEMO Planning Area includes thousands of miles of maintained and unmaintained unpaved roads and tracks, and tens of millions of acres of disturbed surface, and the contribution of the relatively small OHV Open Areas is equally relatively small. Regional experience with windblown dust has shown that heavily traveled unpaved roads and similar frequently disturbed (on at least a daily basis) surfaces are the primary contributor to regional dust problems. Confining OHV activity to existing defined OHV Open Areas has been an element of regional dust control planning for more than twenty years, and is an element of Federal PM10 planning.  OHV Open Areas are not a significant contributor to regional dust (PM10) emissions.

AR 183834.  Defendants argue that the record demonstrates that the BLM did consider air impacts in OHV open areas and concluded that those impacts were negligible, and that there is no requirement in either the Court's prior order or NEPA that the BLM conduct an analysis of fugitive dust emissions in this context.

The Court agrees with defendants.  The Court's prior order directing the BLM to consider air impacts in OHV open areas was in the context of evaluating the BLM's assertion that its preferred alternative in the 2006 EIS would result in significant reduction in particulate emissions.  *WEMO I*,

746 F. Supp. 2d at 1098.  The Court noted that the 2006 FEIS did not reflect that any analysis of air impacts in OHV open areas had occurred, and thus that the BLM's conclusion about a significant reduction in particular emissions was not supported.  *Id.*  On remand, the BLM cured this deficiency by considering air impacts in OHV open areas and concluding, based upon the MDAQMD report, that OHV open areas "are not significant contributors" to fugitive windblown dust.

### b.    Impacts Based on Growth

Next, plaintiffs argue that the BLM's analysis of air impacts was deficient because it violated 40 C.F.R. § 1508.8(b) (2019).  That regulation defined "direct" and "indirect effects," and stated that "indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate . . . ."  40 C.F.R. § 1508.8(b) (2019).  Plaintiffs contend that BLM expressly and improperly disregarded growth effects via two unreasonable assumptions about OHV usage.

First, plaintiffs contend that the BLM implausibly assumed that OHV usage levels would not vary between alternatives even though the alternatives differed by thousands of miles.  Plaintiffs argue that greater capacity promotes greater consumption, and they argue that a larger OHV network will likely get more use.  Second, BLM assumed there will be no "change in vehicle use on the route network between 2017 and 2035."  AR 183870, 103629, 103853.  Plaintiffs argue that BLM did not explain this assumption and that it runs counter to the evidence in the record, which shows that the number of OHVs registered in California has more than doubled since 1980 and BLM concedes elsewhere in the FSEIS that "recreation use would continue to increase."  AR 103546, 103614.

Defendants respond by citing the FSEIS' explanation for why BLM concluded that increasing or decreasing motorized route mileages would not cause corresponding changes in total miles of OHV travel:

> [T]he BLM does not anticipate that the total miles of OHV travel over the OHV route network changes as the result of actions under each alternative.  However, the distribution of miles of OHV routes in each alternative might differ locally from one alternative to another within the WEMO Planning Area.  As a corollary, if routes in a WEMO subarea are designated as transportation linear disturbances, the number of OHV users, the number of OHVs, and the amount of miles traveled are shifted to other open WEMO routes.  The distribution of routes designated as transportation

71

> linear disturbances and amounts of acres of route surfaces stabilized or restored may also differ among alternatives. Areas with more miles of routes designated as transportation linear disturbances will over time be producing fewer vehicle and dust emissions. For all SEIS alternatives, designation of routes as transportation linear disturbances is substantially greater than route re-openings. Rehabilitation of disturbed areas after designation of routes as transportation linear disturbances would reduce direct, indirect, and residual emissions and therefore benefit air quality.

AR 103618. Defendants also cite Appendix E to the FSEIS, which states that the BLM analyzed visitor data from the WEMO, *see* AR 183848, and they argue that the BLM's determination is entitled to deference. Finally, defendants assert that the BLM's approach is consistent with the approach the agency took with regard to the Imperial San Dunes Recreation Area, and they note that this Court rejected a similar challenge about route network size and OHV usage levels in connection with the 2013 Recreation Area Management Plan for the ISDRA *See ISDRA II*, 35 F. Supp. 3d 1137, 1162 (N.D. Cal. 2014), *aff'd*, 883 F.2d 1136, 1147-48 (9th Cir. 2016).

The Court concludes that the BLM's assumption that the total miles traveled is unrelated to the overall size of the OHV network has some support in the record, and therefore the Court cannot conclude that it is arbitrary and capricious. The FSEIS states "[t]he total miles traveled in the planning area appears to be primarily the result of population changes, economic activity, public land uses which require access, and demand for recreational opportunities," and thus that "the total miles traveled by OHVs within the WEMO Planning Area is unrelated to the overall size of the route network." AR 103613. The FSEIS also notes that when several acres of the Coolgardie subregion were closed to protect LMMV habitat, staff observed that the closure shifted users from the closed areas to nearby areas that were not fenced off. AR 103614. And while the ISDRA is a different geographic area than the WEMO, it is correct that in that case "[f]acts and data in the record tend to support the assertion that opening further acreage to off-road vehicle use would not lead to an increased number of visitors." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d at 1147.

However, the Court concludes that the assumption that OHV usage will remain constant from 2017 to 2035 has no support in the record, and therefore that it was arbitrary and capricious for the BLM to rely on that assumption in its analysis of air quality impacts. That assumption was contained in the Air Quality Analysis performed by Aspen Environmental Group for the FSEIS, AR

United States District Court
Northern District of California

United States District Court
Northern District of California

18370, and the basis for that assumption is not explained by Aspen.  *See* AR 183870.  Indeed, Aspen prepared 2035 air emissions analyses with a population/traffic growth assumption using State of California population projections, AR 183872-183874, but BLM chose not to use those analyses and instead opted for the no-population growth model without explanation.  AR 103629, 103853.[34] Other portions of the FSEIS undermine or directly contradict the assumption that OHV use will remain constant from 2017 to 2035.  The FSEIS states that the population of California and the planning area is expected to increase by 2035 and that an increase in population "is reflected in an increase in use of public lands for recreation throughout the Planning Area."  AR 103545-103546. Table 4.1.1 of the FSEIS, titled "General Assumptions for Analysis" of the environmental consequences of the proposed action explicitly states that two assumptions are that "[t]he level of recreation use would continue to increase in proportion to regional population growth, and will be higher near the centers of population growth" and that "[h]igh rates of urban growth would continue, especially in the southern and southwestern portions of the planning area."  AR 103614.

Defendants do not specifically address this argument except to cite this Court's prior order in *WEMO I*, 746 F. Supp. 2d at 1098.  Reliance on the Court's prior order is unavailing, however, because in the prior order the Court noted that plaintiffs were not challenging projections about future OHV levels.  *Id.* ("However, the cited statements consist of general background information, and do not contain projections about future OHV levels under the WEMO Plan.").  Here, in contrast, the assumption that OHV usage would remain unchanged between 2017 and 2035 is embedded in the air impacts analysis, and it underlies the forecast for 2035 ozone nonattainment/maintenance areas, AR 103629, and the forecast for air quality cumulative impacts by 2035 for $PM_{10}$ nonattainment and maintenance areas, AR 103852-103853 – both of which are contained in Chapter 4, Environmental Consequences.  Thus, unlike before, the unsupported assumption directly affected the agency's analysis of the environmental impacts to air quality and was not simply contained in a discussion of background information.  Because the agency's assumption is both unexplained and

---

[34]  The population growth analyses showed a "fairly substantial" difference as compared to the no-population growth analyses for $PM_{10}$ emissions, AR 183873, and an increase, though "not [a] substantial" one, for ozone.  AR 183874.

1    "runs counter to the evidence before the agency," it is arbitrary and capricious.  *State Farm*, 463

2    U.S. at 43.

3

4                    **5.    Climate Change/Greenhouse Gas Emissions**

5           Plaintiffs raise a number of challenges to the FSEIS' assessment of greenhouse gas emissions

6    ("GHGs").  As a threshold matter, plaintiffs contend that the BLM "specifically excluded GHGs

7    from its air quality report," Pls' Reply at 27, citing AR 183845 in the FSEIS for the proposition that

8    "[t]he scope of this inventory does not include . . . greenhouse gases . . . ."  However, plaintiffs'

9    selective quotation is misleading.  The full sentence, which is contained in the Aspen report, states,

10   "The scope of this inventory does not include toxic air contaminants, greenhouse gases, and certain

11   State of California criteria pollutants such as hydrogen sulfide and vinyl chloride *that are not*

12   *emitted, or are only emitted in negligible quantities*, by WEMO Route Network use."  AR 183845

13   (emphasis added).  Thus, the Aspen air quality report did address GHGs, and only excluded those

14   GHGs that were not attributable to the OHV route network.  The Aspen report explains that the air

15   quality analysis consisted of five steps, the first of which was to gather 2017 emissions inventories

16   for the jurisdictions within the WEMO, and those emissions include GHGs.  *Id*. at AR 183845-

17   183846 (explaining steps and showing 2017 emissions for carbon dioxide and nitrous oxide).

18          Plaintiffs also challenge the GHG analysis as incomplete.  Plaintiffs assert that the BLM

19   stated that there was insufficient data to predict local climate impacts with certainty, citing AR

20   103635.  Plaintiffs argue that BLM may not ignore scientifically-supported methods that exist to

21   assess the actual effects of greenhouse gas emissions by insisting that they are too speculative.  The

22   portion of the FSEIS cited by plaintiffs states, in relevant part,

23          Specific climate modeling efforts were not carried out for the WEMO Planning Area
             due to the limited availability of site and activity specific data and the limited timing,
24          availability and applicability of modeling systems for the scope and range of
             alternatives.  The recent climate modeling efforts for the 2016 DRECP LUPA can be
25          applied to much of the general WEMO area, and related resources, and have been
             incorporated in this analysis, where appropriate.
26

27   AR 103635.  Thus, the BLM stated that while specific climate modeling efforts were not conducted

28   for the WEMO planning area, climate modeling for the 2016 DRECP LUPA – which encompassed

United States District Court
Northern District of California

the WEMO planning area – could be applied and was incorporated as appropriate.  AR 103348 (FSEIS stating that "The DRECP addressed a larger land area than the WEMO Planning Area, but the WEMO Planning Area is entirely encompassed within the DRECP area."); *see also N. Plains Res. Council*, 668 F.3d at 1088-89 (agency may incorporate by reference coverage of matters of broader environmental impact into subsequent narrower environmental analysis).

Plaintiffs' other challenges, however, have merit.  Plaintiffs contend that the BLM improperly failed to analyze GHG impacts among alternatives, *see* AR 103857 ("Plan alternatives were not evaluated individually for their resilience to the effects of greenhouse gases."), despite the fact that the FSEIS states that "as exhibited in Appendix E, Alternative 3 has a higher potential to contribute to overall GHG emissions." AR 103636.  Defendants do not specifically respond to this contention except to cite AR 103641 of the FSEIS which states that "the designation of the transportation network under the WMRNP alternatives would have no discernible effect on the volume of OHV use, and therefore no effect on associated GHG emissions."  However, the Court finds it internally inconsistent to state that Alternative 3 has a higher potential to contribute to GHG emissions but then also state that the alternatives have no effect on those emissions.  In addition, for the reasons stated earlier, the Court finds that the "no population growth" assumption, which also impacted the GHG analysis, is unsupported and arbitrary and capricious.

### D.    Informational Document/Public Participation

Plaintiffs argue that the FSEIS fails as an informational document for all of the reasons stated above, and also because the BLM's Errata only provided limited information about major changes to the 2019 Route Network made in response to new legislation and failed to describe how those changes affected each of the alternatives.  Plaintiffs contend that the Errata contained only a "bare bones" summary that listed changes to Alternative 5 and did not present a true comparison of Alternative 5 as presented in the FSEIS with Alternative 5 in the Errata, and no comparison of Alternative 5 in the Errata with the other alternatives.  Plaintiffs note that BLM did not provide new route mileage totals in the Errata, and that instead the public is "left to add or subtract the approximate miles impacted, and even then it is nearly impossible to discern where the changes in

1
2
3
4
5
6
7
8

miles occurred" or how the changes alter resources impacts.  Plaintiffs argue that this violates NEPA's requirement that agencies provide the public "with an accurate assessment of the information to evaluate" an agency's proposed action.  *Nat. Res. Def. Council*, 421 F.3d at 811-13.  Plaintiffs also contend that BLM's process for designating routes was opaque and unexplained, and thus thwarted public scrutiny.  For example, plaintiffs argue that Appendix G provided only minimal, boilerplate descriptions of BLM's minimization approach that did not explain how the criteria informed actual route designation, and that BLM's description of network-wide minimization measures listed in Table 2.2-1 is similarly opaque.

9
10
11
12
13
14

Defendants respond that plaintiffs have not cited any authority in support of their arguments that the Errata should have included different information, and they note that the Errata was issued after the period for public comment had closed.  As to plaintiffs' arguments about the FSEIS' description of the route designation process, defendants contend that plaintiffs are attempting "to graft some presentation of hard data or similar NEPA-based requirement onto the FLPMA-based minimization duty."  Defs' Reply at 20.

15
16
17
18
19
20
21
22
23
24
25

An agency "has discretion in deciding how to organize and present information in an EIS." *Montana Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013) (rejecting plaintiffs' claim that the BLM should have structured an FEIS differently by including sections "devoted exclusively to elk, bighorn sheep, . . . and other objects of the Monument" rather than    "around specific subjects—air quality; cultural resources; fish and wildlife [etc.]" because "BLM's decision to structure the FEIS in this fashion was within the agency's discretion").  "Where the information in the initial EIS was so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of the alternatives, revision of an EIS may be necessary to provide 'a reasonable, good faith, and objective presentation of the subjects required by NEPA.'" *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989) (quoting *Johnston v. Davis*, 698 F.2d 1088, 1095 (10th Cir. 1983)).

26
27
28

The Court concludes that the BLM's Errata and FSEIS did not violate NEPA.  While the Errata could have provided more detail regarding the changes made to the 2019 Network, including a comparison of the alternatives, the Court cannot conclude that the information provided was "so

United States District Court
Northern District of California

1    incomplete or misleading," and the Court does find it significant that the Errata was issued after the

2    time for public comment had closed.

3          As to the discussion of the OHV route designation process, although the Court has found

4    that the BLM did not comply with the FLPMA minimization criteria, the Court declines to find that

5    the BLM's description of its process was inadequate as a NEPA matter.  Plaintiffs cite 40 C.F.R.

6    § 1502.24 (2019), which required agencies to "identify any methodologies used" in an EIS.  The

7    BLM complied with that regulation by identifying the methodologies it used to designate OHV

8    routes.  Plaintiffs argue that the BLM's disclosure of its methodologies was inadequate because the

9    BLM did not explain how its designated OHV routes consistent with the FLPMA minimization

10   criteria.  However, while the BLM's methodology was flawed under FLPMA for the reasons

11   discussed *supra*, that does not mean that the BLM's *description* of its methodology was inadequate

12   such that it impaired public participation.

13

14   **III.    Endangered Species Act**

15         Plaintiffs assert five claims under the ESA.  First, plaintiffs challenge the BLM's

16   determination that the 2019 Route Network Project would have "no effect" on three listed birds, the

17   consequence of which was that the BLM did not engage in formal consultation with FWS regarding

18   those species.  Second, plaintiffs challenge as flawed the FWS's conclusion that the 2019 Route

19   Network was not likely to jeopardize the continued existence of the desert tortoise, contending that

20   FWS failed to evaluate the best available science and did not adequately consider recovery of the

21   species.  Third, plaintiffs contend that the Incidental Take Statement for the desert tortoise contained

22   in that Biological Opinion uses an improper "surrogate" method and lacks required "reasonable and

23   prudent measures and terms and conditions."  Fourth, plaintiffs claim that FWS's analysis of the

24   impacts of PA-I was defective because FWS assumed PA-I only applied to the WEMO Planning

25   Area, while plaintiffs assert that PA-I in fact applies to the entire CDCA.  Finally, plaintiffs contend

26   that because of these errors, the BLM violated the ESA by issuing the 2019 ROD.

27

28

United States District Court
Northern District of California

77

### A.   "No Effect" Determination for Least Bell's Vireo, Southwestern Willow Flycatcher and Yellow-Billed Cuckoo

When the BLM initiated formal ESA consultation with the FWS regarding the 2019 Route Network Project, the BLM determined that three endangered birds – the Least Bell's Vireo, the Southwestern Willow Flycatcher, and the Yellow-Billed Cuckoo – "occur within the WMRNP Planning Area[,] [h]owever no routes designated as off-highway vehicle (OHV) open or limited will be within these species' habitat; therefore BLM has made a 'No Effect' determination for these species and will not be discussed further in this consultation request."  FWS 9190 (2019 letter from BLM requesting formal consultation with FWS); *see also* AR 17494-17495 (2015 BLM Biological Assessment ("BA") for WEMO Route Project stating that "[b]ased on a GIS evaluation which looked at the mapped range of these species and/or critical habitat, there was no overlap between this route network and these species' ranges or critical habitat" except for Least Bell's Vireo, and for that bird "only 0.5 miles of designated motorized open route overlaps with Least Bell's Vireo habitat . . . [and] [t]his route already exists on the ground and no new disturbance of habitat will be needed to maintain this motorized route.  Given this small overlap and lack of additional habitat impacts, the BLM has determined that there would be 'No Effect' on this species.").  Plaintiffs challenge this "no effect" determination.

"Section 7 imposes on all agencies a duty to consult with either the Fish and Wildlife Service or the NOAA Fisheries Service before engaging in any discretionary action that may affect a listed species or critical habitat." *Karuk Tribe of California v. U.S. Forest Serv*., 681 F.3d 1006, 1020 (9th Cir. 2012).  "The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts." *Id.*

Plaintiffs challenge the BLM's "no effect" determination for the three birds.  Plaintiffs argue that the BLM's finding is contradicted by information in the record showing that the 2019 Route Network may affect the species' habitat.  As support, plaintiffs cite portions of the FSEIS and Appendix E stating that the three birds are "potentially affected" by the TMA route designations. *See* AR 103497 (FSEIS, stating that Least Bell's Vireo is "considered to potentially occur within

the planning area based on recent documentation"); AR 183888 (FSEIS Appendix E, Table E.3-1 "Special Status Species" stating that the Least Bell's Vireo is "Potentially affected by TMA Route Designations" because "Habitat has been documented for this species within the proposed action area on BLM lands"); AR 183886 (same table, stating that Southwestern Willow Flycatcher is "Potentially affected by TMA Route Designations" because "Habitat for this species exists within the proposed action area" and also stating that "[i]n addition to the known breeding sites documented in the 2005 WEMO Final EIS" there were "historical occurrences"); AR 183886 (same table, stating that Western Yellow-billed Cuckoo is "Potentially affected by TMA Route Designations" because "Habitat has been documented for this species within the proposed action area on BLM lands"). Plaintiffs also assert that maps in the AR show that the 2019 route network intersects with the birds' habitat.  *See* Decl. of Curtis Bradley (Dkt. No. 40-1).[35]  Thus, plaintiffs argue that the record demonstrates that the 2019 route network "may affect" these three species.  Plaintiffs also argue that BLM's assertion of "no impact" because the 0.5 mile overlap of the route network and critical habitat for the Least Bell's Vireo does not cause new disturbance is immaterial because what matters is whether the agency action "may affect" the species, and a 0.5 mile overlap with the bird's critical habitat "may affect" it.

The BLM responds by providing the following context for its "no effect" determination.  The BLM states that in connection with the 2006 OHV route network, it analyzed the potential effects of the proposed WEMO project on the vireo and flycatcher (the cuckoo was not listed until 2014) and determined that the project would have "no effect" on these species.  FWS 10452 (FWS 2006 BiOp).  BLM states that although FWS was not legally required to weigh in on BLM's "no effect" determination, FWS concurred with that determination in its 2006 BiOp, stating,

> We are not aware of southwestern willow flycatchers breeding on lands managed by the Bureau in the planning area (Service 2002b).  Least Bell's vireos breed within the Big Morongo Canyon Area of Critical Environmental Concern (LaPre 2005i).  Both species migrate through the western Mojave Desert and, during migration,

---

[35]  The Bradley declaration attaches maps created from GIS data in the AR to show the 2019 route network and habitat data from the AR to show the overlap.  Defendants do not object to the Bradley declaration as it does not introduce new information outside the record, but defendants do respond to that declaration with their own declaration, as discussed *infra*.

could use any type of riparian habitat in the planning area in a transitory manner. The proposed action will not affect individuals of these species during migration because of their transitory presence at any given site within the planning area and because provisions of the proposed action are generally protective of riparian habitat throughout the planning area.  The proposed action will not affect breeding least Bell's vireos at the Big Morongo Canyon Area of Critical Environmental Concern because the Bureau is not proposing any actions within this area in the West Mojave Plan; additionally, the focus of the Bureau's management direction for this area of critical environmental concern is the conservation of wildlife, including particularly migratory songbirds.

FWS 10452-10453 (2006 BiOp).  The BLM states that on remand from this Court (which did not directly involve the ESA claims), the agencies built on the relevant ESA analyses completed before 2006 and addressed changes since 2006.  *See* AR 17497 (2015 BLM Biological Assessment stating "The new BO will incorporate effects to federally endangered or threatened species and/or their critical habitat not previously considered or which may have changed since 2006, as well as any changes based on a proposed route network different from that proposed and adopted in 2006."); FWS 5348 (FWS 2019 BiOp "incorporating that discussion [2006 BiOp] by reference").  The BLM asserts that, consistent with that approach, BLM determined in 2015 that the proposed route network would have "no effect" on the three special status birds because no proposed routes would be within the birds' breeding or critical habitat.

The BLM asserts that plaintiffs' citations to the FSEIS and SEIS and reliance on the maps attached to the Bradley declaration are misplaced.  As to the cited portions of the FSEIS and SEIS, BLM asserts that those portions of record contained the BLM's "broader initial NEPA analysis intended to comply with NEPA's procedural mandate to identify any potential affected environment," and that "[f]or this broad-scale NEPA description of the impacted area, BLM used general data from the DRECP Species Distribution Model."  Defs' Reply at 22.  The BLM asserts that "these were not ESA findings," and that instead, for the ESA "no effect" determination, the BLM used more precise data from the California Natural Diversity Database ("CNNB") and critical habitat designations to determine potential impacts on the birds' breeding and critical habitat.

In response to plaintiffs' submission of the Bradley declaration, the BLM has submitted the declaration of Matthew Toedtli, who served as the project lead for the 2019 WEMO Route Network project and related adoption of amendments to the CDCA Plan.  Toedtli Decl. ¶ 2 (Dkt. No. 41-1). Toedtli states that when the BLM did the impact analysis leading to the "no effect" conclusion,

BLM "used the CNDDB and/or criterial habitat data, not the DRECP modeled data." *Id.* ¶ 5.  He

explains,

> 6.  The CNDDB and critical habitat data was used for these three species instead of modeled data because hard, collected data, such as the CNDDB and critical habitat data, is more accurate and therefore better than predictive data, such as the DRECP Species Distribution Modeled data.
>
> 7.  The DRECP Species Distribution Modeled (predictive) data was used to support Chapter 3, the Affected Environment section of the FSEIS.  Plaintiffs' declaration takes figures from FSEIS Appendix A, which supports Chapter 3, and enlarges the maps for these three species.   However, the Environmental Consequences portion of the EIS (Chapter 4) relied on the CNDDB and/or critical habitat data for these three species as indicated in the BA and BiOp. The impact analysis of Chapter 4 is consistent with the BA, and the BiOp.
>
> 8. In particular, with regard to the:
>
> a. **Southwestern Willow Flycatcher**: the attachment shows the distribution of critical habitat for the species and designated routes.  As is evident, there are no routes within the critical habitat for flycatcher. This map was taken from Figure 3.4.60 of the FSEIS and the overlay of predictive habitat from the DRECP Species Distribution Model was "turned off" to show the CNDDB and critical habitat data layers only.  Figure 1.1, "Southwestern Willow Flycatcher, California Natural Diversity Database and critical habitat, West Mojave Route Network Project Proposed/Selected Action (Alternative 5)" shows the extent of the flycatcher CNDDB habitat and critical habitat data with the Project Alternative 5 (the Selected Alternative) overlaid.  The 2015 Biological Assessment made the determination that flycatcher would not be impacted by the route network because of the lack of overlap with critical habitat (AR 017494-017495).  The FSEIS finds no overlap of the flycatcher CNDDB habitat data with the Selected Alternative.
>
> b. **Western Yellow Billed Cuckoo**: attachment Figure 2.1 "Western Yellow billed Cuckoo, California Natural Diversity Database, West Mojave Route Network Project Proposed/Selected Action (Alternative 5)" shows the extent of the Cuckoo CNDDB habitat data with the Project Alternative 5 (the Selected Alternative) overlaid (no critical habitat in the area).  The cuckoo was listed in November 2014, and the 2015 Biological Assessment made the determination that cuckoo would not be impacted by the route network because of the lack of overlap with critical habitat (AR 017494-017495).  The FSEIS finds no overlap of the cuckoo CNDDB habitat data with the Selected Alternative.
>
> c. **Least Bell's Vireo**: the attachment Figures 3.1-3.4. "Least Bell's Vireo California Natural Diversity Database, West Mojave Route Network Project Proposed/Selected Action (Alternative 5)" shows the extent of the Vireo CNDDB habitat data with the Project Alternative 5 (Selected Alternative) overlaid (no critical habitat in the area). BLM further analyzed any proposed routes within the CNDDB data for the vireo to verify any intersection with breeding habitat. The small amount of non-breeding habitat crossed by a small .5-mile section of designated route is explained in the BA (AR 017495).

*Id.* ¶¶ 6-8.

"An agency may avoid the consultation requirement only if it determines that its action will

have 'no effect' on a listed species or critical habitat." *Karuk Tribe*, 681 F.3d at 1027. "'[M]ay affect' is a 'relatively low' threshold for triggering consultation. '*Any* possible effect, whether beneficial, benign, adverse or of an undetermined character,' triggers the requirement." *Id.* at 1027 (internal citations omitted, emphasis in original, quoting *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009)). "[A]ctions that have any chance of affecting listed species or critical habitat — even if it is later determined that the actions are 'not likely' to do so — require at least some consultation under the ESA." *Id.* at 1027. "Consultation under the ESA may be formal or informal." *Id.* at 1029. "Formal consultation requires preparation of a biological opinion detailing how the agency action affects listed species or their critical habitat, but informal consultation need be nothing more than discussions and correspondence with the appropriate wildlife agency." *Id.* "If the wildlife agency agrees during informal consultation that the agency action 'is not likely to adversely affect listed species or critical habitat,' formal consultation is not required and the process ends." *Id*. (quoting 50 C.F.R.. § 402.13(a)). "To determine whether the BLM's no effect determination was arbitrary and capricious, we must decide whether the BLM 'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (*quoting Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003)).

The Court concludes that the record shows that in reaching its "no effect" determination, the BLM "'considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Kraayenbrink*, 632 F.3d at 496. The administrative record shows that the BLM and the FWS engaged in some consultation regarding the BLM's prior "no effect" determination and that FWS explicitly agreed with that assessment in the 2006 BiOp, and the BLM relied on the same methodology in 2019 to conclude that there would be "no effect" on the three listed birds. Plaintiffs have not pointed to anything new in the administrative record, such as new scientific studies or new OHV routes impacting the three birds, that would require a different approach. In connection with the 2006 BiOp, the FWS agreed with BLM's "no effect" determination for two of the listed migratory birds, and in reaching that conclusion explicitly emphasized (1) breeding locations as important; (2) the fact that "[t]he proposed action will not

82

affect individuals of these species during migration because of their transitory presence at any given site within the planning area"; and (3) that the proposed action was "generally protective of riparian habitat throughout the planning area."  FWS 10452.  In the absence of changed circumstances or new data, it was rational for the BLM to adopt the same approach in 2015 for all three migratory birds and to consider the same relevant factors – breeding and critical habitat – when determining whether the proposed network may affect the listed species.  Regarding the 0.5 mile of Least Bell's Vireo critical habitat that intersects with a designated route, the BLM's BA found "no effect" because this route already existed on the ground and thus "no new disturbance of habitat will be needed to maintain this motorized route.  In other words, this route was part of the preexisting 2006 OHV network, which the BLM and FWS had already determined would cause "no effect" to the species.  On this record, the Court concludes that the BLM's "no effect" determinations were rational and based on relevant factors.  *See Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 924-26 (9th Cir. 2018) (upholding "no effect" determination where even though steelhead salmon would be exposed to copper concentrations as a result of discharge into river, agency concluded that discharge from project would be lower than background concentration); *cf. Karuk Tribe*, 681 F.3d at 1028 (holding Forest Service was required to consult with federal wildlife agencies before allowing mining to proceed in critical habitat of listed species where, *inter alia*, record showed that Forest Service biologists had determined that miners' compliance with certain protocols "should 'reduce'—not eliminate—'the impacts to anadromous fisheries").

Plaintiffs contend that the BLM's explanation of how it reached its "no effect" determination is a "post-hoc" determination that is not found in the administrative record.  The Court disagrees, and finds that the explanation in Toedtli's declaration is consistent with the BLM's 2015 Biological Assessment and thus is not a "post-hoc" rationalization.  The declaration provides further detail on how the BLM reached its conclusions, including which habitat data and maps in the administrative record that the BLM considered, and it is directly responsive to the Bradley declaration and the maps attached thereto.  *See also San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 992  (stating "a reviewing court may consider extra-record evidence where admission of that evidence . . . is necessary to determine 'whether the agency has considered all relevant factors and has explained

1    the decision'").

2

3    **B.      No Jeopardy Conclusion for Desert Tortoise**

4         Plaintiffs argue that the FWS violated the ESA by failing to properly assess the proposed

5    action's impacts on the desert tortoise.  "The ESA permits federal agencies to authorize actions that

6    will result in the taking of endangered or threatened species only if the projected take 'is not likely

7    to jeopardize the continued existence of' any listed species." *Turtle Island Restoration Network v.*

8    *United States Dep't of Com.*, 878 F.3d 725, 735 (9th Cir. 2017)  (quoting 16 U.S.C. § 1536(a)(2)).

9    "*Jeopardize the continued existence of* means to engage in an action that reasonably would be

10   expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and

11   recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that

12   species." 50 C.F.R. § 402.02 (emphasis added).

13        The FWS's 2019 BiOp concluded that the 2019 Route Network was not likely to jeopardize

14   the survival and recovery of the desert tortoise.  The jeopardy analysis relied on four components:

15            1) the Status of the Species, which describes the rangewide condition of the species,
             the factors responsible for that condition, and its survival and recovery needs; 2) the
16           Environmental Baseline, which analyzes the condition of the Covered Species in the
             action area, the factors responsible for that condition, and the relationship of the
17           action area to the survival and recovery of the Covered Species; 3) the Effects of the
             Action, which determines the direct and indirect impacts of the proposed Federal
18           action and the effects of any interrelated or interdependent activities on the Covered
             Species; and 4) the Cumulative Effects, which evaluates the effects of future, non-
19           Federal activities in the action area on the Covered Species.

20   FWS 5357.

21        In the section on the status of the species and its critical habitat, FWS discussed, *inter alia*,

22   the listing history, recovery plan, ecology and life history of the desert tortoise, its geographic

23   distribution, and threats facing the species.  *Id.* at FWS 5358-5380.  To establish the environmental

24   baseline of the desert tortoise, the FWS focused on the Western Mojave Recovery Unit because

25   most of the action area is within that unit.  *Id.* at FWS 5387.  The FWS based its estimates on range-

26   wide sampling done between 2004 and 2014 in conservation areas within that unit.  *Id.* at FWS

27   5387-5388.  The FWS stated that it "[g]enerally expected that desert tortoises occur at lower

28   densities outside of conservation areas," although it "was aware of a few instances of higher

United States District Court
Northern District of California

densities." *Id.* at FWS 5387.  Overall, the sampling showed that the number of desert tortoises had declined by approximately 50% from 2004 to 2014 in the Western Mojave Recovery Unit and four critical habitat units within the action area:

**Table 7: Summary of range-wide sampling for the Western Mojave Recovery Unit and the critical habitat units within the action area.**

| Recovery Unit/Critical Habitat Unit | Surveyed Area (km²) | 2014 Density | 2004 Abundance | 2014 Abundance | Change in Abundance |
|---|---|---|---|---|---|
| Western Mojave Recovery Unit | 6,294 | 2.8 | 35,777 | 17,644 | -18,133 |
| Fremont-Kramer Critical Habitat Unit | 2,347 | 2.6 | 12,251 | 6,196 | -6,055 |
| Superior-Cronese Critical Habitat Unit | 3,094 | 2.4 | 19,216 | 7,398 | -11,818 |
| Ord-Rodman Critical Habitat Unit | 852 | 3.6 | 7,036 | 3,064 | -3,972 |
| Pinto Mountains Critical Habitat Unit | 508 | 2.4 | 3,126 | 1,241 | -1,885 |

*Id.* at FWS 5388; *see also id.* at FWS 5369 (BiOp Table 1, citing 2018 study estimating change in desert tortoise abundance by extrapolating densities within conservation areas to all modeled habitat of desert tortoise, showing 50% decline in Western Mojave Recovery Unit from 131,540 desert tortoises in 2004 to 64,871 desert tortoises in 2014).  In its discussion of the status of the species, the FWS stated that the density of adult tortoises per square mile in the Western Mojave Recovery

United States District Court
Northern District of California

Unit had declined from approximately 5.7 adults per square kilometer in 2004 to 2.8 adults per square kilometer in 2014, and that the 2014 density was below the minimum density (3.9 adult animals per square kilometer) "recommended to avoid extinction in the 1994 recovery plan." *Id.* at FWS 5370.[36]  The FWS also found that in the Western Mojave Recovery Unit "the relative number of juveniles to adults indicates that juvenile numbers are declining faster than adults."  *Id.* at FWS 5370[37]; *see also id.* at FWS 5373-5381 (discussing status of desert tortoise critical habitat).

The FWS next evaluated the indirect and direct effects of the action, and agreed with the FSEIS' summary of the deleterious effects of OHV use on desert tortoises, stating that "OHV vehicles and routes can":

> 1.  Have adverse effects to individuals due to vehicle strikes, and reduce the occurrence of desert tortoises near routes;
>
> 2.  Occupy land area that would otherwise be occupied by desert tortoises;
>
> 3.  Introduce and spread invasive non-native plants;
>
> 4.  Change fire cycles because of increase prevalence of invasive annual grasses;
>
> 5.  Attract subsidized predators, such as common ravens, and allow dogs to have access to sensitive areas;
>
> 6.  Allow access for illegal dumping, vandalism, collection of desert tortoises, abandonment of captive desert tortoises; and off-highway vehicle use of unauthorized areas;
>
> 7.  Create edge effects due to water runoff that attract desert tortoises to routes; and
>
> 8.  Cause population fragmentation and reduced patch size.

*Id.* at FWS 5390.  The FWS considered this list to "include those effects that are reasonably certain to occur," and based its analysis on those effects.  *Id.* at FWS 5391.  The FWS also found that the following adverse effects to desert tortoise critical habitat was "reasonably certain to occur" as a

---

[36]  The 2019 BiOp states that the 2004-2014 declines in abundance and density within the Western Mojave Recovery Unit are similar to declines in most of the other recovery units.  FWS 5369-5370.

[37]  The BiOp cited an FWS 2015 report for the statement that "the relative number of juveniles to adults indicates that juvenile numbers are declining faster than adults," without quantifying that decline.  FWS 5370.  The BLM's October 2019 Errata, which added information to the FSEIS, cited the 2018 Allison and McLuckie study for the proposition that the proportion of juveniles had declined by 91% between 2004-2014 in the WEMO.  AR 204954.

result of the proposed action:

> 1. Occupy land are that would otherwise be occupied by desert tortoises.
>
> 2. Remove vegetation and compact soil, thus reducing available forage and substrate for burrow construction shelter when a new road or staging area forms;
>
> 3. Change local hydrology;
>
> 4. Introduce and spread invasive non-native plants;
>
> 5. Change fire cycles because of increasing prevalence of invasive annual grasses;
>
> 6. Create edge effects adjacent to roads; and
>
> 7. Proliferate disturbance due to vehicles operating off of designated routes.

*Id.* at FWS 5399-5400. The FWS also acknowledged,

> Within critical habitat of the desert tortoise, we acknowledge that more routes generally occur in areas with a higher probability of supporting desert tortoises than in areas with lower probabilities (greater or lesser than 0.5 in the Nussear *et al* 2009 model). See Table 4.4-3.1 Toedtli (2019).[38]  Areas with a higher proportion of habitat features that are favorable to desert tortoises generally support more desert tortoises.  Consequently, off-highway vehicle use poses a greater threat in the conservation areas, which comprise approximately 34.3 percent of the action area. . . .

*Id.* at FWS 5398.[39]

The FWS concluded that the proposed action would result in the loss – or "take" – of eight adult desert tortoises annually.  *Id.* at FWS 5406.  The FWS concluded that "the loss of 8 desert tortoises annually and 40 by 2024 through casual use of the route network in the action area is not likely to appreciably reduce the number of desert tortoises in the Western Mojave Recovery Unit" because "[t]he loss of 8 desert tortoises at this time represents approximately 0.07 percent of the estimated number of large desert tortoises" and "40 desert tortoises by 2024 represents approximately 0.46 percent of the estimated number of large desert tortoises within [the] conservation areas . . . ."  *Id.* at FWS 5406.[40]  FWS also found that because the proposed action

---

[38]  The citation to "Toedtli (2019)" is a citation to a table of Errata contained revised data for the FSEIS.  FWS 5348.

[39]  The FWS also considered "cumulative effects" as part of its jeopardy analysis. "Cumulative effects" are effects of future state or private activities not involving federal activities, and the FWS stated it was unaware of any such activity in the action area.  FWS 5404.

[40] As noted *supra*, the FWS assumed that the current trend of approximately 50% decline

United States District Court
Northern District of California

would not result in the creation of new OHV routes, "the proposed action would not cause the loss of habitat and any change in the distribution of the desert tortoise for that reason." *Id.* at FWS 5407.

### 1.    Best Available Science

Plaintiffs argue that the FWS's BiOp ignores two key studies regarding desert tortoises, and therefore violated the ESA's requirement to base its determination on the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), as well as its obligation to "examine the relevant data." *State Farm*, 463 U.S. at 42.  The two studies cited by plaintiffs are (1) Michael Tuma *et al.*, *Modeling Agassiz's Desert Tortoise Population Response to Anthropogenic Stressors*, 80 J. WILDLIFE MGMT. (2016), FWS 27223-27238; and (2) Kristin Berry *et al.*, *Protection Benefits Desert Tortoise (Gopherus agassizi) Abundance: The Influence of Three Management Strategies on a Threatened Species*, 28 HERPETOLOGICAL MONOGRAPHS 66-92 (2014), AR 17212-17239. Plaintiffs contend that if FWS had addressed these studies, the agency might have determined that far fewer OHV routes were necessary in order to protect the desert tortoise because these studies show that OHV use is associated with the most "precipitous" decline of desert tortoises and that exclusion of OHVs is critical to tortoise conservation.

Defendants argue that FWS did not need to consider these studies because the FWS's 2011 Revised Recovery Plan is the most comprehensive review of all threats to the desert tortoise. Defendants note that the 2011 FWS Revised Recovery Plan for the desert tortoise "lists multiple reasons for the tortoise's decline," including off-highway vehicle activity and grazing, "but does not identify OHVs and grazing as 'primary' causes of decline."  Defs' Mtn. at 39 (citing the 2011 Revised Recovery Plan at FWS 11086).  Defendants also argue that the Berry and Tuma studies "merely reinforce the unremarkable and universally accepted position that OHV use and poorly managed grazing adversely affects tortoise survival and recovery." *Id.* at 40.  Defendants assert that

---

from 2004-2014 would continue from 2014 until 2024, and extrapolated numbers of large desert tortoises in conservation areas of the Western Mojave Recovery Unit, showing a projection of 17,645 large desert tortoises in 2014 declining to 8,702 large desert tortoises in 2024.  FWS 5405-5406.  The FWS used these numbers to reach the .07% and .46% calculations.

1   FWS acknowledged these adverse impacts and reasonably determined that, while adverse impacts

2   will continue with OHV use and limited grazing, the 2019 Route Project would not jeopardize the

3   tortoise or result in adverse modification of critical habitat because the Project maintained or

4   improved existing tortoise conservation measures.

5          "A biological opinion may [] be invalid if it fails to use the best available scientific

6   information as required by 16 U.S.C. § 1536(a)(2)."  *Pac. Coast Fed'n of Fishermen's Ass'n, v.*

7   *Nat'l Marine Fisheries Serv.*, 265 F.3d at 1034; *see also* 16 U.S.C. § 1536(a)(2) (". . . In fulfilling

8   the requirements of this paragraph each agency shall use the best scientific and commercial data

9   available.").  "The purpose of this standard 'is to prevent an agency from basing its action on

10   speculation and surmise.'"  *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1066-67 (9th Cir.

11   2024) (quoting *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995).  "An agency complies

12   with the best available science standard so long as it does not ignore available studies, even if it

13   disagrees with or discredits them."  *San Luis & Delta Mendota Water Auth.*, 776 F.3d at 995.

14   "Essentially, FWS cannot ignore available biological information."  *Kern Cnty. Farm Bureau v.*

15   *Allen*, 450 F.3d 1072, 1080-81 (9th Cir. 2006) (internal quotation marks omitted).  "[T]o succeed

16   on a best-available-science claim, a plaintiff must not only identify relevant scientific evidence that

17   the agency ignored, but show that it 'is in some way better than the evidence [the agency] relies

18   on.'"  *Nat. Res. Def. Council*, 102 F.4th at 1067 (quoting *Locke*, 776 F.3d at 995); *see Ctr. for*

19   *Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (plaintiff showed that agency

20   failed to acknowledge scientific data that "contradicted" the agency's scientific conclusion).

21          The Court concludes that by failing to address the Tuma and Berry studies, FWS violated its

22   obligation to insure that its no jeopardy determination was based on "the best scientific and

23   commercial data available," 16 U.S.C. § 1536(a)(2).  As an initial matter, both studies post-date the

24   2011 Revised Recovery Plan, and thus were not considered in that plan.  The Tuma study (2016)

25   used different models to estimate the effect of various threats on desert tortoise populations in the

26   Superior-Cronese critical habitat area of the WEMO and in one area outside the WEMO.  FWS

27   27226.  The study stated that previous threat reviews were discussed in FWS's 2011 Revised

28   Recovery Plan, as well as a 2002 U.S. Geological Survey and in a 2004 Desert Tortoise Recovery

United States District Court
Northern District of California

Plan Assessment, and that these reviews did not "prioritize the importance of the threats," which "constrains the ability of land managers to implement targeted conservation measures." *Id.* at FWS 27224. The goal of the Tuma study was to "prioritize local threats in site-specific conservation areas using a spatially explicit individual-based population model to overcome the limitations that have characterized earlier threats analyses . . . ." *Id.* Researchers evaluated a range of threats such as off-highway vehicle use, urbanization, agriculture, energy development, military training, mining, livestock grazing, predation by ravens, respiratory tract disease, collection by humans for pets or consumption, and collisions with vehicles on paved or unpaved roads. *Id.* at FWS 27223. The study concluded that for the Superior-Cronese study area, the "human presence threat model" – which included off-highway vehicle use – "caused the most precipitous and significant decline" because, in part, of "the proliferation of roads and off-highway vehicle routes in and adjacent to the study areas." *Id.* at FWS 27234. The Tuma study recommended that "managers should focus on reducing human access to this conservation area and making it more remote, particularly in areas identified as having higher tortoise occurrence potential," specifically by "closing and restoring routes and trails, limiting recreational permits, and increasing law enforcement to prevent illegal activities. Off-highway vehicle events should be prohibited within the conservation area." *Id.* at FWS 27235.

In the BiOp section on "Threats," FWS discussed the 2011 Revised Recovery Plan and listed various threats to the species including OHV activity, and then stated that it "remain[ed] unable to quantify how threats affect desert tortoise populations," and that it was continuing to study the issue. FWS 5361. However, the Tuma study specifically analyzed a range of threats facing the desert tortoise and arrived at conclusions about how to prioritize those threats, with "human presence" posing the greatest threat, followed by "subsidized predator," then "disease," and finally "land in-holdings." FWS 27235. Thus, the Tuma study directly addressed an issue about which FWS had expressed uncertainty in the BiOp. The Court does not hold FWS was required to adopt the findings of the Tuma study. However, "[a]n agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them." *San Luis & Delta Mendota Water Auth.*, 776 F.3d at 995.

United States District Court
Northern District of California

1       The same is true of the Berry study.  The Berry study (2014) evaluated three contiguous

2   areas of the WEMO with different land-use histories and management strategies: (1) the Desert

3   Tortoise Research Natural Area, which was the "most protected"; (2) "moderately protected" critical

4   habitat in two ACECs and one management area; and (3) private lands, the "least protected."  AR

5   17214, AR 17216.  The study was based on field team surveys conducted in 2011, and the

6   researchers' objectives were to, *inter alia*, "compare tortoise abundance and other population

7   attributes in 2011," "identify natural and anthropogenic factors positively or negatively associated

8   with tortoise abundance in 2011," "evaluate differences in mammalian and avian predators in 2011,"

9   and "discuss factors relevant to future recovery efforts for tortoises and their habitats."  *Id.* at AR

10  17215.  The study's authors found that "the management area with the longest history of protection,

11  a fence, and legal exclusion of livestock and vehicles [the Desert Tortoise Research Natural Area]

12  had significantly more live tortoises and lower death rates than the other two [management] areas."

13  *Id.* at AR 17213.  In addition, the study found that despite the emergence of a chronic, infectious

14  disease throughout the Western Mojave – one of the other threats noted in previous studies – adult

15  tortoise densities at the Tortoise Natural Area were "significantly higher than in critical habitat not

16  only in [the] study area but also through the West Mojave Recovery Unit" due to "the protective

17  fence and elimination of grazing and vehicle use."  *Id.* at AR 17233; *see also id.* at AR 17255 (stating

18  densities of 10.2 tortoises/km$^2$ for Tortoise Natural Area, 2.4 for critical habitat, and 3.7 for private

19  land).  The study also found, *inter alia*, that the "high death rates in critical habitat were of particular

20  concern[.]"  *Id.* at AR 17231.

21      The FWS reached its "no jeopardy" conclusion based on the fact that the 2019 Route

22  Network did not create any new routes (and therefore no additional ground disturbance), and

23  because of measures such as possible eventual rehabilitation of TLDs; imposing distance restrictions

24  on parking, stopping and camping; and BLM's "adaptive management program."  FWS 5404-5409.

25  However, if FWS had considered the Berry study's findings about the significant positive impacts

26  of exclusion of OHVs and grazing, as well as the low tortoise density and high death rates in

27  "moderately protected" critical habitat, FWS might well have concluded a smaller and/or differently

28  configured OHV route network was required in order to avoid jeopardy to the species and its critical

United States District Court
Northern District of California

1    habitat, particularly in light of its acknowledgement that the 2019 route network included thousands

2    of miles of OHV routes in desert tortoise conservation areas and that a significant portion of those

3    miles were in "areas with a higher probability of supporting desert tortoises."  FWS 5398.

4

5                        **2.    Recovery**

6          Plaintiffs also contend that the BiOp fails to meaningfully address recovery of the desert

7    tortoise.  With regard to recovery, the BiOp states,

> The proposed action would not remove all threats to the desert tortoise that may result
> from casual use of the proposed route network.  However, the proposed plan
> amendments would contribute to a broad recovery strategy for the desert tortoise
> with regard to casual use of the route network in the Western Mojave Recovery Unit.
> Important components of a recovery strategy include reducing the losses of desert
> tortoises and their habitat.  Permitting stopping, parking, and camping only in
> disturbed areas would ensure that use of the route network does not lead to additional
> habitat loss.  The designation of transportation linear disturbances and their
> rehabilitation would decrease effects of a route network, such as the spread of non-
> native plants.  Finally, the adaptive management program for implementing the route
> network would enable the Bureau to adapt its methods for remediating issues as they
> arise.  For these reasons, we conclude that the proposed action is not likely to
> adversely affect recovery of the desert tortoise.

15   FWS 5407.

16         Plaintiffs argue that although the BiOp acknowledges that desert tortoise numbers and

17   densities have significantly declined since the species was listed, and that various negative impacts

18   to the desert tortoise and its critical habitat were "reasonably likely to occur" as a result of the

19   proposed action, FWS never explains how the 2019 Route Network "will ensure" recovery of the

20   desert tortoise.  Pls' Reply at 35.  Plaintiffs emphasize the studies and surveys showing that the

21   desert tortoise is "sliding towards extinction."  Pls' Mtn. at 39 (citing FWS 5526, 2018 Allison and

22   McLuckie study, also referenced in the BiOp, which states that "The negative population trends in

23   most of the TCAs for Mojave Desert Tortoises indicate that this species is on the path to extinction

24   under current conditions.").  Plaintiffs assert that the FWS never explains how the BLM's

25   management actions will be sufficient to avoid jeopardy, and they emphasize that the BLM did not

26   make a firm commitment of restoration or other mitigation measures, nor did the FWS require any

27   such commitment in the BiOp.

28         Defendants contend that while the goal of the ESA is to recover listed species, the law does

United States District Court
Northern District of California

not require that each Section 7 consultation "ensure" recovery.  Instead, defendants argue that when evaluating an agency's proposed action, FWS must consider whether the action would "[j]eopardize the continued existence" of the species, which "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  Defs' Reply at 24 (quoting 50 C.F.R. § 402.02).

The Court agrees with defendants that the Section 7 consultation process is not required to "ensure" recovery, but rather that agencies are required to ensure that the proposed action is not likely to jeopardize recovery as set forth in the statute and the regulations.  The ESA, 16 U.S.C. § 1536(a)(2), provides,

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.S. § 1536(a)(2). The regulations define "[j]eopardize the continued existence" as "means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  The Ninth Circuit has held that "[u]nder the ESA, the agency must ensure against government action likely to jeopardize the continued existence of an endangered species or harming its habitat." *Alaska v. Lubchenco*, 723 F.3d 1043, 1054 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (Oct. 16, 2013) (citing 16 U.S.C. § 1536(a)(2)).  "[R]ecovery considerations are an important component of both the jeopardy and adverse habitat modification determinations." *Id.*  "Survival and recovery are intertwined and are the complementary goals of the consultation process," and the agency must "consider whether the proposed action, . . . could prevent the species from achieving the Recovery Plan's goals for delisting." *Id.*

1    Under this standard, the Court concludes that the FWS' "no jeopardy" conclusion is flawed

2    because it is premised to a large degree on unenforceable, non-specific commitments by the BLM

3    regarding mitigation and minimization measures through BLM's adaptive management program, as

4    well as enforcement by BLM.   "Mitigation measures relied upon in a biological opinion must

5    constitute a clear, definite commitment of resources," and "must be subject to deadlines or

6    otherwise-enforceable obligations; and most important, they must address the threats to the species

7    in a way that satisfies the jeopardy and adverse modification standards."  *Bernhardt*, 982 F.3d at

8    743 (internal quotation marks and citations omitted).  The FWS explained its conclusion that the

9    2019 Route Project would not jeopardize recovery by relying on limiting parking/stopping/camping

10    to previously disturbed areas – which must be enforced by BLM – and the BLM's adaptive

11    management program, which includes possible, eventual rehabilitation of TLDs and other

12    "potential" mitigation and minimization measures.  The  BiOp explicitly incorporates Appendix G

13    of the FSEIS and relies heavily on the BLM's statement of its adaptive management program and

14    the "possible minimization and mitigation measures [BLM] will employ as part of its management."

15    FWS 5354-5335 (incorporating Appendix G by reference, noting adaptive management and

16    specifically mentioning Table G-2 and "possible minimization and mitigation actions").  Appendix

17    G states that BLM's adaptive management program is dependent on "funding, staff, and partnership

18    opportunities." AR 101515.  Further, and as discussed *supra* in connection with the FLPMA claims,

19    Table G-2 – which is explicitly referenced several times in the BiOp – lists "Possible Minimization

20    and Mitigation Action(s)," AR 101488-101495.   While the listed actions would undoubtedly

21    promote recovery[41] all of the actions are "possible" or "potential."  *Id.*

22    Defendants cite portions of the FSEIS which they assert contain important conservation

23    measures for the desert tortoise, such as the designation of TLDs, and they assert that the FSEIS

24    "mandates" their rehabilitation, AR 103374, AR 103406."  Defs' Mtn. at 37 (citing AR 103374 and

25    AR 103406).  However, the cited pages of the FSEIS do not "mandate" the rehabilitation of TLDs.

26    

----

27    [41]  For example, under the category of "Tortoise Habitat – DT ACECs," Table G-1 lists 17 possible actions ranging from "install wildlife bypass" to "install fencing" to "route closure" to

28    "determine that no additional minimization and mitigation measure is needed based on site evaluation . . . ." AR 101490.

United States District Court
Northern District of California

AR 103374 states that route designations "would provide mechanisms to designate routes as available for use or as transportation linear disturbances," and AR 103406 contains Table 2.2.5, titled "Implementation Strategies for All Action Alternatives." That table lists different activities and the corresponding timing, such as "sign open route network" for Year 1, and "identify and place fencing in areas of concern," for Year 2. *Id.* With regard to rehabilitation, the table states,

> Rehabilitation priorities to be established based on immediacy of risk and the number of resources affected. Focus on routes within DT ACECs and CDNCLs, ACECs affecting listed cultural sites, riparian areas, areas with sensitive receptors, areas with sensitive species, and areas with erosion issues.

AR 103406. The corresponding timing for rehabilitation is "As needed when impacts are identified." *Id.* And as plaintiffs note, elsewhere in the FSEIS, BLM acknowledges that "[d]esignation of routes as transportation linear disturbances . . . may not result in recovery in the short-term, unless active rehabilitation efforts are taken." AR 103701. Thus, the FSEIS (and Appendix G thereto) does not commit the BLM to any particular timetable for rehabilitation of TLDs, and BLM's rehabilitation of TLDs (along with other aspects of its adaptive management program) is dependent on staffing, funding and partnership opportunities. "These noncommittal assurances cannot shoulder the government's burden to identify a 'clear, definite commitment of resources.'" *Bernhardt*, 982 F.3d at 746 (holding mitigation measures in a BiOp were inadequate where, *inter alia*, one mitigation measure "referenc[ed] 'possible' strategies, without selecting a mitigation measure from the incorporated list or committing [the entity] to carrying out any specific number of measures," and one mitigation measure described some "concrete strategies" that were "offered only as *examples* of possible strategies that could be taken" and did not commit the agency to carrying out specific actions); *see also W. Watersheds Project v. McKay*, No. 22-35706, 2023 WL 7042541, at *3 (9th Cir. Oct. 26, 2023) ("Identification of low water conditions depends on field visits, but the AMP provides no schedule or standard for such visits, providing only that they will occur 'as possible' and 'as the opportunity arises.' Absent a 'specific and binding plan[ ]' for these visits, it was arbitrary and capricious for FWS to rely on the effectiveness of the low water mitigation strategies in concluding that there would be no jeopardy."); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1153 (D. Ariz. 2002) (holding inadequate BiOp containing

95

"laundry list of possible mitigation measures").  In addition, as discussed in the next section with regard to the BiOp's Incidental Take Statement, the FWS's reliance on the BLM's list of "possible" mitigation measures, including rehabilitation of TLDs with no particular timetable or concrete commitment, is compounded by the fact that FWS did not include any enforceable reasonable and prudent measures and terms and conditions in the Incidental Take Statement.

Because the FWS relied on unenforceable, "possible" mitigation measures in the BiOp, the FWS's no jeopardy conclusion was arbitrary and capricious.  *See Bernhardt*, 982 F.3d at 748 ("The mitigation measures proposed in the BiOp are indefinite and do not constitute a 'clear, definite commitment of resources,' and FWS's reliance upon those measures to conclude that the polar bear's critical habitat would not be adversely modified by the Liberty project was arbitrary and capricious.").

### C.    Incidental Take Statement

Under Section 7 of the ESA, FWS is required to specify whether any "incidental taking" of protected species will occur as a result of the agency action.  *See* 16 U.S.C. § 1536(b)(4); *see also Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007).  "[T]he Incidental Take Statement's primary function is to authorize the taking of animals incidental to the execution of a particular proposed action."  *Allen*, 476 F.3d at 1036.

Plaintiffs raise two interrelated challenges to the ITS.  First, they contend that the ITS is invalid because it relies on an unsupported "surrogate" approach.  Second, they contend that the BiOp fails to specify any reasonable and prudent measures that are necessary to minimize impacts to the desert tortoise, and that the ITS lacks corresponding terms and conditions to implement those measures.

#### a.    Surrogate Approach/Monitoring

"When the FWS concludes that an action will not jeopardize the existence of a listed species or adversely modify its habitat, but the project is likely to result in incidental takings of listed species, the FWS must provide a written statement with the BiOp that authorizes such takings."

1    *Allen*, 476 F.3d at 1034 (citing 16 U.S.C. § 1536(b)(4)).  The Ninth Circuit has explained,

2
3        The Incidental Take Statement must: (1) specify the impact of the incidental taking
         on the species; (2) specify the "reasonable and prudent measures" that the FWS
         considers necessary or appropriate to minimize such impact; (3) set forth "terms and
4        conditions" with which the action agency must comply to implement the reasonable
         and prudent measures (including, but not limited to, reporting requirements); and (4)
5        specify the procedures to be used to handle or dispose of any animals actually taken.
         16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  As long as any takings comply with
6        the terms and conditions of the Incidental Take Statement, the action agency is
         exempt from penalties for such takings.  16 U.S.C. § 1536(o )(2).  Thus, a BiOp with
7        a no-jeopardy finding effectively green-lights the proposed action under the ESA,
         subject to the Incidental Take Statement's terms and conditions.  *See Bennett v.*
8        *Spear*, 520 U.S. 154, 169–71, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (noting that,
         while a BiOp is technically advisory only, an agency disregards the BiOp "at its own
9        peril").

10       However, the ESA's implementing regulations require the agencies completing the
         project to report back to the FWS on the action's progress and its impact on the
11       species "[i]n order to monitor the impacts of incidental take."  50 C.F.R.
         § 402.14(i)(3).  The agency must immediately reinitiate consultation with the FWS
12       if the amount or extent of incidental taking is exceeded. 50 C.F.R. §§ 402.14(i)(4),
         402.16(a)

13   *Id*. at 1034-35.

14       Section 7's implementing regulations provide that when specifying "the impact of incidental

15   taking as the amount or extent of such taking," the agency may use a "surrogate."  The regulation

16   states,

17       (i) Incidental take.

18           (1) In those cases where the Service concludes that an action (or the
         implementation of any reasonable and prudent alternatives) and the resultant
19       incidental take of listed species will not violate section 7(a)(2), . . . the Service will
         provide with the biological opinion a statement concerning incidental take that:
20
21               (i) Specifies the impact of incidental taking as the amount or extent
             of such taking.  A surrogate (e.g., similarly affected species or habitat or
22           ecological conditions) may be used to express the amount or extent of
             anticipated take, provided that the biological opinion or incidental take
23           statement:  Describes the causal link between the surrogate and take of the
             listed species, explains why it is not practical to express the amount or extent
24           of anticipated take or to monitor take-related impacts in terms of individuals
             of the listed species, and sets a clear standard for determining when the level
25           of anticipated take has been exceeded;

26   50 C.F.R. § 402.14(i)(1)(i).

27       The BiOp's ITS states that it is adopting a "surrogate" approach, and addresses the three

28   regulatory conditions for the use of a surrogate:

97

The implementing regulations for section 7(a)(2) clarify that the Service may use surrogates to express the amount or extent of anticipated take when "exact numerical limits on the amount of anticipated incidental take may be difficult" (80 FR 26832). The implementing regulations (50 CFR 402.14(i)(1)(i)) require that the Service meet three conditions for the use of a surrogate. To use a surrogate, the Service must:

1. *Describe the causal link between the surrogate and take of the listed species*: We are not aware of any research that addresses the ratio of found carcasses to the actual number of mortalities for desert tortoises. In an amendment to a previous biological opinion (Service 2007), we estimated that eight desert tortoises likely died per year in the Western Mojave Recovery Unit because of casual use[42] of the route network, based on our professional judgment. In that same amendment, we also anticipated that desert tortoises were also likely to die because of livestock grazing and casual use not associated with routes. We acknowledged that we would not detect every mortality and required that the Bureau reinitiate formal consultation if it found three desert tortoises that died because of livestock grazing and casual use related to mining and the route network in any 12-month period. The amount of conservation activity with regard to the desert tortoise in the Western Mojave Recovery Unit has increased substantially since 2007. The Bureau and conservation organizations are routinely conducting restoration work; other crews are monitoring desert tortoises and common ravens. For this reason, we expect the biologists and other field workers will find more desert tortoises that have died because of casual use of the route network than in the past. Consequently, we consider the finding of four large desert tortoises that died because of casual use of the route network as a reasonable surrogate. Please refer to the discussion on page 11 of this biological opinion for a full explanation of the use of four large desert tortoises as a trigger for re-initiation of formal consultation.[43]

---

[42] The BiOp states that "'Casual use' refers to individuals using routes designated as open; these non-commercial uses do not require individual authorization from the Bureau." FWS 5349.

[43] The Court could not locate any such discussion on page 11 of the BiOp. However, pages 8-10 of the BiOp contain a section titled "Monitoring" that discusses the issue. *See* FWS 5355-5357. That section states, in relevant part:

In many consultations, the Federal agency is proposing to disturb a specific area of habitat over a defined time. The Federal agency and Service can then estimate the number of individuals of the listed species in that area and assess, in a reasonably direct manner, the effects of the proposed action, including the affected number of individuals of the listed species. In this case, the Bureau is not proposing to disturb a specific area of habitat over a defined time. The activities on which it is consulting are restricted to previously disturbed areas and will occur over time. However, desert tortoises are mobile; they can enter routes and the previously disturbed areas on which the Bureau proposes to allow stopping, parking, and camping. For this reason, off-highway vehicles threaten desert tortoises in a less predictable manner.

For these reasons, monitoring using standard protocols is not reasonable. Therefore, the Service and Bureau have agreed that the Bureau will require all of its permittees, contractors, employees, and field crews to notify it whenever they detect a dead or injured desert tortoise. Upon receiving the notification, the Bureau and Service will discuss whether the incident resulted from casual use or from a special permit or right-of-way grant.

*Id.* at 5355-5356. The "Monitoring" section also explains why FWS specified "large" desert tortoises (180 millimeters or larger) versus smaller tortoises and states that FWS continued to

2. *Describe why it is not practical to express the amount of anticipated take or to monitor take-related impacts in terms of individuals of the listed species*:  The Bureau cannot monitor the route network in a practical or reasonable manner that would allow it to find most desert tortoises that die because of collisions with vehicles. Scavengers remove the carcasses of any animal soon after death.  Additionally, the network is too large and the Bureau cannot predict where use will occur in relation to where desert tortoises are likely to be active.

3. *Set a clear standard to determine when the proposed action has exceeded the anticipated amount or extent of the taking*:  The Bureau will re-initiate formal consultation when it finds four large desert tortoises that have likely died because of casual use of the route network in a calendar year.

Accordingly, we establish the surrogate of four large desert tortoises found dead in a calendar year because of casual use of the route network as described in the final supplemental environmental impact statement, errata (Toedtli 2019), and this biological opinion.

FWS 5411-5412.

Plaintiffs challenge the ITS's use of a surrogate of four dead desert tortoises as "nonsensical" because it relies on an approach – finding dead tortoises – that the FWS had concluded was impractical.  Plaintiffs emphasize that #2 in the ITS explicitly states that BLM "cannot monitor the route network in a practical or reasonable manner that would allow it to find most desert tortoises that die because of collisions with vehicles" because scavengers remove the carcasses "soon after death" and because "the network is too large" and therefore that the BLM "cannot predict where use will occur in relation to where desert tortoises are likely to be active."  FWS 5411.  Plaintiffs argue that it is arbitrary and capricious for the FWS to explain the need for a surrogate by stating that monitoring will not detect eight large dead desert tortoises in a year, when the agreed-upon surrogate does not require any specified or formal monitoring, and instead relies upon BLM agents and conservation field workers encountering four large dead desert tortoises in the course of conducting their work.  Plaintiffs assert that the FWS could have chosen a surrogate that could be more easily monitored, such as one based on habitat or ecological conditions.  Plaintiffs argue that as a result, the BiOp violates the regulation's requirement that an ITS "set[] a clear standard for determining when the level of anticipated take has been exceeded" as required for the use of a surrogate.  50 C.F.R. § 402.14(i)(1)(i).   Plaintiffs also argue that by not requiring formal monitoring to establish

---

believe (in accordance with its 2007 determination) that eight desert tortoises were likely to die annually because of casual use of the OHV network "[b]ased on our professional judgment, monitoring since that time, and discussions with the Bureau."  *Id*.

whether the take limit has been reached, the ITS provides no method by which FWS can measure its performance.

Defendants respond that the surrogate of four dead large tortoises is a "reasonable effort to (1) monitor the effects of the use of the route network on the species and (2) provide the necessary information to help determine if reinitiation of section 7 consultation is required." Defs' Reply at 26. Defendants assert that "BLM can and does find tortoises that die due to vehicle collisions," *id.* at 25, citing the BiOp at FWS 5405, which states "From 2007 through 2018 the Bureau (2014, 2015b, 2019c) found five desert tortoises that likely died because of casual use on the route network in the action area." FWS 5405. Defendants also state that they are unaware of science or data that would support using a different type of surrogate. With regard to monitoring, defendants argue that the protocol they adopted is reasonable and that it takes advantage of the increased presence of "numerous" BLM personnel working in the WEMO area. Defs' Mtn. at 42.[44] Under that protocol, BLM requires all of its permittees, contractors, employees, and field crews to notify the agency whenever they detect a dead or injured dead tortoise; when that occurs, BLM and FWS are required to confer to discuss whether the incident resulted from casual use or from a special permit or right-of-way grant; and BLM is required to report annually to FWS the results of its monitoring efforts. FWS 5355-5357 (description of monitoring), FWS 5409-5411 (ITS), FWS 5449 (reporting). Defendants assert that this protocol is reasonable and sound because it is essentially the same protocol that was explicitly set forth in the 2006 BiOp's ITS as a "term and condition" to implement Reasonable and Prudent Measure #1, which was "The Bureau must monitor its activities to ensure that the level of incidental take is commensurate with the analysis contained in the Biological Opinion." FWS 449-450 (2006 BiOp).

The Court concludes that FWS's surrogate approach is arbitrary and capricious because the underlying rationale is internally inconsistent and unsupported by the record. The FWS explained the need for a surrogate by stating that BLM cannot monitor the route network in a practical or

---

[44] The record does not contain information on how many BLM employees are currently working in the WEMO area. At the October 2023 hearing on this matter, defense counsel stated that 18 positions had been authorized, and that 16 or 17 employees were then employed.

United States District Court
Northern District of California

1    reasonable manner that would allow it to find most desert tortoises that die because of collisions

2    with vehicles, both because scavengers remove the carcasses of dead animals "soon after death" and

3    because the network is too large.  That statement, on its own, is reasonable and supported by the

4    record.  *See, e.g.*, FWS 5380 (BiOp citing a 2013 study which "noted that as many as 10 desert

5    tortoises are reported killed annually on paved roads within Mojave National Preserve" but that

6    "[b]ecause carcasses on roads are quickly removed by scavengers or destroyed by other vehicles,

7    we expect that more desert tortoises are killed on roads than are reported.").  However, it is then

8    unreasonable to select a surrogate of four dead tortoises, the discovery of which is dependent on

9    BLM employees and other individuals encountering the dead animals in the course of their work,

10   under essentially the same monitoring protocol from the 2006 BiOp that proved unworkable.

11   Indeed, defendants' assertion that the BLM can find dead tortoises that have been killed by casual

12   OHV use by citing to the fact that the BLM found a total of five dead tortoises from 2007-2018 –

13   the time period when the 2006 BiOp's monitoring protocol was in effect – undercuts the notion that

14   using the same general monitoring protocol will be effective.  Further, as plaintiffs note, while the

15   2006 BiOp explicitly required a monitoring protocol because monitoring was contained in a

16   reasonable and prudent measure and terms and conditions,[45] here the ITS does not contain any such

17   language.

18        The Court does not hold that FWS must use some other type of surrogate, such as relying on

19   habitat or other ecological conditions, although the Court notes that the regulatory language

20   contemplates that a surrogate is used when a number cannot be used.  *See* 50 C.F.R. § 402.14(i)(1)(i)

21   ("surrogate (e.g., similarly affected species or habitat or ecological conditions) may be used" when

22   "it is not practical to express the amount or extent of anticipated take or to monitor take-related

23   impacts in terms of individuals of the listed species.").  And it is possible that four dead large

24   tortoises in a calendar year is an appropriate number.  However, it is irrational to premise the use of

25   that "surrogate" on a monitoring protocol that relies upon essentially the same protocol that detected

26   five dead tortoises over an 11 year period.  *See* FWS 5405, FWS 5411, FWS 449-450.  Defendants

27

28        _____

          [45] The legal requirement to contain such measures is discussed in the next section.

United States District Court
Northern District of California

assert that some unspecified number of additional personnel will be present and thus that the monitoring will be more effective. However, given the limited efficacy of the prior monitoring protocol and the acknowledgment that "[s]cavengers remove the carcasses of any animal soon after death" and that "the [route] network is too large and the Bureau cannot predict where use will occur in relation to where desert tortoises are likely to be active," the current surrogate approach is arbitrary and capricious.

           b.      Reasonable and Prudent Measures and Terms and Conditions

       The ITS does not contain any reasonable and prudent measures ("RPMs") or terms and conditions to implement RPMs. In contrast, the 2006 BiOp contained two RPMs (one requiring BLM to monitor, and one requiring BLM to offer educational materials) as well as terms and conditions to implement the RPMs. FWS 449-451. Plaintiffs contend that an ITS must contain RPMs and terms and conditions, while defendants argue that there is no such legal requirement and that whether to include those items is entirely discretionary.

       Defendants do not cite any authority for their assertion that it is optional for an ITS to include reasonable and prudent measures and terms and conditions, and the Court concludes that defendants' position is contradicted by the plain language of the ESA, the implementing regulations, case law, and FWS's own Consultation Handbook. 16 U.S.C. § 1536(b)(4)(C) provides,

       (4) If after consultation under subsection (a)(2), the Secretary concludes that--

       . . .

       (C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

       the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that--

       (i) specifies the impact of such incidental taking on the species,

       (ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

       (iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

> (iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4)(C).  As this language demonstrates, FWS "shall" provide an ITS that "specifies the impact of" incidental take, "specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact," and "sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with . . . to implement the" reasonable and prudent measures.  *Id.*  While the language of the statute confers discretion on FWS to determine *what* the RPMs and terms and conditions are ("measures that the Secretary considers necessary or appropriate to minimize such impact"), the statute imposes a mandatory duty to provide ("shall provide") a "written statement" that contains the elements set forth in subsection (C)(i)-(iv).  "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."  *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171 (2016); *see also Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking.").

Similarly, the implementing regulation requires that an ITS contain RPMs and terms and conditions.  *See* 50 C.F.R. § 404.14(i) ("the Service *will* provide with the biological opinion a statement concerning incidental take that: . . . Specifies those reasonable and prudent measures . . . [and] Sets forth the terms and conditions . . .") (emphasis added); *see Nat. Res. Def. Council, Inc. v. James R. Perry*, 940 F.3d 1072, 1078 (9th Cir. 2019) ("The word 'will,' like the word 'shall,' is a mandatory term, unless something about the context in which the word is used indicates otherwise.") (internal citation omitted).

Ninth Circuit case law addressing the ITS requirement is in accord.  *See Allen*, 476 F.3d at 1034 ("The Incidental Take Statement *must*: (1) specify the impact of the incidental taking on the species; (2) specify the 'reasonable and prudent measures' that the FWS considers necessary or appropriate to minimize such impact; (3) set forth 'terms and conditions' with which the action agency must comply to implement the reasonable and prudent measures (including, but not limited to, reporting requirements) . . . .") (emphasis added); *see also Bennett*, 520 U.S. at 169-70 ("[T]he

1   Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency

2   to 'take' the endangered or threatened species *so long as it respects the Service's 'terms and*

3   *conditions*.'") (emphasis added). This is consistent with FWS's ESA Handbook, which explains,

> In issuing an incidental take statement, the Services provide a statement of
> anticipated incidental take with reasonable and prudent measures, as appropriate, to
> minimize such take. This statement provides an exemption from the taking
> prohibitions of section 9 only when the agency and/or applicant demonstrate clear
> compliance with the implementing terms and conditions. These terms and conditions
> implement reasonable and prudent measures designed to minimize the impact of
> incidental take on the species as described in the incidental take statement and are
> binding on the action agency. In preparing an incidental take statement, the Services
> are responsible for documenting the amount or extent of take anticipated; writing
> reasonable and prudent measures with implementing terms and conditions that are
> clear, precise, and enforceable; and including reporting requirements that assure
> timely compliance with the terms and conditions described.

FWS, Final ESA Section 7 Consultation Handbook, 4-48 (Mar. 1998).

Defendants assert that "BLM's proposed action required numerous recovery-based strategies that mitigate adverse impacts to the tortoise" and that "[a]s a result, FWS in its discretion, did not deem any additional measures necessary or appropriate to minimize the impact of the incidental taking." Defs' Mtn. at 43. Similarly, at the hearing on these motions, defense counsel asserted that RPMs and terms and conditions were not necessary because they were "baked into" the project.

The problem with this argument is that it conflates two independent and separate statutory obligations. Section 1536(a) requires that an agency insure that any action it carries out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species," 16 U.S.C. § 1536(a)(2). Section 1536(b) provides that even if the action will not jeopardize the species or modify its critical habitat, if the agency action is likely to result in "take" of the species, the FWS is required to issue a written statement specifying the impact of incidental take on the species and measures "to minimize such impact" and the terms and conditions to implement those measures. 16 U.S.C. § 1536(b)(4)(C). Thus, the two subsections serve different protective purposes for listed species, with subsection (a) insuring against jeopardy and adverse modification of critical habitat, and subsection (b) specifying the impact of incidental take and measures to minimize that impact. *See*

*Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) ("Thus, the ITS serves as a check on the agency's original decision that the incidental take of listed species resulting from the proposed action will not [jeopardize the continued existence of the species]").  Defendants' reading of the statute would render a portion of subsection (b) superfluous, because the agency could conclude, as it did here, that it need not issue any RPMs to minimize impact based on the FWS's assessment that the action agency was taking sufficient action not to jeopardize the species.  Further, as discussed *supra*, the BLM's minimization and mitigation measures are not enforceable nor are they sufficiently concrete.  Accordingly, the Court concludes that the ITS was arbitrary and capricious and otherwise contrary to the law because the surrogate approach was not supported by the record and because the ITS lacks RPMs and terms and conditions.

### D.    Scope of Agency Action and Action Area

The FWS stated in the BiOp that "[t]he federal action we are considering in this biological opinion is the proposed amendment of the California Desert Conservation Area Plan for the West Mojave Route Network Project."  FWS AR 5381.  The FWS defined the "action area" as the approximately 3.1 million acres of public lands managed by the BLM in the WEMO Planning Area, and discussed the effects of removing the route cap under PA-1 only with regard to the WEMO area "implementation level" decision.  FWS AR 5381-5382, 5351, 5391.

Plaintiffs contend that the plain language of the ROD does not limit PA-1's applicability to the WEMO planning area, and instead applies to the entire 25 million acre CDCA.  As a result, plaintiffs argue that FWS was required to evaluate how the removal of the route cap will affect listed species and their critical habitat throughout the entire CDCA.  Plaintiffs emphasize language in the ROD stating that "This ROD amends the CDCA Plan to: 1. Eliminate the CDCA Plan language restricting the existing route network to routes established before approval of the CDCA Plan in 1980."  AR 183523.  Plaintiffs also argue that it is the ROD that is the controlling final agency action, not the FSEIS, and thus it is the language of the ROD that controls.

Defendants argue that the AR demonstrates that the removal of the route cap in PA-1 applies only to the WEMO planning area.  At the hearing in response to questioning from the Court,

United States District Court
Northern District of California

1    defendants noted that the ROD itself states in the Introduction,

2        This Record of Decision (ROD) documents the BLM's selection of Alternative 5,
         Final Proposed Action (Selected Alternative), as modified below, from the
3        WMRNP's Final Supplemental Environmental Impact Statement (FSEIS) and
         Proposed Land Use Plan Amendment (LUPA). The Selected Alternative includes
4        both plan-level and implementation-level decisions. *It approves seven land use plan
         amendments to the motor vehicle access, recreation and livestock grazing elements
5        within the CDCA Plan for the WEMO planning area*.

6    AR 183522 (emphasis added); *see also* AR 103366 (FSEIS stating "If approved, the WMRNP

7    amendment to the Livestock Grazing, Motorized Vehicle Access (OHV use), and Recreation

8    Elements of the CDCA Plan, and the route designation process updates that would be incorporated

9    into the CDCA Plan, *would be applicable only to the BLM-administered public lands within the*

10   *planning area*.") (emphasis added). Defense counsel also stated that if BLM sought to apply the

11   PA-I amendment language outside of the WEMO Planning Area, BLM would be required to engage

12   in a separate decision-making process including a separate ESA review.

13       The Court concludes that based upon the language in the ROD describing the final proposed

14   action as "approv[ing] seven land use plan amendments . . . within the CDCA Plan for the WEMO

15   planning area," that PA-I only applies within the WEMO planning area, and thus that it was not an

16   error for the agencies to define the action area as limited to that geographic area. Although the

17   language from the ROD that is quoted by plaintiffs could be read as expansively applying to the

18   entire CDCA, that language must be read in conjunction with the introductory language in the same

19   document that limits PA-I to the "WEMO planning area."

20

21       **E.      BLM's Reliance on BiOp**

22       Section 7 of the ESA imposes an affirmative duty on a federal agency to ensure that any

23   action it carries out will not jeopardize the continued existence of any endangered or threatened

24   species or result in the destruction or adverse modification of critical habitat. *See* 16 U.S.C.

25   § 1536(a)(2). The BLM may rely on the Service's determination that an action is not likely to cause

26   jeopardy or adverse modification as long as that agency's reliance is not "arbitrary, capricious, an

27   abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also*

28   *Pyramid Lake Paiute Tribe of Indians*, 898 F.2d at 1415 ("A federal agency cannot abrogate its

United States District Court
Northern District of California

responsibility to ensure that its actions will not jeopardize a listed species; its decision to rely on a FWS biological opinion must not have been arbitrary or capricious.").

The parties agree that plaintiffs' claim that the BLM violated the ESA by relying on the Service's BiOp rises or falls with plaintiffs' challenge to the BiOp itself. Because the Court has concluded that the FWS's BiOp violated the ESA in several ways, the Court finds that the BLM has also violated the ESA.

**CONCLUSION**

For the reasons set forth above, the parties' cross-motions for summary judgment are GRANTED IN PART and DENIED IN PART. The Court sets a case management conference for November 22, 2024, to discuss further proceedings in this case regarding the remedy. The Court directs the parties to meet and confer prior to that conference to determine whether the parties can agree on either a resolution or a process for a resolution, and to submit a case management conference statement no later than November 15, 2024.

**IT IS SO ORDERED**.

Dated: October 22, 2024

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California

107